IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STATE OF OKLAHOMA, ex rel. Scott Pruitt, in his official capacity as Attorney General of Oklahoma,<br><br>       **Plaintiff,**<br><br>       v.<br><br>KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services; and TIMOTHY GEITHNER, in his official capacity as Secretary of the United States Department of the Treasury,<br><br>       **Defendants.** | No. 6:11-cv-00030-RAW |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

Introduction ............................................................................................................................. 1

Background .............................................................................................................................. 2

Standard of Review .................................................................................................................. 6

Argument:  Oklahoma Lacks Standing to Challenge the Minimum Coverage Provision ............... 6

I.      Oklahoma Cannot Sue the Federal Government to Exempt Its Citizens from
Federal Law ................................................................................................................. 6

II.     Oklahoma Has Alleged No Cognizable Injury to Its Own Interests as a State .................... 8

Conclusion ............................................................................................................................. 13

# TABLE OF AUTHORITIES

*Cases:*

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ............................................................................................... 7, 9

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ..................................................................................................... 6

*Florida v. Mellon,*
    273 U.S. 12 (1927) ....................................................................................................... 9

*Illinois Dep't of Transp. v. Hinson,*
    122 F.3d 370 (7th Cir. 1997) ..................................................................................... 11

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .............................................................................................. 10, 11

*Massachusetts v. Laird,*
    451 F.2d 26 (1st Cir. 1971) ........................................................................................ 11

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ................................................................................................ 7, 10

*Missouri v. Illinois,*
    180 U.S. 208 (1901) ..................................................................................................... 7

*New Jersey v. Sargent,*
    269 U.S. 328 (1926) ..................................................................................................... 7

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................................................... 10

*Nova Health Sys. v. Gandy,*
    416 F.3d 1149 (10th Cir. 2005) ................................................................................... 6

*Oregon v. Mitchell,*
    400 U.S. 112 (1970) ................................................................................................... 10

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ..................................................................................................... 6

*Texas v. ICC,*
    258 U.S. 158 (1922) ..................................................................................................... 7

*Cases (cont'd):*

*Texas v. United States,*
   523 U.S. 296 (1998)..................................................................................................9

*United States v. Raines,*
   362 U.S. 17 (1960)....................................................................................................6

*United States v. West Virginia,*
   295 U.S. 462 (1935)..................................................................................................9

*Virginia v. Sebelius,*
   702 F. Supp. 2d 598 (E.D. Va. 2010), *appeals pending*, Nos. 11-1057, 11-1058
   (4th Cir.)...................................................................................................................9

*Wyoming v. Lujan,*
   969 F.2d 877 (10th Cir. 1992) ..................................................................................7

*Wyoming v. United States,*
   539 F.3d 1236 (10th Cir. 2008) ..............................................................................10

**Federal Statutes:**

26 U.S.C. § 36B ...............................................................................................................4

26 U.S.C. § 45R ...............................................................................................................4

26 U.S.C. § 4980H ...........................................................................................................4

26 U.S.C. § 5000A ...............................................................................................1, 4, 12

26 U.S.C. § 5000A(a) ......................................................................................................6

26 U.S.C. § 5000A(e) ......................................................................................................5

26 U.S.C. § 5000A(f) .......................................................................................................5

42 U.S.C. § 300gg............................................................................................................4

42 U.S.C. § 300gg-1(a)....................................................................................................4

42 U.S.C. § 300gg-3(a)....................................................................................................4

42 U.S.C. § 300gg-11 ......................................................................................................4

42 U.S.C. § 300gg-12 ......................................................................................................4

*Federal Statutes (cont'd):*

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) ...................................................................................... 4

42 U.S.C. § 18031 ..................................................................................................................... 3

42 U.S.C. § 18071 ..................................................................................................................... 4

42 U.S.C. § 18091(a)(2)(A) ...................................................................................................... 5

42 U.S.C. § 18091(a)(2)(B) ...................................................................................................... 2

42 U.S.C. § 18091(a)(2)(F) .................................................................................................. 2, 5

42 U.S.C. § 18091(a)(2)(I) ....................................................................................................... 5

42 U.S.C. § 18091(a)(2)(J) ....................................................................................................... 3

*State Constitution and Statutes:*

OKLA. CONST. art. I, § 1 ........................................................................................................... 8

OKLA. CONST. art. II, § 5 ........................................................................................................ 11

OKLA. CONST. art. II, § 19 ...................................................................................................... 11

OKLA. CONST. art. II, § 37 ........................................................................................................ 8

*Miscellaneous:*

Dep't of Health & Human Servs., *Coverage Denied: How the Current Health
   Insurance System Leaves Millions Behind* (2009) ........................................................... 3

H.R. REP. NO. 111-443 (2010) .................................................................................................. 3

Letter from Douglas W. Elmendorf, Director, CBO, to John Boehner, Speaker,
   U.S. House of Representatives (Feb. 18, 2011) ................................................................. 5

## INTRODUCTION

Congress enacted the Patient Protection and Affordable Care Act ("Affordable Care Act") in response to a crisis in the interstate health care market.  The Act includes a series of measures tailored to that market to address economic conduct that has contributed substantially to that crisis.  It establishes new health insurance Exchanges where individuals and small businesses can pool their purchasing power to buy more affordable insurance.  It creates tax incentives for employers to purchase health insurance for their employees.  It offers subsidies and tax incentives for the poor and the middle class to obtain insurance.  It ends the industry practice of denying coverage, or charging more, to individuals because of pre-existing medical conditions, which has prevented many from obtaining affordable insurance.  And, in the provision at issue here, it will require individuals who are not otherwise exempt to obtain qualifying insurance or to pay a tax penalty with their income tax returns for 2014 and subsequent years.

The State of Oklahoma seeks to challenge this minimum coverage provision, 26 U.S.C. § 5000A.  Oklahoma bases its challenge on the State's recent enactment of an amendment to the Oklahoma Constitution that declares the State's disagreement with the federal statute.  The minimum coverage provision applies to Oklahoma residents, however, not to the State of Oklahoma itself.  It has been settled for decades that a state may not sue the federal government to declare its citizens exempt from federal regulation.  Nor may a state create standing simply by declaring that its citizens have rights that, in the abstract, conflict with federal law.  Oklahoma's challenge to the minimum coverage provision must be resolved instead in a live case that involves parties who have a concrete interest in the issue.

Reasonable minds can differ as to the wisdom of the policy judgments that Congress made in enacting the Affordable Care Act. But those judgments are reserved for the legislative process, not for the courts. The State of Oklahoma may not convert its political disagreement with the Act into a legal dispute. The defendants accordingly request that the Court dismiss Oklahoma's complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction. Because of the importance of the issues presented, the defendants also respectfully request that the Court grant them the opportunity to present oral argument in support of their motion.

## BACKGROUND

The interstate market for health care services is one of the largest and most important sectors of the U.S. economy. In 2009, the United States spent more than 17% of its gross domestic product on health care. 42 U.S.C. § 18091(a)(2)(B). People without insurance actively participate in this vast market but, as a group, do not pay the full cost of the services they obtain. Congress found that, in 2008, the cost of uncompensated health care for the uninsured amounted to $43 billion. 42 U.S.C. § 18091(a)(2)(F). Congress further found that health care providers pass on much of this cost "to private insurers, which pass on the cost to families," increasing by "over $1,000 a year" the average premiums of families who carry insurance. *Id.* Higher premiums, in turn, make insurance unaffordable for even more people.

At the same time, insurance companies use restrictive underwriting practices to deny coverage or charge unaffordable premiums to millions across the nation because they have pre-existing medical conditions. One national survey estimated that 12.6 million non-elderly adults – 36% of those who tried to purchase health insurance directly from an insurance company in the individual market – were denied coverage, charged a higher rate, or offered limited coverage

because of a pre-existing condition in the previous three years.  Dep't of Health & Human Servs., *Coverage Denied: How the Current Health Insurance System Leaves Millions Behind*, at 1 (2009).  The insurance industry practice of "medical underwriting" is costly even for those who are able to obtain insurance, resulting in significant increases in the administrative fees that are responsible for 26% to 30% of the cost of premiums in the individual and small group markets. 42 U.S.C. § 18091(a)(2)(J).

Congress enacted the Affordable Care Act to address the problems in the national health care system, which individual states have proven to be unable to solve effectively.  Through comprehensive reforms, the Act will make health care coverage widely available and affordable, protect consumers from restrictive insurance underwriting practices, and reduce the uncompensated care to the uninsured that shifts costs to other participants in the interstate health care market.  The Act's reforms have five main components.

First, for the individual and small-group insurance market, Congress established health insurance Exchanges "as an organized and transparent marketplace for the purchase of health insurance where individuals and employees (phased-in over time) can shop and compare health insurance options."  H.R. REP. NO. 111-443, pt. II, at 976 (2010) (internal quotation omitted). The Exchanges will allow individuals and small employers to use the leverage of collective buying power to obtain prices and benefits that are competitive with those of large-employer group plans.  42 U.S.C. § 18031.

Second, the Act builds on the existing system of employer-based health insurance, in which most individuals receive coverage as part of employee compensation.  As with previous measures designed to encourage employer-based insurance, Congress used the federal tax laws to help achieve its goal, establishing tax incentives for small businesses to purchase health

insurance for their employees, 26 U.S.C. § 45R, and prescribing tax penalties under specified circumstances for certain large businesses that do not offer their full-time employees adequate coverage, 26 U.S.C. § 4980H.

Third, for individuals and families with household income between 133% and 400% of the federal poverty line, Congress created federal tax credits for payment of health insurance premiums. 26 U.S.C. § 36B(a), (b). Congress also created cost-sharing reductions to help cover out-of-pocket expenses such as copayments or deductibles for eligible individuals who receive coverage through an Exchange. 42 U.S.C. § 18071. In addition, Congress expanded eligibility for Medicaid to cover all individuals with income below 133% of the federal poverty line. 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).

Fourth, the Act removes barriers to insurance coverage. As noted above, a variety of insurance industry practices have increased premiums for, or denied coverage to, those with the greatest health care needs. The Act bars insurance companies from refusing to cover individuals because of a pre-existing medical condition, 42 U.S.C. §§ 300gg-1(a), 300gg-3(a), canceling insurance absent fraud or intentional misrepresentation of material fact, 42 U.S.C. § 300gg-12, charging higher premiums based on a person's medical condition or history, 42 U.S.C. § 300gg, and placing lifetime or annual dollar caps on the benefits of the policyholder for which the insurer will pay, 42 U.S.C. § 300gg-11.

Fifth, Congress enacted the minimum coverage provision that is at issue in this case, which, beginning in 2014, amends the Internal Revenue Code to require non-exempted individuals to maintain a minimum level of health insurance or else pay a tax penalty with their annual income tax return. 26 U.S.C. § 5000A.[1] The penalty does not apply to individuals whose

---

[1] An individual may satisfy this provision through enrollment in an employer-sponsored

household income is insufficient to require them to file a federal income tax return, whose premium payments exceed 8% of their household income, who establish that the requirement imposes a hardship, or who satisfy certain religious exemptions. 26 U.S.C. § 5000A(e).

Congress found that this minimum coverage provision "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased." 42 U.S.C. § 18091(a)(2)(A). Congress found that the provision will reduce the substantial cost-shifting in the interstate health care market that results from the practice of consuming health care without insurance and that increases the premiums of insured consumers. 42 U.S.C. § 18091(a)(2)(F). In addition, Congress found that the provision is central to the viability of the Act's requirement that insurers provide coverage and charge premiums without regard to a person's medical condition or history. If these reforms were enacted without a minimum coverage provision, "many individuals would wait to purchase health insurance until they needed care," undermining the effectiveness of insurance markets. 42 U.S.C. § 18091(a)(2)(I). The Congressional Budget Office has projected that the Act's various provisions, taken in combination, will reduce the number of non-elderly people without insurance by about 33 million by 2019, and will reduce the federal budget deficit by $210 billion over the next ten years. Letter from Douglas W. Elmendorf, Director, CBO, to John Boehner, Speaker, U.S. House of Representatives (Feb. 18, 2011).

---

insurance plan, an individual market plan including a plan offered through the new Exchanges, a grandfathered health plan, certain government-sponsored insurance programs such as Medicare, Medicaid, or TRICARE, or similar coverage recognized by the Secretary of Health and Human Services in coordination with the Secretary of the Treasury. 26 U.S.C. § 5000A(f).

5

**STANDARD OF REVIEW**

The defendants move to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Oklahoma bears the burden to show that it has standing to sue. *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

**ARGUMENT**

**OKLAHOMA LACKS STANDING TO CHALLENGE THE MINIMUM COVERAGE PROVISION**

**I.     Oklahoma Cannot Sue the Federal Government to Exempt Its Citizens from Federal Law**

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation omitted). The requirement of a case or controversy is essential to ensure that a federal court will involve itself only in live disputes between the actual parties before it, and not "hypothetical cases" involving absent third parties. *United States v. Raines*, 362 U.S. 17, 22 (1960); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 317 (1966) (holding that state lacked standing to challenge provision of federal law before it had been enforced in that state). Oklahoma's challenge to the minimum coverage provision does not present an actual case or controversy. That provision applies only to "individual[s]," 26 U.S.C. § 5000A(a), not states. It thus may be challenged by individuals who would meet the usual standing requirements. Longstanding principles governing *parens patriae* standing, however, prohibit the State of Oklahoma from litigating against the United States on its citizens' behalf. Oklahoma may not circumvent those

principles by enacting a provision of state law declaring that its citizens have a right to be free of federal law.

Insofar as Oklahoma's complaint asserts any cognizable rights, they are the rights of its residents. The Supreme Court has long held, however, that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)). As the Supreme Court explained in *Mellon*, the citizens of a state "are also citizens of the United States," and "[i]t cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Mellon*, 262 U.S. at 485. The Court stressed that "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id.* at 485-86. "In that field it is the United States, and not the state, which represents them as parens patriae." *Id*. at 486.

These principles control here. Oklahoma's complaint asks this Court "to adjudicate, not rights of person or property, not rights of dominion over physical domain, not quasi sovereign rights actually invaded or threatened, but abstract questions of political power, of sovereignty, of government." *Mellon*, 262 U.S. at 484-85. Such abstract questions do not present a justiciable issue. Oklahoma's suit falls squarely within the rule that a "State does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens." *Wyoming v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992); *see also Texas v. ICC*, 258 U.S. 158, 162 (1922) (state's claim of infringement upon state sovereignty was merely "an abstract question of legislative power," not a justiciable case or controversy); *New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (allegation that

7

provisions of federal law "go beyond the power of Congress and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial power").

## II.     Oklahoma Has Alleged No Cognizable Injury to Its Own Interests as a State

Oklahoma attempts to avoid the bar against *parens patriae* standing by instead resting its claim on the enactment of an amendment to the Oklahoma Constitution. The amendment declares that "[a] law or rule shall not compel, directly, or indirectly, any person, employer or health care provider to participate in any health care system," which phrase is defined to include health insurance coverage. OKLA. CONST. art. II, § 37(B)(1). The manifest intent of the provision is to declare the State of Oklahoma's opposition to the Affordable Care Act; indeed, it exempts all "laws or rules in effect as of January 1, 2010," *id.*, § 37(D)(4), clarifying that its focus is the Affordable Care Act alone. The provision is purely declaratory. It simply proclaims, as part of the Oklahoma Bill of Rights, that state residents have a right not to participate in any health care system. And it grants the State no enforcement powers. In sum, the provision serves no purpose other than as a vehicle – though a fundamentally flawed one – for the effort to assert standing here.

Oklahoma asserts that the enactment of its state constitutional enactment has created a "collision" with federal law, Compl. ¶ 3, thereby creating an "immediate, actual controversy involving antagonistic assertions of right," *id.*, and that it "has an interest in asserting the validity" of its enactment, *id.*, ¶ 5. It is far from certain that there is any actual "collision" between the state and federal enactments, particularly given the Oklahoma Constitution's recognition of the supremacy of federal law. OKLA. CONST. art. I, § 1. But even if the provisions truly were in conflict, Oklahoma could not circumvent the bar to *parens patriae* standing by means of an enactment that purports to exempt its citizens from federal law. A state does not

8

have a right to obtain an advisory opinion from a federal court as to the validity of its state law, in the absence of an actual controversy.

In *United States v. West Virginia*, 295 U.S. 463 (1935), for example, West Virginia licensed construction of a dam pursuant to a state law, and the United States contended that a federal license was required under the Federal Water Power Act. The State contended that the federal statute exceeded Congress's power, and that the state act therefore controlled. *Id*. at 469. Although it recognized that there was a concrete dispute between the United States and the private dam builder (who sought to build without a federal license), the Supreme Court dismissed the complaint as between the United States and West Virginia, holding that it presented merely a "difference of opinion" between the state and federal governments, not a case or controversy. *Id*. at 473-74; *see also Florida v. Mellon*, 273 U.S. 12, 17 (1927) (alleged conflict between state and federal inheritance tax laws did not give state standing to sue); *Texas v. United States*, 523 U.S. 296, 302 (1998) (state's claim of "threat to federalism" from application of federal law was mere "abstraction," in absence of concrete injury to state).

Oklahoma relies on the contrary ruling in *Virginia v. Sebelius*, 702 F. Supp. 2d 598 (E.D. Va. 2010), *appeals pending*, Nos. 11-1057, 11-1058 (4th Cir.). Compl. ¶ 6. The court in that case held that "the mere existence" of a similar statute granted the Commonwealth of Virginia standing to challenge the minimum coverage provision. *Id.* at 605. Its ruling rested on a basic misunderstanding of *Alfred L. Snapp*, in which Puerto Rico sued a private employer for discriminating against Puerto Rican residents in violation of federal law. The Court held that Puerto Rico had standing to sue the private party as *parens patriae*. 458 U.S. at 609-10. But in its sole reference to suits brought by a state against the United States, *Alfred L. Snapp* reaffirmed the settled limits on state standing discussed above. The Court noted that, unlike the plaintiffs in

cases such as *Massachusetts v. Mellon*, Puerto Rico was "seeking to secure the federally created interests of its residents against private defendants." *Id*. at 610 n.16.  The Court did not remotely suggest that a state could convert a "naked contention that Congress has usurped the reserved powers of the several states," *Mellon*, 262 U.S. at 483, into a concrete controversy against the federal government by codifying its legal claim before filing it.

A comparison with cases in which the Supreme Court has found that states have standing to sue the federal government confirms that this lawsuit is not justiciable.  For example, in *Massachusetts v. EPA*, 549 U.S. 497, 522-23 (2007), the Court held that the state could challenge EPA's failure to regulate greenhouse gas emissions because "rising seas," caused in part by these emissions, would injure Massachusetts "in its capacity as a landowner" and "have already begun to swallow Massachusetts' coastal land."  A state likewise may challenge a measure that commands the state to take action, *e.g.*, *New York v. United States*, 505 U.S. 144 (1992) (federal law required state to take title to nuclear waste or enact federally-approved regulations), or that prohibits specified state action, *e.g.*, *Oregon v. Mitchell*, 400 U.S. 112 (1970) (federal law prohibited literacy tests or residency requirements in state elections).

Oklahoma's suit has none of these features.  The minimum coverage provision applies only to individuals, and it neither commands the State to take action nor prohibits the State from taking any action.  Nor is this a case in which federal action "interferes with [a State's] ability to enforce its legal code."  *Wyoming v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008).  In some circumstances, a state may have standing to challenge federal action that significantly disrupts that state's ability to take enforcement action under its own regulatory scheme.  But Oklahoma's enactment does not create a regulatory scheme that the state government seeks to enforce.  In the absence of a concrete effect on the enforcement activities of the state

government, a state may not base its standing on an abstract interest in an asserted conflict between state and federal law. *See Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 372-73 (7th Cir. 1997) (state lacked cognizable injury where ability to enforce statutes was not hindered).

If this provision were sufficient to create standing, a state could sue the federal government to invalidate federal expenditures that the state deemed inconsistent with its state constitutional protection against the use of public funds to support religious entities. *See, e.g.*, OKLA. CONST. art. II, § 5. Or it could sue the federal government for conducting civil jury trials with less than twelve jurors. *See, e.g.*, OKLA. CONST. art. II, § 19. The legislature could pass a statute – or, indeed, the governor could issue an executive order – purporting to exempt Oklahoma citizens from Social Security, and then sue the United States based on the state's alleged interest in the validity of the state law. Or the state might object to deployment of military forces in a particular armed conflict, enact a statute or constitutional amendment purporting to exempt its residents from military service in the conflict, and then sue the United States. Such provisions would serve no purpose other than as a tool to attempt to create standing, to import policy disagreements from the legislative to the judicial arena. *See Massachusetts v. Laird*, 451 F.2d 26, 29 (1st Cir. 1971) (state lacked *parens patriae* standing to challenge legality of a war, even where it enacted a statute declaring its standing to do so).

As the Court stressed in *Massachusetts v. EPA*, "there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n.17.[2] The objective of the Oklahoma enactment is "to protect her

---

[2] The Court was unanimous on this point. The dissent in *Massachusetts v. EPA* would

11

citizens from the operation of federal statutes." *Ibid.* Supreme Court precedent forecloses Oklahoma's invitation to adjudicate the "antagonistic assertions of right," Compl. ¶ 3, that are the sole basis for this suit.

In sum, the State of Oklahoma seeks to prevent the federal government from enforcing the minimum coverage provision of 26 U.S.C. § 5000A against Oklahoma residents. That provision, however, imposes no burdens on Oklahoma as a state. If any live controversy exists as to the constitutionality of Section 5000A, it is a controversy between an individual who is subject to that provision and the federal government, not between the state and the federal government. Oklahoma lacks standing to assert the rights of its citizens against federal regulation. Codifying the state's policy disagreement does not change this result.

---

have held that *Mellon* precluded standing in that case. 549 U.S. at 539 (Roberts, C.J., dissenting). Indeed, the Chief Justice suggested that the state's "true goal for this litigation may be more symbolic than anything else. The constitutional role of the courts, however, is to decide concrete cases – not to serve as a convenient forum for policy debates." *Id.* at 547.

## **CONCLUSION**

For the reasons set forth above, the plaintiff's complaint should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction. The defendants respectfully request the opportunity to present oral argument in support of this motion.

DATED this 28th day of March, 2011.

        Respectfully submitted,

        TONY WEST
        Assistant Attorney General

        IAN HEATH GERSHENGORN
        Deputy Assistant Attorney General

        MARK F. GREEN
        United States Attorney

        SUSAN S. BRANDON
        Assistant United States Attorney


        s/ Joel McElvain
        JENNIFER D. RICKETTS
        Director
        SHEILA M. LIEBER
        Deputy Director
        JOEL McELVAIN (D.C. Bar #448431)
        Senior Trial Counsel
        United States Department of Justice
        Civil Division, Federal Programs Branch
        20 Massachusetts Avenue, N.W.
        Washington, D.C. 20001
        Phone:  (202) 514-2988
        Fax:     (202) 616-8202
        Email:   Joel.McElvain@usdoj.gov

        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 28, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

      E. Scott Pruitt
      Cornelius Neal Leader
      Sandra D. Rinehart
      Office of the Attorney General
      313 NE 21st St.
      Oklahoma City, Oklahoma 73105

                             s/ Joel McElvain
                             JOEL McELVAIN