1                 IN THE UNITED STATES DISTRICT COURT

2                 FOR THE EASTERN DISTRICT OF OKLAHOMA

3     STATE OF OKLAHOMA ex rel E. Scott    )

4     Pruitt, in his official capacity     )

5     as Attorney General,                 )

6                                          )

7              Plaintiff,                  )

8                                          )

9     VS.                                  )    NO. 11-CV-00030-RAW

10                                         )

11    KATHLEEN SEBELIUS, in her official   )

12    capacity as secretary of the United  )

13    States Department of Health and      )

14    Human Services; TIMOTHY GEITHNER,    )

15    in his official capacity as          )

16    Secretary of the United States       )

17    Department of the Treasury,          )

18             Defendants.                 )

19                              *    *    *

20                     TRANSCRIPT OF MOTION HEARING

21                     DEFENDANT'S MOTION TO DISMISS

22               BEFORE THE HONORABLE RONALD A. WHITE

23                    UNITED STATES DISTRICT JUDGE

24                          JUNE 20, 2013

25                              *    *    *

1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:      MR. E. SCOTT PRUITT

 3                          Office of the Attorney General

 4                          313 NE 21st Street, 3rd Floor

 5                          Oklahoma City, Oklahoma 73105

 6

 7                          MR. PATRICK R. WYRICK

 8                          Office of the Attorney General

 9                          313 NE 21st Street, 3rd Floor

10                          Oklahoma City, Oklahoma 73105

11

12   FOR THE DEFENDANTS:    MR. JOEL McELVAIN

13                          U.S. Department of Justice

14                          Civil Division

15                          20 Massachusetts Avenue

16                          Washington, DC 20001

17

18   FOR THE DEFENDANTS:    MS. SUSAN S. BRANDON

19                          Assistant United States Attorney

20                          1200 West Okmulgee

21                          Muskogee, Oklahoma 74401

22

23   COURT REPORTER:        KARLA S. McWHORTER, CSR-RPR

24                          United States Court Reporter

25

1                    **COURT IN SESSION**

2                    (10:30 a.m.)

3        THE COURT:  We are on the record in State of

4  Oklahoma, el rel E. Scott Pruitt versus Kathleen

5  Sebelius and Timothy Geithner.

6     Will counsel enter their appearances, please?

7        MR. WYRICK:  Your Honor, Patrick Wyrick on

8  behalf of the State of Oklahoma.

9        THE COURT:  Thank you, Mr. Wyrick.

10       MR. PRUITT:  Scott Pruitt, Attorney General

11  for the State of Oklahoma, Your Honor.

12       THE COURT: Thank you, Mr. Pruitt.

13       MR. BATES:  Tom Bates, First Assistant

14  Attorney General.

15       THE COURT:  Thank you.

16       MR. McELVAIN:  Your Honor, Joel McElvain for

17  the Defendants.

18       THE COURT:  Thank you.

19       MS. BRANDON:  Susan Brandon for the Defendants.

20       THE COURT:  Thank you, Ms. Brandon.

21    All right.  This matter comes on today on the

22  Defendant's, the Government's Motion to Dismiss the

23  Amended Complaint.

24    Before we get started, I have some preliminary

25  matters.  We have two government entities involved.

Typically it is only one and I say...what does the
Government think.  I know we want a clear record, so
I am going to refer to the United States of America
as the Government and I am going to refer to the State
of Oklahoma as either the State or Oklahoma.  If I do
that incorrectly, because we want a clear record, that
is when you may interrupt me and tell me that I have
denominated you incorrectly.  That's the only time you
can interrupt me, by the way, but you can interrupt me
there.

We are here to have a hearing on the Affordable
Care Act or the ACA.  I trust counsel will not refer
to the Act by the name that it has become known by
colloquially.

Now, I don't want either side telling me whether
the law is good or bad.  That's not why we are here.
I noticed in the briefing that there was some of that.
I don't want to know whether the law is good or bad.
That's not why I am here.  That's not what I am here
to decide.  The purpose of this suit is to determine
whether the statute and the subsequent regulations pass
legal muster.  And that's not what we are even for here
today.  As you know, what we are here for today is to
discuss the issue of standing, whether the State of
Oklahoma has the standing to bring this suit at all.

1     Okay.  Also, I don't know, Ms. Brandon, if you warned

 2 them of this or not, you being local counsel, but

 3 when I have a motion hearing like this, I typically

 4 have both lawyers at the podiums.  That way I can

 5 bounce questions off of them at the same time and ask

 6 what do you think of that, what do you think of that.

 7 Okay?  So I need one of you to take one podium and one

 8 of you to take the other.

 9     Mr. McElvain, you lost the flip of the coin I had

10 back in my chambers, so you get to be up front.

11 Mr. Wyrick, you can be at the back.

12          MR. McELVAIN:  I elect to receive, Your Honor.

13          THE COURT:  What now?

14          MR. McELVAIN:  I elect to receive.

15          THE COURT:  Okay, okay.  All right.

16     Mr. Wyrick, I don't know if you had some argument

17 that you wanted to start out with or perhaps had some

18 revelation that you woke up in the middle of the night

19 with and thought, oh, this will really convince the

20 Court, but I want to start off just with a question.

21 Okay?  In fact, probably this whole session will be

22 my questions.

23     The briefing and the talk of the ACA has probably

24 by necessity been somewhat esoteric and theoretical

25 because it is a complicated statute. I would like you

1 to, in a hypothetical, give me an example -- a

2 concrete example of how it is going to work after

3 January 1st, 2014.  And with the facts of assuming you

4 lose this case, not that you are necessarily, but

5 assuming you lose this case and assuming I am an

6 employee of an Oklahoma Corporation -- let's call it

7 Pruitt Corporation -- Pruitt Corporation has more than

8 50 employees.  I work 30 hours per week.   What happens

9 after January 1st, 2014 to me and to Pruitt Corp?  I

10 know there's going to be different branches, but give

11 it your best shot.

12          MR. WYRICK:  Well, under the Affordable Care

13 Act, there are a couple of scenarios that could play

14 out.  And, you know, there are some safe harbors that

15 have been built into some of the regulations, but I

16 am going to focus on sort of the usual case.

17      If that employee is, in fact, a permanent

18 employee working more than --

19          THE COURT:  Let's call him employee Ron White.

20          MR. WYRICK:  If Ron White is my employee and

21 he is a permanent employee working more than 30 hours

22 per week, I have to offer him insurance coverage that

23 satisfies the standards that are in the Affordable

24 Care Act.

25          THE COURT:  What about the 30 hours per week?

1  Does the ACA change -- I mean, how did -- how did a

2  full-time employee used to be set?  How did that -- what

3  was the definition of it?

4          MR. WYRICK:  I think the federal law has

5  often used 30 hours.  Under state law, we have always --

6  in terms of eligibility for health insurance benefits,

7  it has been a 999 hours per year threshold.  So if you

8  work a 1000 hours or more under state law, you are

9  eligible for our health insurance.

10          THE COURT:  Okay.

11          MR. WYRICK:  Under the Affordable Care Act,

12  it is just 30 hours per week you are a permanent

13  employee, you are considered a full-time employee.  As

14  an employer, I have to offer you insurance.  If I

15  completely fail to offer you insurance, I can be

16  subject to the 26 USC 4980H(a) assessment.

17          THE COURT:  Now, you are getting esoteric.

18  Okay?

19          MR. WYRICK:  Right.  Well, I'm breaking that

20  down because there are two different assessments that

21  they can make against that large employer.  One is

22  the Subpart A assessment in that statute and one is

23  the Subpart B assessment.

24      The Subpart A assessment is one that they can make

25  if I completely fail to offer you insurance whatsoever.

1   If in that circumstance if the employee qualifies,

 2   that is, they are in that 133 percent to 400 percent

 3   of the poverty level income range, they are eligible

 4   or potentially eligible for a credit or a subsidy

 5   from the federal government that they can use to go

 6   buy insurance through a health insurance exchange.

 7              THE COURT:  And how am I paid that?

 8              MR. WYRICK:  Well, there are two different

 9   ways.  In one instance, in the subsidy instance, the

10   federal government actually pays it directly to the

11   insurance provider.  That's the subsidy where they

12   actually --

13              THE COURT:  So they don't pay it to me?

14              MR. WYRICK:  They forward it -- they -- I

15   don't think there is any circumstance in which the

16   money ever goes directly to your pocket.  There is a

17   circumstance in which you get a tax credit at the end

18   of the year.

19              THE COURT:  So that's indirectly/directly to

20   me?

21              MR. WYRICK:  Yes, I think so.  And that's a --

22   and in the circumstance where that happens, the health

23   insurance exchange can then certify that at least one

24   of your -- at least one of Pruitt Corp's employees,

25   Ron White in this instance, was not offered insurance

1  by Pruitt Corp and he received a credit from the

2  federal government.

3      In that instance the employer is then hit with a

4  penalty which is $2,000.00 and they divide it by 12,

5  so you are penalized each month.  $2,000.00 divided by

6  12, so $167.00 per month for every employee that I

7  employ minus the first 30.  There is kind of this

8  safe harbor built in...well, we are not going to

9  penalize you for the first 30.

10         THE COURT:  So even if I am the one who

11  qualifies Pruitt Corporation for that penalty, the first

12  30 aren't -- there is no assessment of the penalty for

13  them?

14         MR. WYRICK:  That's right.  But as the

15  employer, you are penalized for all of your employees

16  that you fail to offer coverage for.  So if you have a

17  1000 employees, therefore you are hit with a penalty

18  for 970 employees.

19      Now, the second circumstance that can happen is the

20  Subpart B situation.  That's when Pruitt Corp offers

21  insurance, but it doesn't meet the affordability

22  standard.  That is, Ron White has to pay more than

23  9.5 of the premium cost.  So under the federal

24  government's standard, it is not good enough insurance.

25  In that circumstance the employee is still eligible to

1  go to the federal government and receive the same

2  subsidy or credit to buy insurance from a health

3  insurance exchange.  In that circumstance, however,

4  as the employer, I am hit with a $3000.00 penalty for

5  that employee, but only for the employees who

6  actually have gone and the federal government has

7  paid some money to.  So it is not nearly as punitive

8  as the Subpart A penalty where there is really on

9  proportionately between what the federal government

10  is paying out and what they are hitting the employer

11  with.

12       So those are the two scenarios and that's what

13  you are faced with as a large employer.

14            THE COURT:  All right.  Thank you.

15       Mr. McElvain, anything to add or to contradict

16  what Mr. Wyrick has said?

17            MR. McELVAIN:  No, I think Mr. Wyrick's

18  summary is largely accurate.  The one caveat that I

19  would note is his use of the phrase that the employer

20  has to offer the coverage.  This is -- we are in the

21  realm of taxes.  If they don't offer the coverage,

22  they are subject to a tax assessment.  There is no

23  further requirement.  This way it is quite analogous

24  to the (No. 10:39:59) coverage provision, which was

25  an issue in the Supreme Court last year where the

opinion for the Court said this is a tax, nothing else
happens to you.  You either --

THE COURT:  That's where we get into the tax
versus penalty conundrum.

MR. McELVAIN:  Right.  But the only point is,
is that -- I would just note that it is a misnomer to
say that anybody has to do anything.  You are subject
to a tax if you don't.  It is your lawful choice
whether you do or not.

THE COURT:  All right.  Okay.  Mr. McElvain,
the government has filed a Motion to Dismiss.  Now,
let's see if you can agree with me on these points:
Motions to Dismiss are not favored, correct?

MR. McELVAIN:  I don't know if --

THE COURT:  In general, Motions to Dismiss are
not favored.  It is more favored to hear a case on the
merits.

MR. McELVAIN:  I don't know if I agree with
that characterization, Your Honor.  I think it is the
Plaintiff's burden to show that there is standing and
the Supreme Court has indicated over and over that you
need to be quite zealous to be sure that there is,
in fact, jurisdiction.  So...

THE COURT:  But in general, I think even in
more general terms, Motions to Dismiss are not favored.

1          MR. McELVAIN:  If there are factual allegations

2     that support a claim and support a standing, then the

3     case should proceed forward.

4          THE COURT:  So they are not in general favored

5     unless they are correct?

6          MR. McELVAIN:  I'm sorry?

7          THE COURT:  So they are not in general favored

8     or disfavored -- they are not in general favored unless

9     they are correct in the end?

10          MR. McELVAIN:  Well, it is the Plaintiff's

11     burden to allege facts showing that there is standing --

12          THE COURT:  Sure.  But in doing that and

13     fulfilling their burden, the Court takes into account

14     that Motions to Dismiss are not favored in general in

15     the law.

16          MR. McELVAIN:  I -- I -- yeah, I suppose

17     that that is right, but it is the Plaintiff's burden

18     and so they need to make an affirmative allegation.

19          THE COURT:  I never thought that it would

20     take -- I thought that was an easy one to get you to

21     admit.  And all you have to do is get -- in your

22     complaint is give a short and plain statement of the

23     case, yes?

24          MR. McELVAIN:  Yes, subject to the Iqbal

25     standards that --

1          THE COURT:  Twombly and Iqbal?

2          MR. McELVAIN:  Twombly and Iqbal.

3          THE COURT:  What is the standard there?

4          MR. McELVAIN:  Is that you have to allege

5     sufficient facts to support a claim.  And since we are

6     here on jurisdiction, sufficient facts to show that

7     there is, in fact, a claim for standing, that there is

8     some actual injury that you, yourself, incurred.

9          THE COURT:  And you certainly agree, as

10    you've already said, that the Plaintiff has the burden

11    of proving jurisdiction --

12         MR. McELVAIN:  Correct.

13         THE COURT: -- in the pleadings -- well, in

14    the pleadings?

15         MR. McELVAIN:  Well, in the pleadings have

16    the burden of alleging facts that if later proven

17    would show their standing.

18         THE COURT:  Okay.  So that could be done -- if

19    it is uncertain, that could be done at a later time.

20    If there is uncertainty as to jurisdiction and

21    uncertainty as to whether the facts alleged are

22    sufficient, wouldn't the special solicitude given to

23    state governments militate in favor of denying the

24    motion to dismiss at the preliminary stages?

25         MR. McELVAIN:  No, Your Honor, and I --

```
 1            THE COURT:  And I am not talking about this

 2    specific case.  I am talking about in general --

 3            MR. McELVAIN:  Yeah, yeah.  I would refer

 4    this Court to Wyoming versus Department of Interior,

 5    the recent Tenth Circuit decision, which spoke about

 6    the special solicitude language from the Supreme Court

 7    in the Massachusetts case.

 8            THE COURT:  Isn't that the case that said,

 9    boy, there's not much guidance for trial courts in

10    deciding this?

11            MR. McELVAIN:  Correct, but they said the

12    one thing that we do know for sure is it does not

13    change the requirement of concrete injury and that a

14    state, like any other litigant, must show that there

15    is concrete injury.

16            THE COURT:  Okay.  Well, what does it mean --

17    what does the phrase in all of the case law mean when

18    they say "special solicitude?"

19            MR. McELVAIN:  I, I would agree with the

20    Tenth Circuit's characterization that it is not entirely

21    clear what that -- what is meant.  My understanding

22    would be that your obligation is to pay special close

23    attention to what the allegations are and --

24            THE COURT:  Okay.  You understand that I have

25    a special solicitude for thinking about what the Tenth
```

1   Circuit thinks.

2          MR. McELVAIN:  Sure, yes.

3          THE COURT:  Okay.  And you said your under-

4   standing is it means this...well, where does your

5   understanding come from?

6          MR. McELVAIN:  I, I -- again, with the Tenth

7   Circuit, I will -- I will agree with the Tenth

8   Circuit's characterization that it is not clear.

9   That's my best guess as to what that phrase means.

10  What the Tenth Circuit -- we don't need to go anywhere

11  further than what the Tenth Circuit said in Wyoming,

12  which was whatever else it means, it does not erase

13  the concrete injury requirement and that's why we are

14  here on a standing motion to dismiss today because the

15  concrete injury requirement is not met.

16         THE COURT:  Okay.  Now, there are three

17  Wyoming cases we will be discussing, as you know.

18         MR. McELVAIN:  I'm sorry?

19         THE COURT:  There will be three Wyoming cases

20  that we will probably be discussing, as you know.

21         MR. McELVAIN:  Yes.

22         THE COURT:  Wyoming seems to be in a lot of

23  the cases.

24      We have to take their statements in their

25  complaint -- Oklahoma's statements in their complaint

1 as true?

2          MR. McELVAIN:  Yes.

3          THE COURT:  Okay.  Is that true across the

4 board?  Let me stop you.

5     Mr. Wyrick, my statement, they have to be taken as

6 true, the allegations in your complaint.  Is that

7 correct?

8          MR. WYRICK:  So long as they are plausible,

9 yes.

10          THE COURT:  Okay.  So the plausibility

11 standard comes from Twombly.

12     All right.  So you can allege that Oklahoma has

13 standing.  If I have to take that as true, my job is

14 easy and I'm done.  Is that right?

15          MR. WYRICK:  We have to do a little more

16 than that and I think we have in the amended complaint.

17 We have to at least allege enough facts where the

18 Court can determine whether it is plausible as to

19 whether we have standing.

20          THE COURT:  Okay.  So it is facts you have

21 got to allege that I take as true?

22          MR. WYRICK:  At least enough for the Court to

23 determine whether it is plausible that we will be able

24 to establish standing at the summary judgment stage.

25          THE COURT:  Okay.  Mr. Wyrick, in that line

1  of thinking -- I mean, in the cases which take the

 2  Gestalt theory of finding standing, where is your -- I

 3  mean, where is your best basis in those line of cases

 4  to stand on?

 5          MR. WYRICK:  Which injury?  Is that what you

 6  are asking?

 7          THE COURT:  No, the -- where the cases taken

 8  together form a Gestalt sort of idea of what standing

 9  is.

10          MR. WYRICK:  Well, I mean, I think Lujan says

11  it best.  It is a concrete injury, in fact, that is

12  traceable and is going to be redressable by the relief

13  we seek.  In terms of the injuries that we have alleged

14  here, our injuries kind of fall within two categories.

15  There is the injury to the state as a sovereign that

16  really falls within the Wyoming v. United States case,

17  the ATF case.  And then there are the injuries that

18  the state has suffered as a large employer and those

19  are much more like what the Court normally sees --

20          THE COURT:  Mr. McElvain, do you understand

21  what I mean?

22          MR. McELVAIN:  I believe, sir --

23          THE COURT:  You don't, do you?

24          MR. McELVAIN:  I can take a stab at it.

25          THE COURT:  Go ahead.  That's all I did in

1  asking the question.

2        MR. McELVAIN:  Okay.  You know, again, the

3  Plaintiff needs to allege concrete -- a concrete

4  injury to show standing.  And to take the two divisions

5  of their claim of standing that Mr. Wyrick identified,

6  the sovereign standing and the employer standing, the

7  claim of sovereign standing -- actually, I have to

8  subdivide this further because one part of their claim

9  is --

10        THE COURT:  And that's my point.  Okay?

11        MR. McELVAIN:  Okay.

12        THE COURT:  You are subdividing it into

13  different parts, right?  I would be being inaccurate

14  if I said there is actually a line of cases that take

15  the Gestalt line of reasoning.  I just made that up,

16  but basically there are different subdivisions of

17  this analysis, right?  Gestalt means the hole is bigger

18  than the sum of its parts.  It seems the courts -- not

19  that they ever say this, but it seems the courts use

20  that theory that...well, if you put all of the cases

21  together and look at all of the subdivisions, that

22  together those can create a standing.  Does that make

23  sense?

24        MR. McELVAIN:  I don't think that that is

25  what the case law holds, Your Honor.  I think we need

1  to go through each claim of the State one by one and

2  decide if each claim alleges a concrete injury or not.

3  So I don't think there is any sort of hole that is

4  greater than the sum of its parts analysis that we

5  would --

6           THE COURT:  You don't know of any case that

7  says that?

8           MR. McELVAIN:  I think it is implicit in

9  various Supreme Court and Tenth Circuit cases which have

10  gone through with similar cases where a state has alleged

11  sovereign standing.  They said, well --

12          THE COURT:  So it is implicit?

13          MR. McELVAIN:  Well, take the Wyoming versus

14  Department of Interior case --

15          THE COURT:  No, I don't want to take that yet.

16  I am not ready to go there.  I am just about ready to

17  go there, but not quite.  Okay?

18          MR. McELVAIN:  Okay.

19          THE COURT:  Mr. Wyrick, how do you respond to

20  that?  Like I said, there is no case that says Gestalt

21  reasoning, but would you disagree or agree that the

22  cases taken together seem to -- seem to line up in a

23  way that the issue of standing really is often decided

24  based upon the sum of the parts -- the sum of the parts

25  being less than the hole itself?  Am I off base on that?

1  Because that is a -- that is a theory that is in your

2  favor, but I want to know if you disagree with it or if

3  you can legally in good faith agree that that is an

4  analysis that the Court should take.

5          MR. WYRICK:  I think I can.  I think that that

6  is a fair reading of the case law.  I think we have

7  alleged an injury that would suffice under several of

8  the different lines, but the fact that we have

9  alleged a --

10          THE COURT:  But can I take them together?  If

11  one is sort of weak and one is a little stronger and

12  this one is weak and this one is really strong, can I

13  put them all together and find standing instead of doing

14  it individually on each subdivision as Mr. McElvain says?

15          MR. WYRICK:  I don't think the Court needs to

16  do that here, but I think the Court can look at the sum

17  of the injuries and the harms that are caused to see

18  whether we have -- you know, if this is really sort of a

19  crystalized concrete injury.  I would agree with that

20  statement.

21          THE COURT:  That is interesting.  I don't

22  know if you are right, but it is still interesting.

23      Okay.  Mr. Wyrick, the Mellon case seems to be

24  cited by the -- both parties, maybe the government

25  more than Oklahoma, but nowhere in the briefing by

either side are there any facts relating to the Mellon

case.  Can you give me the facts of the Mellon case?

MR. WYRICK:  Oh, I'm trying to think.  Is

Mellon --

THE COURT:  Mellon, I think, is a bank.

MR. WYRICK:  The bank.  Yeah, that is the case

that was relied on or was the argument for the quasi-

sovereign parens patriae standing in Massachusetts v.

EPA?  As I recall, they refer back to Mellon?

THE COURT:  Well, the original Mellon case --

Mr. McElvain, can you give me the facts of the

Mellon case?

MR. McELVAIN:  <u>Massachusetts versus Mellon</u> was

a suit by the Commonwealth of Massachusetts against,

I believe, the Secretary of the Treasury at the time.

Their claim was that their Tenth Amendment rights were

being violated because there was a program in existence

-- a federal program -- for payments to -- I would have

to go back to the case, but I think expectant mothers

are young children, something -- something along those

lines.  And they claimed that that interfered with

their state sovereign right not to have such a

program.  The Supreme Court held, "You cannot bring this

suit.  It is a parens patriae suit.  Any claims you are

bringing are really claims that your individual

1  citizens should be bringing."

2      So as to the suit between the State and the

3  federal government, that suit was dismissed.

4          THE COURT:  Based upon the rejection of the

5  Tenth Amendment argument?

6          MR. McELVAIN:  They did not reach the merits.

7  They said that the State was the wrong party to bring

8  the claim because the State cannot bring claims on

9  behalf of their citizens.

10          THE COURT:  Who was the right party to bring

11  the claim in the Mellon case?

12          MR. McELVAIN:  An individual citizen who was

13  harmed by what the federal government was doing.

14          THE COURT:  Do you agree, Mr. Wyrick, that's

15  basically what the case says?

16          MR. WYRICK:  It was a parens patriae case.

17  Of course, we do not rely on parens patriae standing

18  in this case.  That's one misconception that the

19  government has in the briefings.

20          THE COURT:  Do you -- you both say that each

21  other has misconceptions, but that's not -- I probably do

22  too.

23      Do you rely upon the Tenth Circuit -- not Tenth

24  Circuit -- the Tenth Amendment, Mr. Wyrick?

25          MR. WYRICK:  You know, we do have the one

1  claim, the Garcia claim, that we have included.

2          THE COURT:  Oh, we will get to that.

3          MR. WYRICK:  Yes.  It is Count 4 --

4          THE COURT:  We will get to that at the end.

5          MR. WYRICK:  Right.  No, our other counts, our

6  counts that relate to the IRS rule directly, the APA

7  claim and the old -- and just the claim that it is

8  unauthorized by law do not rely on the Tenth Amendment.

9          THE COURT:  Okay.  So the -- I'll call it

10  the Garcia claim.  I know that's not what it really is,

11  but it is at least partially based on the Tenth

12  Amendment?

13          MR. WYRICK:  Yes.  I mean, the idea there is

14  that Congress's commerce power doesn't go so far as to

15  allow them to impose these obligations on states.

16          THE COURT:  Okay.  In that regard, I take it

17  the State of Oklahoma does not see the Tenth Amendment

18  to the constitution as simply a tautology?

19          MR. WYRICK:  Well, we are certainly

20  disappointed with the case law that has gone that route.

21  That's right.

22          THE COURT:  It has been described that way.

23          MR. WYRICK:  Right.  We think it has some

24  meaning and, you know, the cases that came before

25  Garcia and those that have come after, Prince and

otherwise, I think, you know, suggested that -- in the

Bond versus United States case, just a couple of terms

ago, the Kennedy opinion suggested that there might be

more to the Tenth Amendment than the Court has given

credit for in previous years.

THE COURT:  Okay.  We are going to come back

to that.  I sort of jumped ahead of my questions there,

but...okay.

Mr. Wyrick, what are the concrete facts showing

injury to the State of Oklahoma that you have pled in

your amended complaint, that you have pled?

MR. WYRICK:  The first injury we have alleged

is the injury to the state as a sovereign.  It is

really that Lujan -- Wyoming versus United States type

injury where Congress by statute has given someone a

right to do something and an agency has taken that away.

If we are right on the merits, and I think we --

THE COURT:  Okay.  Who is the someone?

MR. WYRICK:  The someone -- the State of

Oklahoma in this case, yes.

THE COURT:  Okay.  So it is not just someone,

it is the State of Oklahoma.

MR. WYRICK:  Right.  The Affordable Care Act

-- Congress in the Affordable Care Act, you know,

described a system where it was the states who would

1  decide whether they would set up health exchanges or

2  they would elect to have the federal government do that.

3  And as a consequence of those actions, that would

4  determine whether certain tax credits were allowed

5  within the state --

6          THE COURT:  I understand that, but my question

7  was -- and you partially answered it, but my question

8  was:  What concrete facts showing injury have you pled

9  in your amended complaint?  And you have said, first of

10 all, injury to sovereignty of the state of Oklahoma.

11    What else?

12         MR. WYRICK:  That's the first injury --

13         THE COURT:  Right.

14         MR. WYRICK:  -- that the IRS rule took away.

15 We have also alleged that in our capacity as a large

16 employer we are subject to the 4980H assessments

17 because of this IRS rule.

18         THE COURT:  Okay.  So the State of Oklahoma

19 itself as an employer --

20         MR. WYRICK:  As an employer.

21         THE COURT:  Just like --

22         MR. WYRICK:  Just like the Taco Bell

23 franchisee or even the --

24         THE COURT:   Or the Pruitt Corp?

25         MR. WYRICK:  Right, or Pruitt Corp, absolutely.

1          THE COURT:  Okay.  Sorry, Mr. Pruitt.  I am

2   not picking on you.  I am just -- you are the Plaintiff,

3   so I thought I would use you.

4       Okay.  So sovereignty, Oklahoma as an employer,

5   a large employer.  What else, what other concrete facts

6   of injury?

7          MR. WYRICK: I would like to expand on the

8   second for just a moment, if I may.

9          THE COURT:  Sure, go ahead.

10          MR. WYRICK:  It is -- the government has taken

11  a narrow view of being subject to that.  It is not just

12  that we are now within the crosshairs of the regulation.

13  They seem to think that no one can be injured unless

14  they pull the trigger on the penalty and they penalize

15  us.  We have also pled that it imposes, you know,

16  burdensome regulatory burdens on us that --

17          THE COURT:  So I think it is planning,

18  compliance and --

19          MR. WYRICK:  Planning, compliance, record

20  keeping and also the fact that at least in a couple

21  of respects it appears that our benefits plan does not

22  comply with the new federal requirements.

23          THE COURT:  Planning, compliance and record

24  keeping.  Is that sufficient concrete evidence of

25  injury to get past a motion to dismiss?  I mean, don't

1   you have to plead more than that?  I mean, I can't

2   take as true conclusory allegations in the amended

3   complaint.  I mean, everyone has to do planning,

4   compliance and record keeping with regard to their

5   taxes.  They can't sue on those grounds, can they,

6   even an individual?  They can't pay the tax and sue

7   because, gosh, I was injured because I had to have

8   planning, compliance and record keeping and, therefore,

9   give me a refund?

10          MR. WYRICK:  But that would be the type of

11  generalized injury that every taxpayer in the United

12  States suffers as a result of a regulation.  That

13  doesn't particularize it enough.  But the courts and

14  in the case law, when you are the type of entity that

15  is directly within the crosshairs of a regulation --

16  you know, record keeping and reporting requirements

17  are often found to satisfy injury, in fact. I mean,

18  look at the abortion cases.  Planned Parenthood --

19          THE COURT:  Oh, let's not look at those.

20  Let's look at --

21          MR. WYRICK:  Planned Parenthood versus Casey

22  -- I mean, the abortion clinics rely on the fact that

23  those statutes caused them to have to report to the

24  state.  That was their injury as a clinic and why

25  they had to standing to sue.

1       We have an injury here whether there is a new

2    statute --

3              THE COURT:  Did you cite any of those cases,

4    did you cite Casey?

5              MR. WYRICK:  I don't think we cited Casey in

6    the briefing.

7              THE COURT:  That's okay.  Mr. McElvain, are

8    you saying that compliance, planning and record keeping

9    are insufficient?  Because those were pled.

10             MR. McELVAIN:  Well, they weren't pled

11   actually.  If you go back to the complaint, there is

12   none of this in the complaint.  It was argued in the

13   opposition to the Motion to Dismiss.

14             THE COURT:  Talking about what isn't in the

15   complaint, the link to the State of Oklahoma's plan --

16   medical plan for benefits, it is not in the complaint

17   either --

18             MR. McELVAIN:  Correct.

19             THE COURT:  And you cited that.

20             MR. McELVAIN:  Right, but it is their burden

21   to allege facts.  The only reason we cited the plan is

22   to make a further point that --

23             THE COURT:  But I can't go outside the

24   complaining in deciding a Motion to Dismiss.

25             MR. McELVAIN:  All that you need to do to

1  decide the Motion to Dismiss is to show -- is to say that

2  they have pled absolutely nothing about whether they

3  will be subject to 4980H or not.

4          THE COURT:  Okay.  Then whether they pled or

5  didn't plead those factual statements about the Oklahoma

6  -- about the State of Oklahoma health benefit plan, your

7  citation to some web link that says, oh, it looks like

8  they won't be hurt, that is outside the complaint and

9  I can't really rely on that, can I?

10         MR. McELVAIN:  Correct.  All you need to do

11  is look back at the complaint and see if there is --

12         THE COURT:  All I can do, all I can do.

13         MR. McELVAIN:  Correct, correct.

14         THE COURT:  Okay.  Thank you.

15         MR. McELVAIN:  Your Honor?

16         THE COURT:  Yes.  I'm sorry.

17         MR. McELVAIN:  May I return to your question

18  about the Gestalt theory?

19         THE COURT:  Oh, I would love to, sure.

20         MR. McELVAIN:  The thought that did not occur

21  to me at the time, but has occurred to me now is that,

22  in fact, this has actually been directly addressed by

23  the Supreme Court.  In cases like Lewis versus Casey

24  and DaimlerChrysler Corporation versus Cuno, and I

25  can provide the citations to you.

1          THE COURT:  They were -- I know that

2    DaimlerChrysler was cited.

3          MR. McELVAIN:  It was, yes, sir.

4          THE COURT:  So I've got that one.

5          MR. McELVAIN:  The Supreme Court was careful

6    to note that standing is not dispensed in gross.

7    So Plaintiff must show a standing individually for each

8    claim and for each form of relief sought on each claim.

9    So the Supreme Court has been very careful to note

10   that, in fact, you do go one by one and see if each

11   individual claim can survive or not.

12         THE COURT:  Good for you.  Mr. Wyrick?

13         MR. WYRICK:  Well, I didn't understand that to

14   be the Court's point.  I mean, certainly each Plaintiff

15   has to allege facts sufficient to satisfy standing as

16   to each claim.  That's not the issue.  I thought the

17   Court's point was whether, you know, in the aggregate

18   the harms that have occurred to the State -- you know,

19   if each individually might not satisfy across the

20   line, if together they do, I think absolutely.

21         THE COURT:  Well, that was my point.

22         MR. WYRICK:  I think their -- the Daimler-

23   Chrysler case doesn't stand for the proposition that

24   you can't do that.

25         THE COURT:  What does it stand for?

1          MR. WYRICK:  It stands -- I think what he said

2   is correct, that each Plaintiff has to allege facts

3   sufficient to allege injury as to each claim, which is

4   really a noncontroversial proposition.

5          THE COURT:  Well, we will see if it is

6   noncontroversial or not.

7      Okay.  Mr. Wyrick, how do you get around the

8   Wyoming versus U.S. Department of Interior case?  I

9   mean, it is sort of tough, isn't it?

10         MR. WYRICK:  I don't think so.  I mean, I

11  think if you look at the Wyoming -- I want to go back

12  to Wyoming versus United States for just a minute

13  because I think it is on all fours with this case.

14         THE COURT:  Is that the Department of

15  Interior --

16         MR. WYRICK:  That's the ATF case.

17         THE COURT:  Okay.  Well, no, I don't want to

18  go back to that.  I want to stay with the one under

19  which you lose and you tell me how you get around it.

20         MR. WYRICK:  Well, because here what we have

21  alleged is not the type of injury that has occurred to

22  the State -- I mean, in Wyoming it was the trade-off

23  of the coal rights on the ranch in exchange for an

24  easement, right?  What we have alleged here is that

25  we actually have a congressionally granted statutory

1   right.  There what they were -- what Wyoming was

2   complaining about was that there was perhaps this

3   right that they might have or someone might have to

4   object to that trade that the federal government was

5   making.  And they said, well, you haven't shown that

6   you are injured by that trade that anyone is making,

7   nor have you shown, you know, that you as a state have

8   been granted the right to object to that.  In the

9   Wyoming versus United States case, however, the Court

10  said --

11          THE COURT:  Let me stop you.  I'm sorry.

12      Mr. McElvain, how do you get around Wyoming versus

13  United States -- well, el rel Crank -- no, Wyoming,

14  el rel Crank versus United States, which is the ATF

15  case.

16          MR. McELVAIN:  The ATF case.  In that case the

17  Tenth Circuit held that Wyoming had standing because

18  the actions of the ATF implicated Wyoming's power to

19  create and enforce a legal code and the "...and enforce

20  language" is what is key.  If the State of Oklahoma

21  starting with the challenge to the, you know, coverage

22  provision.  If the State of Oklahoma were actually

23  doing something having to do with individuals -- if

24  there was some way that that provision were actually

25  regulating Wyoming as a state, then, of course, they

1 would have standing, but the problem there is that

2 it is not. That provision applies to individuals. It

3 does not apply to a state in any way. So Wyoming is

4 simply attempting to interpose itself in a dispute --

5 a potential dispute between the individual residents

6 and the federal government. The fact that there was

7 a state constitutional amendment does not change the

8 analysis because, again, remember, the language is

9 create and enforce a legal code.

10           THE COURT:  And we will get to that in a

11 little bit too, but I understand what you are saying.

12 I understand that is sort of a weak link in your chain.

13 You probably won't admit that, will you?

14           MR. McELVAIN:  I am sorry, what's a weak link?

15           THE COURT:  That case, <u>Wyoming versus U.S.</u>

16 <u>Department of Interior</u>.  That is sort of a weak link

17 in your chain?

18           MR. McELVAIN:  <u>Wyoming versus Department of</u>

19 <u>Interior</u> is the case about the snowmobiles?

20           THE COURT:  No.  I'm sorry.  The case about

21 the coal land swap.

22           MR. McELVAIN:  I'm sorry, the ATF case?  Is

23 that the --

24           THE COURT:  Yes.  I am sorry, sir, yes, yes.

25           MR. McELVAIN:  Okay.  So <u>Wyoming versus</u>

1  United States, the ATF case -- and there are a lot of

2  Wyoming cases.  So it can get very confusing.

3      Again, the relevant language is "create and enforce

4  a legal code."  This is specifically discussed by the

5  Virginia versus Sebelius case, which said, "We don't

6  have to go into conflict with the Tenth Circuit.  We

7  are well onboard with the way the Tenth Circuit analyzed

8  that case.  The Virginia case was entirely different

9  because we are only talking about a state declaratory

10  statute.  The state enacts something declaring its

11  opposition to what is popularly known as the individual

12  mandate and -- and that is fine, they can declare their

13  policy views, but it doesn't effect at all the way the

14  relationship would be between an individual and the

15  federal government in any potential lawsuit between

16  those parties.  So Virginia didn't have standing in

17  that case and Oklahoma stands in the same posture here.

18          THE COURT:  Well, this paragraph cited by

19  Oklahoma from the Wyoming versus -- let's call it the

20  Wyoming versus ATF case, just to keep them straight

21  and so I won't be confused, as you said.

22      "The Act, however, also grants States significant

23  latitude to determine the applicability of the Act by

24  relying on state law in part to determine the classes

25  of individuals that may not possess a firearm.

1  Therefore, in light of the State's interest in

2  influencing" -- not enforcing -- "influencing the

3  applicability of the Act, we conclude that Wyoming's

4  alleged injury falls within the zone of interest of

5  the Act," meaning they have standing.

6      Okay.  So it doesn't say enforcing, it says

7  influencing.

8          MR. McELVAIN:  Right, but -- I'm sorry.

9  I didn't mean to interrupt you.

10          THE COURT:  No, no, you are fine.

11          MR. McELVAIN:  But the bottom line though is

12  that the reason that it mattered for Wyoming is that

13  they had their own state expunction statute, if that's

14  the correct pronunciation.

15          THE COURT:  Expunction?

16          MR. McELVAIN:  Expunction is the term that was

17  used in the case.  It is not a term I had ever heard

18  before.  Expungement is the term I would use.

19          THE COURT:  Expunction?

20          MR. McELVAIN:  Yes.  Anyway, they had their

21  own state statute which would have been enforced and

22  implemented one way if they had won the case and

23  enforced and implemented a different way if they had

24  lost the case.  ATF had come to Wyoming and said you

25  must change this statute or else we are going to be

1  enforcing concealed carry against all Wyoming

2  residents.  So there was a direct and immediate threat,

3  if you want to use the term threat, to how Wyoming

4  conducted its own regulatory activities.  That's not

5  what we have here, either in the challenge to the

6  minimum coverage provision or in the challenge to the

7  employer tax.

8            THE COURT:  Which is the IRS rule?

9            MR. McELVAIN:  The IRS rule, yes.

10            THE COURT:  Okay.  The parens patriae theory,

11  I think you cited it for the proposition that the

12  United States is presumed to represent the citizens of

13  a state, I guess, even more so or collaterally with

14  the state itself.  I mean, is that a fair reading of

15  what you cited the case for?

16            MR. McELVAIN:  As between the state and the

17  federal government, yes, that's one of the underlying --

18            THE COURT:  The government wins as far as

19  representation of the citizens?

20            MR. McELVAIN:  As far as jurisdiction in

21  federal court goes, yes.

22            THE COURT:  Okay.  Exceptions to that?  None?

23            MR. McELVAIN:  None.  Again, if a state

24  shows its own actually activities are harmed, the State

25  may have standing to sue on its own behalf, but it --

```
 1          THE COURT:  In which case it just wouldn't

 2   be parens patriae?

 3          MR. McELVAIN:  Correct.

 4          THE COURT:  Okay.  Mr. Wyrick?

 5          MR. WYRICK:  It seems as though Massachusetts

 6   versus EPA with its talk about --

 7          THE COURT:  What was that?

 8          MR. WYRICK:  Massachusetts versus EPA with

 9   its talk about quasi sovereign interest recognized

10   that there might at least be some class of what you

11   might think of as a parens patriae type claim where

12   the State also has an interest in the outcome, that

13   quasi sovereign interest, but here you are right,

14   we directly -- the injuries we are relying upon are

15   injuries to the State of Oklahoma, not the injuries

16   to any of our citizens.

17          THE COURT:  Okay.  Back to Wyoming versus

18   ATF, was it correctly decided?

19          MR. McELVAIN:  I'm sorry?

20          THE COURT:  Was it correctly decided?

21          MR. McELVAIN:  I think that there may be

22   reason to question whether it was, but obviously it's

23   Tenth Circuit authority, so we are not going to be

24   doing that questioning here today.

25          THE COURT:  I understand.  Judge, you know,
```

1 as a lawyer can you find -- and I don't want to reach

2 into the depths of your heart and make you expose it

3 to the public, but I just wondered if you thought it

4 was correctly decided.  I have been -- I was asked

5 that about certain cases when I practiced law and I

6 hate it, but I figure it gives me leave to do it to you.

7          MR. McELVAIN:  If I can plead agnosticism

8 on the point, I will.

9          THE COURT:  All right.

10          MR. McELVAIN:  We can assume that it was

11 rightly decided because all it said was there is a

12 case where Wyoming's own regulatory activities are

13 being impacted and --

14          THE COURT:  And, in fact, the Department of

15 Interior case, Wyoming versus Department of Interior,

16 it was subsequent to the ATF case, right?

17          MR. McELVAIN:  Yes.

18          THE COURT:  Its reason flowed from the ATF

19 case.

20          MR. McELVAIN:  Yes, I think that's fair.

21          THE COURT:  Okay.

22                         (PAUSE)

23          THE COURT:  You see, you made me go out of

24 order and I've already crossed off things that we've

25 already covered.

1      Okay, Mr. McElvain.  I hope you don't think I am

2  picking on you.  I made you stand up front and I am

3  asking you more questions.

4           MR. McELVAIN:  That's fine.

5           THE COURT:  Okay.  After January 14th, would

6  the State of Oklahoma have standing?  I mean, you cited

7  a case, South Carolina versus Katzenbach, which I believe

8  went to that issue.  It is almost more of a rightness

9  issue more than a standing issue, but you cited it for

10  that reason why, certainly before January 1st, 2014,

11  the State of Oklahoma doesn't have standing.

12           MR. McELVAIN:  Right.  That's an additional

13  problem they have under the South Carolina versus

14  Katzenbach reasoning, but even after January of 2014

15  they don't have standing because, again, it goes to

16  the -- what they claim their injuries are.  The

17  sovereign interest that they are claiming is a belief

18  that the State economy will be harmed.  Now, obviously

19  we vigorously dispute.  We think that the economy will

20  be helped, but it doesn't --

21           THE COURT:  A policy difference between the

22  State of Oklahoma and the federal government doesn't

23  confer standing?

24           MR. McELVAIN:  Correct.

25           THE COURT:  But a legal difference in the

1   effect of the statute would?

2          MR. McELVAIN:  That actually affects Oklahoma's

3   own activities would impart standing, yes.

4          THE COURT:  Okay.  So aren't we getting the

5   cart before the horse?  Aren't we deciding the merits

6   in order to decide standing?  How do we know without

7   getting to the merits that this is simply a policy

8   disagreement or this is a difference in the legal

9   effect of the law?

10         MR. McELVAIN:  No, we don't need to get into

11  the merits.  And again, to be clear, we do vigorously

12  dispute the merits.  We believe the rule was properly

13  promulgated.  We believe Oklahoma is only looking at

14  one half of the relevant statutes.  But you can even

15  assume that they are right and they are still not

16  alleging any injury that they themselves suffer as

17  opposed to an injury that perhaps an employer within

18  Oklahoma might suffer.

19         THE COURT:  Wouldn't that be really more -- I

20  know you dispute my statement, which I think is

21  Blackletter Law.  We can dispute that ourselves, but

22  wouldn't that be something more appropriately decided

23  on the merits because I can throw out a case for lack

24  of jurisdiction anytime, right?

25         MR. McELVAIN:  True, but we do have to get

1  passed the Motion to Dismiss stage and establish

2  whether they have alleged a concrete injury.

3        THE COURT:  Mr. Wyrick, under Twombly your

4  5assessment is that all Oklahoma has to do is show --

5        MR. WYRICK:  -- enough to convince the Court

6  that our claims are plausible.  We will plausibly be

7  able to meet our standard --

8        THE COURT:  Okay.  And there is nothing here

9  plausible, Mr. McElvain?

10       MR. McELVAIN:  Correct.  Because when you look

11 at the individual -- types of individual injuries they

12 are claiming, the sovereign injury as a matter of law

13 is not an injury that they can sue on.  The injury to

14 their -- in their status as an employer, there is

15 simply nothing pled in the complaint at all.  They

16 don't allege at all whether they are going to incur

17 the assessment and manage to get into the benefits

18 plan, speculation about temporary employees or

19 what have you, which we think they are also wrong on --

20       THE COURT:  But that is also something

21 outside of --

22       MR. McELVAIN:  It is also something way

23 outside of the pleading, so we are not even getting

24 to that point yet, correct.

25       THE COURT:  Okay.  Mr. Wyrick?

1          MR. WYRICK:  Well, first, I want to dispute

2    the sovereign injury that he described, the damage to

3    the economy.  The sovereign injury that we have alleged

4    upfront is that we had a choice -- Congress gave us

5    the choice.  It was ours to make as the State of

6    Oklahoma.

7          THE COURT:  A right given to Oklahoma by the

8    federal statute?

9          MR. WYRICK:  By statute and they took that

10   away.

11         THE COURT:  Let me interrupt.  How does that

12   interplay with the right given by the ACA to Oklahoma

13   -- interplay with the amendment to the constitution

14   of Oklahoma giving Oklahomans the right not to be

15   included in any healthcare system?  Is there a

16   Gestalt issue there?

17         MR. WYRICK:  I'm keeping those two separate.

18   I'm keeping Count 1 separate --

19         THE COURT:  Okay.  Is that what I should do?

20         MR. WYRICK:  I think so.

21         THE COURT:  Okay.  That's why we are here,

22   is because the Court needs guidance and education.

23   So I want to hear what the parties have to --

24         MR. WYRICK:  Wyoming versus United States

25   speaks both to Count 1 and the rest of our counts.

1   I think it is on all fours with the rest of the counts,

2   but, yeah, I think in terms of the injury that we have

3   alleged there is a difference.  The large employer

4   mandate injury is -- Congress absolutely gave the

5   State this choice and the IRS took that away.

6           THE COURT:  Or in your view took it away.

7           MR. WYRICK:  If we are right on the merits,

8   took it away.

9           THE COURT:  And if they are right on the

10  merits, the IRS took it away legally.

11          MR. McELVAIN:  I believe --

12          THE COURT:  I'm sorry.  If they are right on

13  the merits, the IRS took away a legal right of the State

14  of Oklahoma and it is not just a policy difference?

15          MR. McELVAIN:  No.  It is still a policy

16  difference and here is why:  The Supreme Court has said

17  in <u>Lujan versus Defenders of Wildlife</u> that even in a

18  case where Congress grants a statutory right -- and

19  obviously we dispute that there has been any such grant

20  here, but even leaving that aside --

21          THE COURT:  I'm sorry.  I hate to interrupt.

22  The ACA didn't grant a statutory right to the State of

23  Oklahoma?

24          MR. McELVAIN:  Well, let's be precise.

25          THE COURT:  Please.

1          MR. McELVAIN:  They do have the right to

2    decide not to set up their own exchange.  That's

3    undisputed.  They have that right.

4          THE COURT:  Okay.  So they have the right --

5          MR. McELVAIN:  That is not an issue.

6          THE COURT:  So they have a right under the ACA?

7          MR. McELVAIN:  Correct.

8          THE COURT:  That's all I wanted to know.  Thank

9    you.

10         MR. McELVAIN:  Right.

11         THE COURT:  Okay.  In that regard -- y'all

12   are really doing a great job of following along with my

13   notes that I thought were totally disorganized.  I

14   appreciate that.  I don't know how you -- have you

15   read these?

16         MR. McELVAIN:  I wish, Your Honor.

17         THE COURT:  Okay.  So Oklahoma exercised its

18   choice given it statutorily by the United States

19   Government under the ACA with the understanding that

20   certain effects flood from that based upon if they are

21   right on the merits, the Blackletter of the law.

22      Okay.  How is that not commandeering state

23   government implementation of policy when the effects of

24   the State of Oklahoma's interpretation of a law given

25   to them statutorily by the federal government are such

44

1  that they can determine what premium credits and what

2  -- well, let's call them what premium credits and what

3  penalties can be -- or taxes can be assessed by making

4  that choice?  Isn't that a choice I have to make on the

5  merits?

6        MR. McELVAIN:  No, because the commandeering

7  cases go to requirements actually imposed on the state

8  itself.  So in New York versus United States, New York

9  was required to take the radioactive waste or Oregon

10 versus Mitchell, where Oregon was required to setup

11 its voter registration forms in some way.  That's

12 pretty far-field from saying that how the federal

13 government implements its own federal tax credit

14 program has anything to do with what a state government

15 is actually itself doing.

16        THE COURT:  But if Oklahoma is right on the

17 merits, the ACA gave them the right to do that.

18        MR. McELVAIN:  If -- assuming that that is

19 right and that there has been that statutory right

20 granted -- and, of course, we dispute that -- but even

21 assuming that is right, the Supreme Court has said over

22 and over again, most notably in Lujan versus Defenders

23 of Wildlife, that even Congress granting a statutory

24 right does not erase the concrete injury requirement.

25 You still have to show that some violation of the

1 statutory right affects a concrete interest of yours

2 in order to have standing.  And that's the problem

3 here, is that Oklahoma does not have that concrete

4 injury here.

5          THE COURT:  Have you given me -- sorry.

6 Have you given me the facts of the Lujan case yet?

7          MR. McELVAIN:  I am afraid I am not well-

8 versed, but I'm -- I am -- it was an environmental

9 case, but the claim was --

10          THE COURT:  But you are --

11          MR. McELVAIN:  -- that they had a statutory

12 right --

13          THE COURT:  But you are relying upon it and --

14 well, okay.

15          MR. McELVAIN:  I apologize.

16          THE COURT:  No, no, no.  I mean, I am just

17 asking.  It was excellent briefing in the case.  My only

18 criticism is that you cited a lot of different law --

19 well, both sides did -- a lot of different law for --

20 and a lot of cases for discrete points of law, but you

21 don't give me the facts for me to -- for the Court to

22 determine whether or how that applies to this case.

23 That's why I am asking a lot for the facts of the

24 cases.  I am not trying to put you on the spot.  I am

25 just trying to figure out how it applies to where we

1   are now.

2       Mr. Wyrick, the facts of the Lujan case, please.

3           MR. WYRICK:  Yeah.  In that case the federal

4   government changed a regulation where they no longer had

5   to do sort of like an environmental assessment of some

6   sort for actions that they took in federal countries or

7   on federal lands in foreign counties.  They scaled that

8   back to only federal lands in the United States or on

9   the high seas.  So the Plaintiffs, this environmental

10  group, alleged...well, we travel to Africa and other

11  places and visit some of these lands and we are injured

12  by your failure to do environmental assessments when

13  you take some significant federal action on those lands.

14          THE COURT:  So what was the result of the

15  Lujan case?

16          MR. WYRICK:  They found that those plaintiffs

17  did not have standing because they had failed to allege

18  that they had any imminent plans to visit any of those

19  foreign lands that they claimed should be subject to

20  the regulation.

21          THE COURT:  But they changed -- is it the

22  same scenario as here that -- at least Oklahoma is

23  alleging -- that the federal government gave us a

24  statutory right and through regulation is taking it away?

25  Is that -- is that analogous or not?

1          MR. WYRICK:  It is a little different because

2     those plaintiffs weren't who had the right to conduct

3     an environment assessment.  It was an obligation imposed

4     on the federal government itself by federal statute to

5     conduct an environmental assessment or -- I don't know

6     if it was actually an environmental impact statement at

7     issue, but whatever environmental assessment the

8     regulations required and they just alleged that they

9     would be sort of, you know, tangentially harmed by the

10    failure to do that because it would have an impact on

11    the wildlife that they wanted to go see if the government

12    failed to do that.  Whereas here, we have a statute that

13    directly regulates the State of Oklahoma and gave the

14    State of Oklahoma the choice and then they took that

15    away.

16          THE COURT:  Without getting into the last part

17    of his argument about how it applies to the State of

18    Oklahoma, did you agree Mr. McElvain with his description

19    and interpretation of the Lujan case?

20          MR. McELVAIN:  Yes, but the --

21          THE COURT:  Okay.  You just disagree on the

22    result xx(11:19.58)

23          MR. McELVAIN:  Yes.

24          THE COURT:  Okay.  Thank you.  So we agree that

25    the ACA gives -- bestows upon the State of Oklahoma at

least one statutory right and the government's position
is that...well, they exercised that right to choose not
to create an exchange, so we are going to, which I agree
is perfectly acceptable under the statute, but Oklahoma
says...well, by exercising that right the statute gives
us other rights, which is to prevent these credits and
these penalties.  The government is saying, no, the
State decision is exactly what the federal government's
decision is.  Let's assume that's right.  I know you
probably disagree with it.  In that case the choice is
meaningless.  The statutory right -- the choice given to
Oklahoma is meaningless.

MR. McELVAIN:  No, it means quite a bit, Your
Honor.  The State either --

THE COURT:  So tell me what it means.

MR. McELVAIN:  Well, the State can decide
whether or not it wants to setup its own exchange,
and some states decide it is better because if you do
set-up the exchange you retain a certain amount of
regulatory authority over insurance plans within that
exchange, which you are surrendering to the federal
government if you decide not to do that.  There are
individual -- you know, it gets fairly (inaudible),
but individual regulations of participating insurers
would either be run by the federal exchange or by the

1  state operated exchange.  So that's one side of it.

2  The other side of it, of course, is there is some burden

3  of time and resources and manpower in setting up the

4  exchange.

5          THE COURT:  Which is one of their concrete

6  allegations of damage.

7          MR. McELVAIN:  No, because they are not doing

8  the exchange.  They have already decided not to do it.

9  So that's the lawful choice and they can do that.

10  That's fine, that's the choice that was given to them

11  by the Affordable Care Act.

12      The further claim that they have the right to

13  decide whether the federal government gives federal tax

14  credits to several hundred thousand of its residents

15  does not state a claim of concrete injury because at

16  that point you are just left with the assertion that

17  we disagree with the federal government's application of

18  federal law.

19      In the Wyoming versus Lujan case, they had the

20  exact on this.  "A generalized grievance that the

21  government is not acting in a way -- the federal

22  government -- the federal government is not acting in

23  a way in which the State maintains is in accordance with

24  federal law is insufficient to demonstrate standing."

25  That's 969 F2d 877 at 883.  I think that's dispositive

1    of this case.

2              THE COURT:  Lujan?

3              MR. McELVAIN:  Wyoming versus Lujan, yes.

4              THE COURT:  Okay.  So that's your primary

5    focus on prevailing, on standing, is Wyoming versus

6    Lujan?  And I am not -- I am not trying to pin you

7    down, but --

8              MR. McELVAIN:  Well, I --

9              THE COURT:  But you just said this case turns

10   on -- this case turns on Wyoming versus Lujan.  Did I

11   hear you say that correctly?

12             MR. McELVAIN:  I think the -- well, I am not

13   sure how to --

14             THE COURT:  Is that overbroad?  Did you mean

15   -- were you a little overbroad?

16             MR. McELVAIN:  I think I am broader than that.

17   The bottom line is, they have to show a concrete injury.

18   Their claims of a sovereign injury have been held

19   repeatedly and cases like that that does not rise to

20   the level of a concrete injury.

21             THE COURT:  Mr. Wyrick, I don't mean to throw

22   you a softball.  It is not really fair to our guests

23   here, but here's a softball:  What's your response to

24   that?

25             MR. WYRICK:  This is far from a generalized

1   grievance.  I mean, we are talking about something

2   specifically granted to the states in which -- and, you

3   know, as Your Honor noted from the briefing, it is a

4   decision of huge policy import to these sovereign

5   states.

6           THE COURT:  If it's just a difference in

7   policy interpretation, there's no standing.

8           MR. WYRICK:  It is not a difference in policy

9   interpretation.  It is that Congress gave the states

10  the right to make the choice of what policy would be in

11  place in its state and that's where it is on all fours

12  with Wyoming versus United States.  Just like Wyoming

13  had an interest in determining the applicability of

14  federal law in that case, the State of Oklahoma has an

15  interest in determining the applicability of this law

16  in our state.

17          THE COURT:  Okay.  Mr. McElvain, suppose --

18  this is a hypothetical.  Okay?  Suppose the federal

19  government came in and said we are going to pay all of

20  the expenditures of the State of Oklahoma, all of them.

21  All of the -- everyone who gets benefits in the State

22  of Oklahoma, we are going to pay.  We are going to pay

23  for the Department of Corrections, we are going to pay

24  for the roads and the bridges, but, of course, we are

25  going to do it the way we want to.  Now, that would be

1 commandeering of state sovereignty, wouldn't it?

2        MR. McELVAIN:  I think you would have to look

3 to the language and the Supreme Court's opinion from

4 last year, NFIB, as to what amounts to a compelled

5 choice.

6        THE COURT:  I am sorry, I don't mean to

7 express disbelief, but are you really saying that

8 wouldn't be just prima facia commandeering of state

9 sovereignty?

10        MR. McELVAIN:  I am suggesting it is highly,

11 highly unlikely that that would ever happen --

12        THE COURT:  That's not what I am asking.  I

13 said it was a hypothetical.

14        MR. McELVAIN:  And -- well, I am sorry if I

15 have -- let me be sure I understand your hypothetical.

16 The federal government is coming in and saying you have

17 the choice Oklahoma that we will pay for everything or

18 they just are saying they are going to do that?

19        THE COURT:  We are just going to do it.

20        MR. McELVAIN:  Oh, well, yeah, I think that

21 probably would constitute commandeering.

22        THE COURT:  Because that's what the IRS rule

23 does too, isn't it?  I mean, just on a different

24 scale.  I used the hypothetical to see, are they

25 completely different or is it a sliding scale of what

1  they are doing?

2          MR. McELVAIN:  I think that's entirely

3  different.  The IRS rule has nothing to do with any

4  of the State of Oklahoma's activities.  It is just a

5  tax credit on a federal tax return that is going to

6  individual residents.  It has nothing to do with the

7  State of Oklahoma.

8          THE COURT:  Have I asked you about <u>Virginia</u>

9  <u>versus Sebelius</u> yet?

10         MR. McELVAIN:  You have not.

11         THE COURT:  I am now.  The facts of that case?

12         MR. McELVAIN:  Actually, it is almost identical

13 to the original complaint in this case because Virginia

14 had enacted a statute declaring their opposition to the

15 minimum coverage provision and they claimed that statute

16 as their basis for standing to sue to challenge the

17 constitutionality of that.  The Fourth Circuit held that

18 is not sufficient.  Again, this goes back to the

19 language of what the state's interest in it is -- is the

20 interest in creating and enforcing a legal code.  So just

21 enacting a statute that is declaratory of policy does not

22 create a concrete injury that would make Virginia the

23 right party to bring that lawsuit as opposed to

24 individual persons who might have been affected by them.

25         THE COURT:  How does that differ from the ATF

1   case though?  Is it just a difference of opinion between

2   the Fourth Circuit and the Tenth Circuit?

3           MR. McELVAIN:  No.  Virginia specifically

4   discussed the ATF case and said we don't need to decide

5   whether it is rightly decided.  We can assume that it is.

6   It is very different from what we have here because in

7   Wyoming, Wyoming had its own regulatory activities at

8   stake.  It is the way Wyoming -- as we have already

9   discussed -- it was the way Wyoming operated its

10  expunsion or expungement statute.  It would have

11  operated differently depending on if -- depending on

12  whether they had won the case.  So the state government

13  itself actually really had something concrete at stake

14  in the outcome of the case.

15          THE COURT:  Mr. Wyrick, differentiate <u>Virginia</u>

16  <u>versus Sebelius</u>.  I mean, it is pretty important to this

17  decision, isn't it?

18          MR. WYRICK:  To Count 1 absolutely.  And that

19  count -- you know, we understand that the NFIB Sebelius

20  case has come down.  We are asking the Court to dispose

21  of that claim consistent with NFIB Sebelius.  We are

22  not trying to revive the claim.  You want to talk

23  about --

24          THE COURT:  Under the commerce clause rather

25  than the --

1          MR. WYRICK:  The taxing power rather than the

2   commerce clause, absolutely.

3          THE COURT:  I am sorry, I interrupted you.  Go

4   ahead with your explanation of the differentiation of

5   this case from Virginia versus Sebeblius.

6          MR. WYRICK:  Factually it is pretty close,

7   but the Fourth Circuit got that case wrong and they got

8   that case wrong --

9          THE COURT:  Good for you.  Just go ahead and

10  say so.

11         MR. WYRICK:  Well, they got it wrong because

12  they were presented with Wyoming versus United States

13  and they rejected that reasoning incorrectly based on

14  their determination that Virginia just had no interest

15  in actually enforcing that statute, that it was just

16  purely a political statement.  And that was just a

17  decision that the Fourth Circuit made.  Now, they

18  recognized that if Virginia had some interest in

19  actually enforcing that section of its code, Wyoming

20  versus United States was squarely on point.  Now here

21  we have a constitutional amendment that prohibits

22  people in the State of Oklahoma from being subject, you

23  know, to these types of things.

24         THE COURT:  Well, let me stop you there.  First

25  of all, you don't ever appear in front of the Fourth

1  Circuit, do you?

2          MR. WYRICK:  Thankfully, no.

3          THE COURT:  Okay.  Well, you won't after today.

4          MR. WYRICK:  Yeah.

5          THE COURT:  Getting on to the state

6  constitutional amendment, okay, it doesn't put any burden

7  on the state at all.  I mean, it gives a right to the

8  citizens.  It seems to be a state policy statement, just

9  like Mr. McElvain said.  How can you argue that the ACA

10  prevents enforcement of that constitutional amendment

11  when there is nothing for the State to enforce?  It is

12  an individual right.  Who are they going to sue?  I mean,

13  if that right is violated, they are going to sue, I guess,

14  the federal government, maybe.  I don't know.  That

15  doesn't affect Oklahoma.  That question didn't make any

16  sense, did it?

17          MR. WYRICK:  Well, I think the question is...

18  the Attorney General of the State of Oklahoma is the

19  chief law officer, you know, has the authority to

20  enforce all of the state's laws.  And if we were

21  presented with a situation where someone was violating

22  that constitutional provision in a way that effected

23  the State of Oklahoma, we would absolutely enforce that

24  code.

25          THE COURT:  Can you point me to a case that

1 says that?  Because the Lujan case sounds completely

2 opposite of that.  Is that what I am hearing you say,

3 Mr. McElvain?

4          MR. McELVAIN:  Well, let me be sure I under-

5 stand Mr. Wyrick's point.  That, that -- if his claim

6 is that the state government could enforce that

7 particular constitutional amendment, I am not sure I

8 follow that from the reading of the actual text of the

9 amendment, but assuming that and as long as we are

10 talking about purely a matter of state law, that is

11 not anything that is implicated by the minimum coverage

12 provision.  The minimum coverage provision is a federal

13 tax that's not affected by the Oklahoma provision and

14 doesn't affect the Oklahoma provision.

15          THE COURT:  And again --

16          MR. McELVAIN:  So the --

17          THE COURT:  And again -- and we will disagree

18 probably or you will disagree with the statement in my

19 question, but doesn't that go to the merits of the

20 claim?  It doesn't go to standing.  It goes to -- it

21 goes to whether or not Oklahoma ultimately prevails on

22 whether or not the IRS rule or its correlation with

23 the ACA affects Oklahoma's legal rights.

24          MR. McELVAIN:  No.

25          THE COURT:  I mean, you -- I'm sorry.

1          MR. McELVAIN:  No, I'm sorry.

2          THE COURT:  No, you go ahead.

3          MR. McELVAIN:  No.  Starting with the minimum

4   coverage provision, that's not a merits question,

5   that's a standing question because Oklahoma's burden

6   is to allege some concrete injury that it suffers from

7   the federal enactment and it just hasn't.  Whatever

8   the state constitutional provision is, if it's purely

9   declaratory or if its enforcement is not affected one

10  way or the other, then there is no such injury.

11         THE COURT:  But there is -- I mean, the

12  standard is just plausibility under Twombly, Twombly

13  and Iqbal?

14         MR. McELVAIN:  But they haven't even alleged

15  plausibility yet since as a matter of law they lose

16  on the standing on that theory.

17         THE COURT:  Okay.  I guess you can call it

18  a companion case.  Is it Halbig versus Sebelius?

19  Tell me about that, Mr. Wyrick.  I assume you have

20  been following it.

21         MR. WYRICK:  Yes, I have actually.

22         THE COURT:  So have I.

23         MR. WYRICK:  I have read the briefing.  They

24  got a little ahead of us now in the summary judgment

25  stage.  That is a case filed in the D.C. district by

1 private plaintiffs making essentially the exact same

2 claims that we make here on the merits.

3      THE COURT:  Well, that's what the government

4 says you -- not what you should be doing, but what

5 should be done, right?  So there is probably no issue

6 of standing in that case?

7      MR. WYRICK:  Well, their view is that private

8 large employers might have standing.  Well, we are a

9 large -- there is no dispute in this case that we are

10 a large employer subject to these regulations and

11 subject to this penalty.

12      THE COURT:  But they don't get back to Garcia.

13      MR. WYRICK:  But there is no distinction

14 between the State of Oklahoma here in its capacity as a

15 large employer and those large employers there.  There

16 is just not.

17      THE COURT:  Respond.

18      MR. McELVAIN:  The claim that the State of

19 Oklahoma here is subject to the 4980H assessment -- as

20 we have already discussed, there is nothing pled that,

21 in fact, they are subject to it.  And if you go beyond

22 the pleadings, it is very unlikely that they would be

23 subject to it.

24      THE COURT:  So the -- well, could they amend?

25      MR. McELVAIN:  Well, they've already amended

1 once, so it would be up to the Court.

2          THE COURT:  Well, of course, I suppose.  I

3 was assuming that I would allow -- I often do that on

4 motions to dismiss, is allow leave to amend.  I am not

5 saying I am going to here, by the way.   But couldn't

6 they cure that?  It wouldn't be a futile amendment,

7 would it?

8          MR. McELVAIN:  If they came back with an

9 amendment with the allegations that they presented in

10 their opposition to the Motion to Dismiss, they would

11 still lose.  We would go through them -- particularly

12 if their claim is, well, we need to plan now.  We don't

13 know for sure that we are going to be subject to the

14 assessment in 2014, but we now to plan now for the

15 possibility.  The Supreme Court just rejected precisely

16 the same claim in Clapper, the case that I --

17          THE COURT:  That's your supplemental

18 authority, right?

19          MR. McELVAIN:  Correct.

20          THE COURT:  Give me the facts in that case

21 because the facts weren't in the supplement.

22          MR. McELVAIN:  My apologies, Your Honor.

23 The plaintiffs in that case were a group of journalists

24 and researches, I believe, who dealt with foreign

25 entities, who believed that it was possible that they

1  were subject to surveillance by the NSA --

2          THE COURT:  Where in the amendment complaint

3  is the word "possibility" used?

4          MR. McELVAIN:  I -- well, that's exactly the

5  problem.  Oklahoma does not allege anything at all

6  about whether it is subject to the assessment.  So we

7  are already at the point of where I am arguing whether

8  maybe they could amend to make their complaint look

9  more like their opposition to the Motion to Dismiss

10 and even then they will still lose.

11         THE COURT:  I could have sworn that they said

12 in their amended complaint that it will definitely --

13 that it will definitely apply to them and injure them.

14         MR. McELVAIN:  They say that they are --

15         THE COURT:  And those are factual statements

16 or at least it is a mixed question of fact and law,

17 the fact that it will injure them, which we must take

18 as true.  They didn't say it was a possibility.  They

19 said it would.

20         MR. McELVAIN:  They said that they are a large

21 employer.  They did not allege additional facts which

22 would show that, in fact, they would incur the

23 assessment.

24         THE COURT:  And an amendment would cure that?

25         MR. McELVAIN:  No, it wouldn't because --

1   unless they come up with some completely new and

2   different set of facts other than what they've talked

3   about in their opposition brief.

4           THE COURT:  Well, they can do that, can't they?

5           MR. McELVAIN:  If we get a different complaint,

6   then I would look at the different complaint and respond

7   appropriately, but we would --

8           THE COURT:  Okay.  I won't ask you to

9   speculate.

10          MR. McELVAIN:  But going to the opposition

11  brief -- so their claim is that -- the State of

12  Oklahoma's claim is fine, we don't know for certain

13  that we are going to be subject to this assessment,

14  we don't know what the future holds in 2014 or future

15  years, but we now to plan now for that possibility.

16  And that's what the Supreme Court rejected because

17  the same argument was presented by the plaintiffs

18  there that...sure, we don't know what is happening in

19  the future, but we have to take steps now to plan and

20  the Supreme Court squarely held -- and if you give me a

21  moment, I can find the language on this.

22      "Respondent's contention --"

23          THE COURT:  Sir, give me the page.

24          MR. McELVAIN:  Oh, this would be 133 Supreme

25  Court 1138 and 1151.

1      "Respondent's contention --"

2           THE COURT:  I'm sorry.  I am just -- I am not

3  as fast as you.

4           MR. McELVAIN:  Oh, I'm sorry.  I apologize.

5           THE COURT:  You probably have yours highlighted,

6  don't you?

7           MR. McELVAIN:  Right here.

8           THE COURT:  Okay.  151?

9           MR. McELVAIN:  1151.

10          THE COURT:  1151.  Okay.

11          MR. McELVAIN:  "Respondent's contention that

12  they have standing because they incurred certain costs

13  as a reasonable reaction to a risk of harm is unavailing

14  because the harm Respondents seek to avoid is not

15  certainly impending."

16      So if you can't show a certainly impending future

17  injury, you can't get around that by saying, but now we

18  are incurring present costs to avoid that future

19  possibility.

20          THE COURT:  Certainly impending.  It is not --

21  the effects on the State of Oklahoma are not certainly

22  impending?

23          MR. McELVAIN:  Correct.  It is not certainly

24  impending.  They are not certain to be subject to the

25  Section 4980H tax.  In fact, it is very unlikely that

1   they will be.

2            THE COURT:  By taking facts outside of the

3   pleading?

4            MR. McELVAIN:  Correct.

5            THE COURT:  Which I can't do?

6            MR. McELVAIN:  If, if, if it comes down to

7   this, we could read --

8            THE COURT:  Because that would be on the

9   merits if I took facts outside of the --

10            MR. McELVAIN:  Well, we could represent our

11   12(B)(1) motion as a motion on the facts, if that ends

12   up being important to the Court, but the bottom line is

13   the first thing they have to do in their pleading is

14   allege that they actually will suffer an injury with

15   sufficient plausibility under the Iqbal standard and

16   they haven't alleged that.  It is very -- again, going

17   back to what I said earlier, it is very, very unlikely

18   that they will incur the assessment, but they haven't

19   even begun to allege whether or not they are in the

20   complaint itself.  All they have alleged is they are

21   a large employer, which they are, but they have not

22   gone further than that.

23            THE COURT:  A large employer that would be

24   subject to the Act?

25            MR. McELVAIN:  Would be subject to --

1   potentially subject to the assessment if they don't --

2            THE COURT:  No, no, just -- let's jump back

3   even further than that.  A large employer that is and

4   will be subject to the Act itself?

5            MR. McELVAIN:  Correct, but that does not

6   mean that they are going to suffer any injury from the

7   operation of the Act if they are already offering

8   coverage that would qualify.

9            THE COURT:  Unless they amend and make a

10  showing of that, in which case we would have this

11  hearing all over again, which I don't really want to

12  do and I am sure you all don't want to either.  One

13  would rather win right now, I know.

14       Okay.  So, Mr. Wyrick, you agree, you would admit,

15  that the Halbig case is really completely

16  distinguishable from this one?

17           MR. WYRICK:  In terms of the state of the

18  plaintiffs?  No, they are large employers just like we

19  are.  I disagree with the premise of what Mr. McElvain

20  said that about our complaint.  We did allege that we

21  are a large employer and --

22           THE COURT:  Let's get back to Halbig.  Okay?

23  I thought you said earlier that it is completely

24  different on the issue of standing than this case.

25           MR. WYRICK:  I didn't say that.  I said we are

1   a large employer just like they are.  We are

2   indistinguishable from those private plaintiffs in

3   terms of --

4            THE COURT:  Okay.  So those are private

5   plaintiffs?

6            MR. WYRICK:  Yes.

7            THE COURT:  Okay.  So it is distinguishable

8   that way.

9            MR. WYRICK:  That's the distinction, but our

10  status as a large employer, there is not a difference.

11           THE COURT:  Well, then, why hasn't the issue

12  of standing not arisen in that case?  I mean, is it

13  because the government just decided not to challenge it?

14      Are you on that case too?

15           MR. McELVAIN:  I am, Your Honor.  We haven't

16  responded to the complaint yet.

17           MR. WYRICK:  I believe the government has

18  indicated they are going to file a Motion to Dismiss

19  on standing grounds.

20           THE COURT:  Okay.  So it will be -- it will

21  be an issue.  And I hate to talk about what you are

22  doing back in your office at the Department of Justice,

23  but if you are on the case, you can tell me that

24  standing is going to be -- is going to be challenged?

25           MR. McELVAIN:  I hate to talk about a brief

1  that hasn't been filed yet.

2        THE COURT:  I know.  I will withdraw the

3  question.  Never mind.  That's -- that's -- I understand

4  that.  Okay.

5        MR. McELVAIN:  But I will offer one

6  observation, which is that there is an Anti-Injunction

7  Act problem with the large employers.

8        THE COURT:  And we are getting to that.

9        MR. McELVAIN:  Yes.

10        THE COURT:  It is next on my list.  How did

11  you know?  All I have to do is turn the page and walla.

12     Okay.  Mr. Wyrick, in your briefing you say, hey,

13  Oklahoma isn't seeking an injunction barring enforcement

14  of the IRS rule, 4980H.

15     Okay, let's say you say that.  Isn't the effect the

16  same?  I mean, if I Rule 40 you on a declaratory basis,

17  really isn't the effect the same as an injunction?

18        MR. WYRICK:  One of the effects of that relief

19  will be that they can't assess that penalty against the

20  State of Oklahoma and its large employers, but that's --

21        THE COURT:  Okay.  So what -- go ahead, go

22  ahead.

23        MR. WYRICK:  That goes to their too narrow

24  view of the injuries that we allege.  You know, the

25  government's view is we can only allege injuries if we

1  are ever assessed the penalty.  We have alleged these

2  other regulatory burdens that are injuries that are

3  imposed upon us and the relief we seek as to the

4  36(B) tax credit regulations are aimed at curing those

5  injuries.  And, you know, if you look at the Bob Jones

6  case that they rely on, the Bob Jones University case --

7  and is the Court familiar with the facts?  I mean, I can

8  give you just a brief --

9          THE COURT:  Please, go ahead.

10          MR. WYRICK:  In that case Bob Jones University,

11  you know, had a not for profit status.  That was

12  withdrawn because of some racial policies.  They weren't

13  admitting minority students.  They sued seeking an

14  injunction to force the IRS to give them their status

15  back.  The Court rejected that claim on anti-injunction

16  grounds or basis.  Bob Jones said, well, what we are

17  asking for is just this letter that says we are not for

18  profit.  We are not actually trying to enjoin the

19  collection of a tax and the Court said...well, the only

20  injuries you complain of are that you are being taxed

21  when you shouldn't be.  That's the only injuries.

22          THE COURT:  And what should happen in that case

23  is that the tax should be paid and then a suit filed on

24  behalf of the tax payer to get a refund?

25          MR. WYRICK:  Right.  They said that the Anti-

Injunction Act is squarely aimed at this type of case
because if you are being taxed right now, then the
federal government is receiving revenues and you are
asking us to give you this letter back, this status
back, and that's going to cut off those revenues.  And
they made a point of noting that the only injuries
alleged by Bob Jones were the payment of those tax
penalties.

Now, in our case we are much closer to -- there
is the Seven Skies versus Holder case out of the D.C.
circuit, an individual mandate case.  It is not really
relevant on those grounds, but they looked at the
Anti-Injunction Act issue as it relates to the individual
mandate and they did, I think, a really good job of
distinguishing that case from Bob Jones where they said
what we have here is relief that seeks to enjoin this
regulatory regime.  Now, one of the consequences of
the relief that we are going to grant is that it is
going to prevent the government from taxing people or
penalizing them or whatever you want to call it if
they fail to comply the regulatory regime, but the
relief that the Plaintiffs are seeking is to be
relieved of all of these regulatory burdens.  That's
the relief they are seeking.  So this is a different
type of case and not the type of case that the

1    Anti-Injunction Act applies to in its terms.  That's,

2    you know, notwithstanding the question of whether we

3    even have a tax here, but just whether the

4    Anti-Injunction Act is even aimed at this type of a case.

5            THE COURT:  Okay.  I'll ask you both this.

6    Who should go first?  Mr. Wyrick, you should go first.

7    Is the AIA, the Anti-Injunction Act -- is it

8    jurisdictional or not?  I know there seems to be a

9    disagreement -- well, of course there is a disagreement

10   among the parties.  Why is it jurisdictional?  I mean,

11   the case is cited by -- the government seemed to

12   indicate it is pretty jurisdictional.  I don't know

13   if there is a degree of jurisdictional, but it seems

14   pretty high up there.

15           MR. WYRICK:  The courts have used that

16   language and this was hotly contested in the NFIB

17   versus Sebelius case.  The parties filed, you know,

18   50 page briefs on this issue.  It was argued before

19   the Supreme Court as to whether it was jurisdictional

20   and the Supreme Court, like it has done in other

21   cases, avoided that difficult question because they

22   said...well, the Anti-Injunction Act doesn't apply.

23           THE COURT:  Can I do that here?  Can I avoid

24   it?

25           MR. WYRICK:  Well, we don't think the

1    Anti-Injunction Act applies, so, yeah, you could avoid

2    that.  We raised that as an issue because if you agree

3    with the government that it applies -- this isn't a

4    jurisdictional statute.  Here is why:  One, they

5    recognize in their briefing that there is a judicially

6    created exception.  Right?  The South Carolina --

7              THE COURT:  But is that the exception that

8    you say isn't applicable here?  Mr. McElvain, didn't

9    you not really say what it --

10             MR. McELVAIN:  It does not apply here.

11             THE COURT:  Okay.  But you didn't tell me

12   what it was?

13             MR. McELVAIN:  I hope I did.  If I didn't --

14   actually, the Williams Packing exception may have been

15   discussed in our brief.  That is an exception that has

16   been described as an exception if the government in no

17   conceivable circumstances can prove the validity of

18   its claim or succeed as a defendant and equity

19   jurisdiction otherwise exists.  It is a very, very,

20   very narrow exception that is not met here.

21             THE COURT:  I remember you talking about

22   the equity exception.

23             MR. McELVAIN:  Yes.

24             THE COURT:  Just your statement on Page 17,

25   "The AIA provides that, with statutory exceptions

1  inapplicable here, 'no suit for the purpose of restraining

2  the assessment or collection of any tax,'" blah, blah, blah.

3        MR. McELVAIN:  There are exceptions that have

4  to do with partnership adjustments, challenges to

5  levies.  There is a whole list of individual things

6  in the code, but none of those are relevant in this

7  case.

8        THE COURT:  Mr. Wyrick, do you agree those

9  statutory exceptions are -- and they sound like they

10  are not really applicable here?

11        MR. WYRICK:  No, and they don't.  The relevant

12  exception that we are talking about is the judicially

13  created exception.  He is right, it is from the

14  Williams Packing case.  It is Blackletter law.  Courts

15  can't create exceptions to jurisdictional statutes,

16  right?  If it is a truly jurisdictional statute,

17  you can't create an exception to it.  That's the first

18  indication that what we have in the Anti-Injunction

19  Act is not jurisdictional.

20     Secondly, in the United States Code in Title 28,

21  we have all of the jurisdictional statutes, right,

22  1332, 1331?  That's where the Tax Injunction Act,

23  the Act that says a federal district court can enjoin

24  the collection of a state tax is found.  The put the

25  Anti-Injunction Act in a separate section.  They

1   didn't put it in the jurisdictional section of the

2   United States Code.  And secondly, I mean, if you just

3   look at the Tax Injunction Act, the difference is

4   that Act is aimed at courts, right?  It says, "A court

5   can't enter this relief."  Whereas, the Anti-Injunction

6   Act is aimed at the litigants.  It says no --

7           THE COURT:  Does it apply to states?

8           MR. WYRICK:  The Tax Injunction Act -- oh,

9   does it apply to states?  Well, the long-standing

10  presumption has always been that when a statute says

11  person that doesn't include the sovereign.

12          THE COURT:  Mr. McElvain?

13          MR. McELVAIN:  We haven't briefed that point

14  because it wasn't an argument raised by the plaintiffs.

15  They just mentioned in a footnote that that might be

16  an issue.  So if this is an issue --

17          THE COURT:  But you had the reply, I mean,

18  you had the last word --

19          MR. McELVAIN:  But they didn't actually raise

20  the argument.  They just said...well, there might be a

21  question about this.

22          THE COURT:  Okay.

23          MR. McELVAIN:  But I would be happy to address

24  the response right now.

25          THE COURT:  Please do.

1          MR. McELVAIN:  Which is the history of the

2    Anti-Injunction Act from the 1860s, when it was first

3    enacted, up to 1967, I believe, which is one of the most

4    recent amendments, simply said no suit for the purpose

5    of restraining the assessment or collection of taxes

6    shall be maintained.  Then there was an issue of...

7    well, is it appropriate if somebody is not even a

8    taxpayer who has had their property levied on, should

9    they be foreclosed from going to federal court?  So

10   Congress established a procedure to do that and then

11   they added language saying -- to the original language

12   saying by any person except for, you know, other things

13   like the levies.  So the "by any person" language that

14   Mr. Wyrick refers to was in addition to the regular

15   language, which the Supreme Court in Bob Jones and

16   Americans United recognized was simply declaratory,

17   didn't change the meaning of the statute.  So the

18   notion that a State is not usually construed to be a

19   person within the meaning of the federal statute does

20   apply for some purposes, but there is no reason to

21   apply that in a case which talks about who or who is

22   not authorized to sue the federal the government

23   because the State has no special sovereignty interest

24   in suing when other parties could not.  So, in fact,

25   the AIA has been applied in a number of cases where

1  states were suing over their own employment taxes --

2         THE COURT:  Let me --

3         MR. McELVAIN:  -- that they paid on their

4  employees.

5         THE COURT:  Let me -- I'm sorry to interrupt.

6  Let me go back to a phrase that you just used.  Well,

7  of course, now I can't remember it.  States have no

8  inherent right to --

9         MR. McELVAIN:  There is no special sovereignty

10  interest that would require them to be treated as not

11  a person for the purpose of this statute because it is

12  just talking about who gets into federal court, not how

13  the state is getting regulated.

14         THE COURT:  And in talking about who gets into

15  federal court, then I am supposed to give that

16  special solicitude we talked about in the beginning,

17  right?

18         MR. McELVAIN:  No.  There are repeated

19  Supreme Court cases where tax statutes have been

20  applied to the states on equal terms as private

21  litigants.  So, again, it is a complicated issue and

22  Mr. Wyrick is right that it was briefed extensively

23  before the Supreme Court.  The Supreme Court didn't

24  need to reach the issue.  If it is something the Court

25  is concerned about, I would be happy to offer

1 supplemental briefs, but all we had up to this point

2 was a footnote noting that there might be a question

3 at some point.

4                                    (PAUSE)

5    And if I could return to the prior question --

6             THE COURT:  I am never -- you know, I take a

7 little time to think --

8             MR. McELVAIN:  I am sorry, Your Honor.

9 I apologize, I apologize.

10             THE COURT:  And you want to fill it with

11 argument, which is good.  I will just not take as much

12 time.

13    One of the standards, one of the exceptions,

14 I think, to the AIA as far as standing goes is whether

15 someone is an aggrieved party without any other

16 recourse.  Are you familiar with that?

17             MR. McELVAIN:  That's the South Carolina

18 versus Regan issue, which Mr. Wyrick mentioned.

19             THE COURT:  Okay.  Couldn't Oklahoma be

20 considered that?  I mean, you are saying -- you are

21 saying they don't have any recourse at all.

22             MR. McELVAIN:  Their claim is that they are

23 going to be improperly -- well, if their claim is that

24 they are going to be improperly assessed a Section 4980H

25 tax, the remedy is to go into a tax refund suit and

1  bring your claim then.  That's the whole purpose of

2  the Anti-Injunction Act, is that Congress set up this

3  procedure that after an assessment these issues can be

4  sort out.

5          THE COURT:  Do you ever -- has the Department

6  ever been involved in a case where a state was being

7  taxed and paid the tax and sued for a refund?

8          MR. McELVAIN:  I'm sure that it has happened.

9  I know that there are a number of cases where states

10  have tried to get around the AIA by claiming that their

11  states -- and Court of Appeals have held that states are

12  subject to the AIA and they have to go to a refund

13  action.

14          MR. McELVAIN:  It arises --

15          THE COURT:  So the Court --

16          MR. McELVAIN:  It arises -- I'm sorry.  I mean,

17  obviously states aren't subject to income taxes, so it

18  arises in the employment tax context.

19          THE COURT:  Okay.  So is there any reported

20  case on that?

21          MR. McELVAIN:  There are.  I did not --

22          THE COURT:  That's okay.

23          MR. McELVAIN:  I have no citations off the top

24  of my head, but there are --

25          THE COURT:  Like you said, this wasn't

1  completely briefed and --

2        MR. McELVAIN:  There is a <u>California versus</u>

3  <u>United States</u> case out of the Ninth Circuit, but I

4  guess -- <u>California versus United States</u> and I am

5  guessing it was in the 1970s, but I, I -- that's a

6  guess.  I don't know the citation off the top of my head.

7        THE COURT:  Okay.  Thank you.  Are you aware,

8  Mr. Wyrick

9        MR. WYRICK:  I am not aware of.  I haven't

10 looked those up.

11       THE COURT:  Fair enough, fair enough.

12    Okay, Mr. Wyrick.  Oklahoma takes the position

13 that the AIA doesn't apply here because it wouldn't

14 be enjoining the collection of a tax because the net

15 effect of the ACA is to -- it reduces tax collection,

16 doesn't increase it.  Okay?  Is that your argument?

17       MR. WYRICK:  That's one of our arguments, yes.

18       THE COURT:  Okay.  And you say the government

19 admitted that or admitted that it would collect less

20 than it pays out?

21       MR. WYRICK:  The government's own agencies

22 and estimates say that is true.

23       THE COURT:  Is that in their brief?

24       MR. WYRICK:  Yes, but we cite to the

25 Congressional Budget Office's analysis of the Act that

1  concludes that in the first year this will cost the

2  federal government 12 billion dollars.

3          THE COURT:  Again, outside the pleadings,

4  something I really shouldn't consider?

5          MR. WYRICK:  Well, no, I think it -- because

6  this is relevant to the law, whether the AIA applies as

7  a matter of law --

8          THE COURT:  I don't know if that's an

9  exception to going outside the pleadings on a motion

10  to dismiss, but...Mr. McElvain?

11          MR. McELVAIN:  We won't dispute that.  It

12  certainly is the case that far more tax credits will

13  be flowing to Oklahoma individuals than there will be

14  taxes collected from Oklahoma employers.  That, I think,

15  is well-established.

16          THE COURT:  Okay.

17          MR. McELVAIN:  It doesn't matter at the end of

18  the day though.  There is exact language on -- well, not

19  exactly, but on this general argument there is language

20  on this from the Tenth Circuit in <u>Hill versus Kemp</u>,

21  where they said you are challenging a tax and you,

22  the plaintiff, are arguing...well, at the end of the day

23  when everything shakes out from the relief you are

24  seeking --

25          THE COURT:  It is not really a collection?

1          MR. McELVAIN:  I'm sorry?

2          THE COURT:  When everything shakes out at the

3     end of the day, it is not really a collection issue.

4          MR. McELVAIN:  The plaintiffs there were

5     saying...well, at the end of the day, let's see what

6     actually -- if you get more revenues from the -- than

7     the relief we are seeking, and the Tenth Circuit said we

8     are not going to parse it that way.  If you are

9     challenging a tax and you are challenging the revenue

10    of a particular tax, we are not going to go beyond

11    that to look at what anybody's theories are about what

12    the overall effects are.

13         THE COURT:  Isn't that true, Mr. Wyrick?

14    I mean, I would really hate to sit up here back in

15    chambers and do the accounting necessary to determine

16    which way it goes, whether it collects more or

17    disperses more.  I mean, you don't want me to do that,

18    do you?

19         MR. WYRICK:  And the Court doesn't have to

20    and that's the distinction between this and the <u>Hill</u>

21    <u>versus Kemp</u> case.  And if I could just take a moment

22    on that case because I think the facts are --

23         THE COURT:  He brought it up, so, yeah, go

24    ahead.

25         MR. WYRICK:  In the Hill versus -- I am

familiar with it because it involved Oklahoma license

plates, right?  It was one of our cases.  The

Plaintiffs in that case did argue for purposes of the

Anti-Injunction Act -- they speculated, as the Court

said, that this might end up being sort of a negative

revenue regulation for the state.  The Court pointed

out two things.  The Court said...well, for purposes

of standing and mootness, you just told us that this

is actually going to cost you money and this is

actually going to be a revenue positive tax for you.

So they said, you know, at best you are speculating and

they said you are asking us to put on our economist hat

and figure out whether that is actually true or not.

You don't have that problem here because the federal

government's own agencies, their own estimates of

even -- you know, he is admitting at the podium this

is going to be a cost -- this is a spending bill for

the federal government, not a revenue raising measure.

       THE COURT:  And that's the case you would

rely upon for that argument?

       MR. McELVAIN:  I'm sorry, Your Honor, who are

you --

       THE COURT:  No, I am sorry, Mr. McElvain.

   Mr. Wyrick, that's the case that you --

       MR. WYRICK:  That's the only case they have

1  cited in response to our argument --

2          THE COURT:  Is there another one?

3          MR. WYRICK:  Well, there is Hibbs versus Winn

4  and if you read the Kemp versus Hill or the Curry versus

5  Hill case, the Court goes into an analysis of Hibbs

6  versus Winn and it was a Supreme Court case.  That was

7  a Tax Injunction Act case, but the issue was someone was

8  challenging state tax credits and the Court in that case

9  went through the explanation and the Tenth Circuit

10 walked through that analysis as well, that what we are

11 talking about is a tax credit and that that doesn't fit

12 within the purposes of the Tax Injunction Act.  The

13 Tax Injunction Act is about protecting the federal

14 government's stream of revenue.  What we have is an

15 Act of Congress that actually does the opposite.  The

16 purposes of the Act just aren't furthered by

17 applying the Anti-Injunction Act.  That's exactly

18 what we have here.

19         THE COURT:  Mr. McElvain, why didn't the AIA

20 bar or affect standing in the NFIB case?  Was it an issue?

21         MR. McELVAIN:  It was an issue.  There was a

22 circuit split because the Fourth Circuit had reached

23 the conclusion that it did apply.  So the Supreme Court

24 needed to address it and the issue in -- if you look at

25 the actual language of Section 500(a), it did not use

1    the actual word tax, it used the word penalty.  That

2    didn't matter for constitutional purposes because the

3    wording doesn't matter for the constitutional power,

4    but the wording actually was dispositive for purposes

5    of the AIA because that is a creature of Congress's

6    creation.  The AIA applies to taxes.  Section 5000(a)

7    did not use that word, so the AIA did not apply.

8    Section 4980H is very different because it does

9    actually refer to the assessment as a tax.  So under

10   the reasoning of NFIB, Section 4980H is subject to the

11   Anti-Injunction Act.

12          THE COURT:  Okay.  I would note for the record

13   that Mr. Wyrick is cheating and getting water from

14   people in the gallery; whereas, you are not getting any

15   at all.  Would you like some water?

16          MR. McELVAIN:  I would, Your Honor.  Thank you.

17          MR. WYRICK:  That's the advantage of the back

18   podium.

19          THE COURT:  It is.  I didn't realize that,

20   but I will remember that for the future and put both

21   podiums up here.  No problem.

22                      (PAUSE)

23          THE COURT:  Mr. Wyrick, did you have anything

24   you wanted to respond to on the NFIB case, the standing

25   issue?

1          MR. WYRICK:  On the Anti-Injunction Act issue?

2          THE COURT:  Yes.  I am sorry, the Anti-

3    Injunction Act issue.

4          MR. WYRICK:  I absolutely do because, if you

5    recall, in that case the government argued that the

6    Anti-Injunction Act didn't apply to the individual

7    mandate and they offered a whole range of reasons why

8    that was so, most of which are squarely on point with

9    the large employer mandate.  You know, they pointed out

10   that when Congress wants the Anti-Injunction Act to

11   apply, they know how to do it.  One example that they

12   gave is Section 9010 of the Affordable Care Act, which

13   is found in Title 9, the revenue raising provisions.

14   In that -- it's an excise tax on health insurance plans

15   and Congress actually said your remedy is a refund

16   action if you have a problem with paying this tax.

17   The government in that case argued that, well, here --

18   one, Congress didn't put this in Title IX of the Act

19   with the revenue raising provisions, they it up in

20   Title I.  And secondly, that just shows how Congress,

21   even within this Act, knew how to say we want the

22   Anti-Injunction Act to apply and they did neither.

23   Those points apply with equal force to the large

24   employer mandate.

25       Another argument that the federal government made

1  was that Congress with, you know, Subchapter B or

2  Subpart B of Chapter 68 of the Internal Revenue Code

3  went in and said everything within this --

4         THE COURT:  I'm sorry, I'm sorry, go back.

5  Give me the citation again.  Subchapter B...

6         MR. WYRICK:  I think it's Subchapter B of --

7  Subpart B of Chapter 68.  It's a long Internal Revenue

8  Code, Your Honor.

9      But, yeah, that provision Congress went in and said

10 for purposes -- we want to treat everything within that

11 section, whether we call it a penalty, an assessment,

12 a tax or whatever, as a tax and that means the Anti-

13 Injunction Act applies to all of it.

14         THE COURT:  Is it -- go ahead.

15         MR. WYRICK:  And the federal government said

16 the individual mandate wasn't put in Chapter 68,

17 therefore, that shows that Congress didn't intend for

18 it to be treated as a tax even though they call it

19 something else.  Same thing is true for the large

20 employer mandate.  They didn't put it in Chapter 68.

21 Now, the only thing they have is this idea that the

22 NFIB court, you know, placed some significance on the

23 fact that Congress didn't use the word tax.  They say

24 there is like talismanic significance to the fact that

25 here --

1          THE COURT:  Say that again.  Talismanic?

2          MR. WYRICK:  Talismanic significance, that

3   that is all you have to care about, is that use of the

4   word tax and you can forget about everything else.

5   Well, you read 4980H and I think it is almost a dozen

6   times they call it an assessable payment.  They call

7   it a penalty in one place.  They do use the word tax

8   once in referring back to the Subpart B assessment

9   and then later when talking about the deductibility

10  they refer back and use the word tax, but the

11  government says place all of the significance on the

12  word that Congress used.  Well, you have to place

13  significance on the fact that the use the word penalty.

14  They use the word assessable payment throughout.  If

15  you read the regulations that the federal government

16  has promulgated, they call it an assessable payment

17  and a penalty.  They don't call it a tax.

18      Now, it is far from clear that Congress intended

19  the Anti-Injunction Act to apply and just that one use

20  of the word tax doesn't indicate -- particularly with

21  everything else we have talked about in context, but,

22  you know, the bigger point is, I think, is it is not

23  a tax.  If you just look at it, it is not for the

24  purposes of raising revenue and that is sort of the

25  bellwether indicator that the Supreme Court has said

of whether something is a tax.  In fact, if it works,

no money goes to the federal government.  Its purpose

is to direct money to insurance companies, not to the

federal coffers.  Second, it is punitive.  Taxes can't

be punitive.  You know, there is the Drexel Furniture

case, the child labor case that we talked about.  The

4980H(a), that's the one where you get hit with the

penalty for every employee, that's punitive.  It has

no correlation to the amount of money that the federal

government is paying out.  As an employer, you get hit

for every employee.  And, you know -- so for purposes

-- I mean, I think just as a starting point if you are

looking at whether it is a tax, no, it is not a tax.

Did Congress intend to treat it as tax nonetheless?

If you look at it within the context of the Affordable

Care Act as a whole, hardly so.

THE COURT:  All right.  Just a moment.

MR. McELVAIN:  May I respond to that, sir?

(PAUSE)

THE COURT:  Before I forget, I will let you

proceed.  Mr. Wyrick, the court reporter has complained

to me about this too, but you talk fast.  Okay?  So, so

-- are you a native Oklahoman?

MR. WYRICK:  I'm actually an Atoka native,

believe or not.  You would never guess, but...

1            THE COURT:  Because we are supposed to talk

2    slow, but we both talk fast.

3            MR. WYRICK:  I know, I'm sorry.

4            THE COURT:  She is having a little trouble

5    getting down everything you say, so if you can try to

6    slow it down that would be helpful.

7         Okay.  Now, do you remember what your response was

8    going to be?

9            MR. McELVAIN:  I do.

10           THE COURT:  Okay.

11           MR. McELVAIN:  I do.  That's usually my

12    problem, Your Honor, so I am feeling lucky, but I am

13    not making any promises for the rest of the argument.

14           THE COURT:  Okay.

15           MR. McELVAIN:  As to the notion that because

16    Congress had a regulatory purposes in enacting a large

17    employer tax, that that takes it out of the AIA, the

18    Supreme Court expressly rejected that notion in the

19    Bob Jones University case.  They went through the prior

20    case law fairly extensively in Bob Jones saying there

21    were times in the past where we looked to whether a

22    tax was more regulatory or more revenue raising.  We

23    don't do that anymore.  If it's a tax that raises

24    revenue, it is subject to the AIA, no matter if

25    Congress also had a regulatory reason in enacting the

1  tax and --

2          THE COURT:  We don't do that anymore,

3  meaning...

4          MR. McELVAIN:  We, the Supreme Court, do not

5  do that anymore.  If it is a tax, it is subject to the

6  AIA --

7          THE COURT:  Based upon the Bob Jones case?

8          MR. McELVAIN:  Bob Jones, yes.

9          THE COURT:  Okay, okay.  Let's move on --

10  let's go to the Garcia issue.

11      Mr. McElvain -- well, no.  Mr. Wyrick, why don't

12  you give us the facts, the reasoning and the result of

13  the Garcia case, which is one, I guess, you sort of want

14  me to ignore.  So you get to do that --

15          MR. WYRICK:  Well, that case involved whether

16  the National Labor Standards Act -- I think it is

17  minimum wage standards in particular involved in that

18  case -- could be applied to a political subdivision of

19  a state, such as the San Antonio Metro Transit Authority

20  or whatever authority it was.  So the Court was

21  confronted with the issue of whether -- you know, it had

22  to overrule, you know, its previous case law where the

23  Court had engaged in the activity of saying we can't

24  impose these types of things on states when they go to,

25  like, core government functions.  In that case the

1  Supreme Court finally said we think that's too

2  difficult, that test has become too complicated to

3  apply, so we are just going to say that under the

4  Commerce Clause we are going to allow the National

5  Fair Labor Standards Act to apply to states.

6      Our argument is that that case remains -- has not

7  been overruled.  We recognize that.  We don't dispute

8  that.  We do think it has been called into question.

9  I mean, you look at --

10         THE COURT:  Let me stop you a minute.

11     Mr. McElvain, was the result of that case based upon

12  the standing?

13         MR. McELVAIN:  No, that's --

14         THE COURT:  That's a substantive case, right?

15         MR. McELVAIN:  That's a merits issue and we

16  haven't gotten to the issue of whether Oklahoma is right

17  or not on the merits, that there is any reason to doubt

18  the continued vitality of that holding.  They don't

19  get over the standing threshold because they haven't

20  alleged any injury to them that could trigger any

21  asserted Tenth Amendment right that would require

22  overruling Garcia.

23         THE COURT:  Which you understand that I am

24  somewhat hesitant to overrule a Supreme Court case,

25  don't you, Mr. Wyrick?

1              MR. WYRICK:  I do, Your Honor.

2              THE COURT:  How would I do that?  I mean, you

3    know, what procedural avenue would this Court take to

4    rule that Garcia isn't applicable?  I mean, it would

5    seem -- it would seem a little too harsh or colloquial

6    to say, hey, Supreme Court, I read Garcia and my

7    interpretation is better than yours.

8              MR. WYRICK:  I think that the one thing --

9              THE COURT:  How am I supposed to do it?

10   I mean, do I say I won't do it and let the Circuit or

11   the Supreme Court do it?  I mean, you are not really

12   expecting me to do it, are you?

13             MR. WYRICK:  We understand that's a difficult

14   position for a district judge.  What we are trying to

15   do is --

16             THE COURT:  Thank you.

17             MR. WYRICK:  We think we have, you know, the

18   right to at least have it heard by the Court, but it is

19   important to note here and the Court in NFIB versus

20   Sebelius talked about it ad nauseam that that was a

21   completely unprecedented type of legislation by the

22   Congress.  Nothing like this had ever been seen before.

23   And I think if you think about it terms of now, in terms

24   of the Commerce Clause, whether we can take that type

25   of unprecedented legislation -- and it is like nothing

```
1   we have ever seen before -- and apply it to the states.

2   There is at least a good argument there that that

3   crosses the line, that Garcia does not stand for the

4   proposition that they can do whatever they please to

5   the states in that regard or under the Commerce Clause

6   or otherwise.

7               THE COURT:  And Garcia, at least on the

8   merits, really goes to which of your claims?

9               MR. WYRICK:  Are you asking me?

10              THE COURT:  Yes.  I am sorry.

11              MR. WYRICK:  Oh, that's Count 4, I believe.

12              THE COURT:  So really the only way -- the only

13  way you can win on Count 4 is if this case goes all of

14  the way to the Supreme Court and they say you can?

15              THE COURT:  Ultimately, unless this Court

16  does find a factual distinction, which we understand --

17  between the case and Garcia or outright -- you can't

18  overrule Garcia, but --

19              THE COURT:  Thank you.  No, I am -- and I am

20  not -- I am just kidding you.  I am just saying that

21  would feel difficult.  Okay.

22                              (PAUSE)

23              THE COURT:  Sorry, I have to go through all of

24  my little tabs.

25                              (PAUSE)
```

1          THE COURT:  Mr. McElvain, is this really an

2    abstract question that the State of Oklahoma has

3    presented?

4          MR. McELVAIN:  Absolutely.  They are simply

5    claiming that they prefer one policy and the federal

6    government has chosen a different policy.  The Supreme

7    Court has held over and over and over that those kind

8    of policy disputes are not a concrete injury or a

9    concrete dispute between the state and the federal

10   government, even though it might lead to a concrete

11   dispute between a private party and the federal

12   government.  United States versus West Virginia,

13   New Jersey versus Sargant, Texas versus ICC, all of

14   which are cited in our briefs, are cases over and over

15   and over again where the Supreme Court has said just

16   a mere conflict between state and federal statutes

17   that don't actually implicate any enforcement or

18   regulatory activities of the state -- the mere fact

19   that they have different policies by itself is not --

20   does not state a concrete controversy.

21          THE COURT:  Okay.  Back with regard to the

22   AIA, you cite Enochs versus Williams Packing.  Did the

23   AIA bar suit in that case?

24          MR. McELVAIN:  It did.  That's my

25   understanding.

1          THE COURT:  Are you sure?  I mean, I --

2          MR. McELVAIN:  I would have to go back and

3    read the case, but they -- that's the case that

4    announced that the standard is very, very narrow and

5    my memory is that the Supreme Court said that that

6    standard was not met.

7          THE COURT:  Well, because in the sentence

8    you quoted from it says"...because of the

9    Anti-Injunction Act, taxes can ordinarily" -- and

10   that's my emphasis -- "ordinarily be challenged only

11   after they are paid by suing for a refund."  That seems

12   to beg the idea that sometimes they can be challenged

13   otherwise.

14         MR. McELVAIN:  There are some -- for income

15   taxes, an individual taxpayer can go to tax court and

16   that would be challenging what is called the notice

17   of deficiency, which is where the IRS says here is

18   what we think your taxes are that are owed, but we

19   haven't actually formally assessed that amount yet

20   or tried to collect it yet.  So there are statutory

21   exceptions in the code before the actual formal

22   moment of assessment arises.  As I mentioned before,

23   there are levying proceedings and partnership

24   adjustments, but --

25         THE COURT:  That's right.

1          MR. McELVAIN:  -- but nothing that is

2    implicated here.

3          THE COURT:  Okay.

4                         (PAUSE)

5          THE COURT:  We are getting close.  I will give

6    you a chance to wind up.

7                         (PAUSE)

8          THE COURT:  Okay.  Mr. -- well, do you want to

9    say something, Mr. Wyrick?

10          MR. WYRICK:  Your South Carolina versus Regan

11    point from before about whether the state has the

12    opportunity to see a refund, again the government is

13    ignoring the injuries we actually allege, which is a

14    regulatory one, but also I am aware of no action for a

15    refund of our sovereign choice that was deprived of us

16    by this IRS rule.  And the government has described no

17    circumstance -- they can't tell us how we would ever

18    be able to get that redressed if not in this type of

19    lawsuit, but they ask the Court under the Anti-Injunction

20    Act to bar the suit in its entirety and that's just

21    wrong.

22          THE COURT:  Okay.  Anything just to wind this

23    up that you would like to leave the Court with?  We

24    have been going almost two hours and all of my tabs,

25    yellow and red, and my pages of notes have been

1 covered.

2     SO, Mr. Wyrick, it is the State of Oklahoma's

3 motion.  Anything you would like to wind up with?

4         MR. WYRICK:  It is actually the government's

5 motion.

6         THE COURT:  I am sorry.  It is your suit.

7 I am sorry.  Mr. McElvain, go ahead.

8         MR. McELVAIN:  You know, I think we have

9 covered all of the ground that I wanted to cover.

10 There is just one further --

11         THE COURT:  Did I cover it more than you

12 wanted to?

13         MR. McELVAIN:  Perhaps, perhaps, but one

14 further point that I would also like to offer, which

15 is there is a particular reason here to be

16 particularly skeptical of a state's claim of

17 standing.  One of the points that the <u>Virginia versus</u>

18 <u>Sebelius</u> court made is that the rule against parens

19 patriae standing by a state against the federal

20 government serves a number of purposes, but one

21 important purpose is to insure the state's litigation

22 -- that we avoid cases where the state's litigation --

23         THE COURT:  Slow down just a little, slow

24 down.

25         MR. McELVAIN:  I warned you, I warned you.

```
 1            THE COURT:  All right.

 2            MR. McELVAIN:  -- to avoid cases where the

 3   state's litigation approach might well diverge from

 4   that of an individual to whom the challenge provision

 5   does apply.  There is very, very good reason to take

 6   that language to heart here because there is an

 7   estimated 380,000 Oklahomans who stand to benefit

 8   from these tax credits --

 9            THE COURT:  Okay, now you are getting to

10   whether it is a good law or a bad law.

11            MR. McELVAIN:  Well, it is not whether it is

12   a good law or a bad law, it is just that there are

13   those hundreds of thousands of people who have an

14   interest that may diverge from the state.  Maybe at

15   the end of the day --

16            THE COURT:  No, that's on the merits though.

17   I mean, that's --

18            MR. McELVAIN:  No, the -- I am sorry.

19   I didn't mean to interrupt you, but --

20            THE COURT:  Go ahead.

21            MR. McELVAIN:  But they do have that interest

22   under the IRS rule that Oklahoma is now seeking to

23   extinguish.  That's not a merits question.

24            THE COURT:  Where do you come up with

25   380,000?
```

1          MR. McELVAIN:  That was the estimate from

2    the Families USA Publication, which we cited in our

3    brief.

4          THE COURT:  But which aren't included in the

5    complaint?

6          MR. McELVAIN:  No, but I don't think there

7    would be any dispute that there are many, many

8    Oklahoma residents that would --

9          THE COURT:  Well, you still -- you don't think

10   there would be, but by the time we get to -- on the

11   merits there may be, but, I mean -- because that is

12   outside the -- that statement you just made is outside

13   the complaint and I am supposed to look at what is in

14   the complaint.

15         MR. McELVAIN:  You know, the Court does not

16   need to decide exactly what the number is or how much

17   they would benefit from --

18         THE COURT:  No, but my problem, Mr. McElvain,

19   is I said at the very beginning of this hearing I don't

20   want to hear about whether it is a good or bad law and

21   when you throw out figures like 380,000, that's --

22   that's getting close to doing that.

23         MR. McELVAIN:  My point is not whether it is

24   a good or bad law.  It is just that there are a lot of

25   people who have their own interest that very likely

1  would diverge from what the State of Oklahoma's

2  asserted interested is.

3          THE COURT:  I will accept a lot.  That's

4  pretty generous.  I mean, that's broad and doesn't

5  get into actual figures that I would decide on the

6  merits.  I accept that.  And I interrupted you again.

7  I am sorry, sir.  Is there anything else you would like

8  to say?

9          MR. McELVAIN:  No, that's just the point,

10  that there is a particular reason to be particularly

11  skeptical of the State's attempt to litigate private

12  citizens rights or responsibilities here where those

13  private citizens could be pursuing their own lawsuit

14  if they have an interest that they seek to vindicate.

15          THE COURT:  Despite the special solicitude

16  element of looking at standing?

17          MR. McELVAIN:  Because that does not erase

18  the concrete injury requirement.

19          THE COURT:  Okay, all right.  Mr. Wyrick,

20  winding up...

21          MR. WYRICK:  Your Honor can ignore the

22  parens patriae red herring because that's what it is.

23  We have alleged injuries to the State of Oklahoma

24  itself.  That first injury that we talked about, the

25  sovereign injury, the deprivation of the choice that

Congress gave us, as best I can tell, the government's only response is that they are right on the merits. They haven't explained how that is not an injury to the state. And as to the injuries that we have alleged about the regulatory burdens that are now imposed on us -- and we did plead those in the complaint. We said we are large employer subject to these. And when they said that is implausible, we expanded on that and gave some concrete examples in the briefing and those concrete examples show that you can be injured by a regulation even if at the end of the day you are never penalized.

The federal government's view of this things is they can point the regulatory gun at you and order you around, but so long as they don't pull the trigger you are never injured. Right?

THE COURT: Now, that's a little bit of hyperbole. let's go back and say that as -- let's go back and say that without the hyperbole.

MR. WYRICK: They can impose these regulations on us, these 144 pages of regulations that we have to wade through and figure out how to comply and figure out where our health plan might diverge from what they tell us we have to do in order to avoid the guarantee that we will be penalized on January 1 if we don't

1 comply.  And their view is you are not injured at all

2 unless we actually penalize you after January 1.  And

3 that's a far too narrow view of what they have done

4 to the State of Oklahoma by imposing this obligation

5 on us when Congress wrote a statute that says they can.

6 That's why the motion should be dismissed or denied.

7          THE COURT:  Okay.  I thank you for your

8 argument.  You guys are really good.  You have given

9 me a lot -- I had a lot to think about before and you

10 come in here and you answer my questions and I find

11 out...well, I have more to think about.  You might

12 think that, well, my argument should be persuasive

13 and it should be easy for him, but that's not the way

14 it usually works.  Like I said, excellent performance

15 as advocates.

16     I hope to get an opinion or order out soon.

17     Did you fly in last night, Mr. McElvain?

18          MR. McELVAIN:  I did, Your Honor.

19          THE COURT:  Stay in Tulsa?

20          MR. McELVAIN:  I stayed in Tulsa, I did.

21          THE COURT:  Muskogee is a nice place to stay

22 too, if you like.

23          MR. McELVAIN:  I like Muskogee too.

24          THE COURT:  Are you leaving today or are you --

25          MR. McELVAIN:  I am flying back tonight.

1          THE COURT:  Okay.  You could put your feet up

2  and stay awhile.

3          MR. McELVAIN:  I am sorry?

4          THE COURT:  You could put your feet up and

5  stay awhile, if you want.

6          MR. McELVAIN:  That would be very nice.

7          THE COURT:  We are glad to have guests here.

8  I guess everyone is a guest here, but it was good to

9  see all of you.

10     Mr. Pruitt, thank you very much for coming.  It

11  was good to see you.

12     All right.  Ladies and gentlemen, thank you very

13  much.

14                    (END OF PROCEEDINGS)

15

16  "I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled

18  matter."

19                    S/Karla S. McWhorter

20                    _____

21                    KARLA S. McWHORTER

22

23                    July 31, 2013

24                    _____

25                    DATE

103