No. CIV-11-030-RAW

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel. E. Scott Pruitt,
in his official capacity as Attorney
General of Oklahoma,

Plaintiff,

-vs-

KATHLEEN SEBELIUS, et al.,

Defendant.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND
BRIEF IN SUPPORT

PATRICK R. WYRICK, OBA #21874
SOLICITOR GENERAL
OKLAHOMA OFFICE OF THE ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK 73105
(405) 522-4448; (405) 522-4534 (FAX)
Service email: fc.docket@oag.state.ok.us
patrick.wyrick@oag.ok.gov
ATTORNEY FOR PLAINTIFF

FEBRUARY 18, 2014

# TABLE OF CONTENTS

Page

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT.... 1**

**INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**PROCEDURAL HISTORY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF MATERIAL FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    **The ACA contemplates two distinct types of Exchanges: those established by a State pursuant to Section 1311 and those established by the federal government pursuant to Section 1321.** . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    **The majority of States, including Oklahoma, decline to establish an Exchange.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    III.    **The ACA authorizes "Premium Assistance Credits" to assist in the purchase of health insurance "enrolled in through an Exchange established by the State under 1311.".** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    IV.    **The IRS promulgates regulations that authorize Premium Assistance Credits in circumstances not authorized by the plain text of the underlying statute.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    V.    **The Challenged Regulations injure Oklahoma because the allowance of the Premium Assistance Credit in Oklahoma subjects the State to large penalties and burdensome reporting requirements.** . . . . . . . . . . . . . . . . . . . . . 10

    VI.    **As a result of the Challenged Regulations making credits and subsidies available in Oklahoma, the State will be forced to provide insurance to employees to whom it does not currently provide insurance, or be subject to enormous penalties.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    VII.    **The State will be forced to take on the burden of compiling information for reports it must make to the federal government whenever the government requests it.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**SUMMARY OF THE ARGUMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**ARGUMENT AND AUTHORITIES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

I.      Oklahoma has standing to challenge the Challenged Regulations because the Regulations have injured the State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.     The Challenged Regulations force the State to either provide costly insurance to employees to whom it currently does not provide insurance or pay substantial penalties to the federal government. . . . . . . . . . . . . . . . . . . . 21

III.    The Challenged Regulations force the State to either incur the expense of complying with burdensome new reporting requirements or pay substantial penalties to the federal government. . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.  The Challenged Regulations deprive the State of its statutory right to decide whether the Employer Mandate and accompanying reporting requirements will apply in Oklahoma.. . . . . . . . . . 24

IV.     The Challenged Regulations are *ultra vires* and violate the Administrative Procedures Act because they contradict the unambiguous language of the statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        A.  The Challenged Regulations flatly contradict the plain text of the Affordable Care Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        B.  Established principles of statutory construction foreclose Defendants' construction of 26 U.S.C. § 36B. . . . . . . . . . . . . . . . . . . . . . . . 31

        C.  The IRS lacked the authority to interpret the provisions of the ACA that it relies on to support the Challenged Regulations. . . . . . . . . . . . 34

        D.  The Challenged Regulations ignore—and even undermine—Congress's intent behind 26 U.S.C. § 36B.. . . . . . . . . . . . . . . . 35

        E.  Defendants' cursory and inadequate response in the administrative record to comments questioning their authority to promulgate the Challenged Regulations proves that they violated the Administrative Procedures Act by failing to give reasoned consideration to those comments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        F.  The decision in *Halbig v. Sebelius* was erroneous and should not be followed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V.      Section 1321(c) of the Affordable Care Act unconstitutionally commandeers state authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

**CERTIFICATE OF SERVICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

# TABLE OF AUTHORITIES

## FEDERAL CASES

*14 Penn Plaza LLC v. Pyett*,
    556 U.S. 247 (2009)........................................................ 41

*Am. Bar Ass'n v. FTC*,
    430 F.3d 457 (D.C.Cir. 2005)........................................... 27

*Am. Petroleum Inst. v. Johnson*,
    541 F.Supp.2d 165 (D.D.C. 2008)...................................... 20

*Appalachian Power Co. v. EPA*,
    249 F.3d 1032(D.C. Cir. 2001).......................................... 40

*Atascadero State Hosp. v. Scanlon*,
    473 U.S. 234 (1985)...................................................... 33

*Badaracco v. Commissioner*,
    464 U. S. 386 (1984)..................................................... 29

*Burrage v. United States*,
    ___ U.S. ___, 134 S.Ct. 881 (2014)...................................... 29

*Caminetti v. United States*,
    242 U.S. 470 (1917)...................................................... 31

*Cheney R.R. Co. v. R.R. Ret. Bd.*,
    50 F.3d 1071 (D.C. Cir. 1995)........................................... 34

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)............................................. 17, 27-30

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)...................................................... 37

*Colo. Envtl. Coal. v. Dombeck*,
    185 F.3d 1162 (10th Cir. 1999)....................................... 19, 37

*Commissioner v. Lundy*,
    516 U. S. 235 (1996)..................................................... 29

*Conn. Nat'l Bank v. Germain*,
 503 U.S. 249 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Custis v. United States*,
 511 U.S. 485 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Department of Labor regulation implementing the Family Medical Leave Act ("FMLA")*,
 231 F.3d 791 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Dep't of Treasury v. Fed. Labor Relations Auth.*,
 837 F.2d 1163 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Dormeyer v. Comerica Bank-Illinois*,
 223 F.3d 579 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Elwell v. Oklahoma ex rel. Bd. of Regents of University of Okla.*,
 693 F.3d 1303 (10th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Gregory v. Ashcroft*,
 501 U.S. 452 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Harbert v. Healthcare Serv. Group, Inc.*,
 391 F.3d 1140 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hernandez-Carrera v. Carlson*,
 547 F.3d 1237 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hill v. Kemp*,
 478 F.3d 1236 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Larson v. Domestic & Foreign Commerce Corp.*,
 337 U.S. 682 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Linda R.S. v. Richard D.*,
 410 U.S. 614 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Los Angeles Haven Hospice, Inc. v. Leavitt*,
 2009 WL 5868513 (C.D. Cal. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Market Co. v. Hoffman*,
    101 U.S. 112 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Marshall v. Chater*,
    75 F.3d 1421 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Massachusetts v. U.S. Department of Transportation*,
    93 F.3d 890 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    132 S. Ct. 2566 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 42-44

*New England Health Care Employees Pension v. Woodruff*,
    512 F.3d 1283 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*New York v. United States*,
    505 U.S. 144 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 44

*Planned Parenthood of Se. Pennsylvania v. Casey*,
    505 U.S. 833 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Printz v. United States*,
    521 U.S. 898 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 35, 44

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ramah Navajo Chapter v. Lujan*
    112 F.3d 1455 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Russello v. United States*,
    464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 32

*Sea-Land Serv., Inc. v. Dep't of Transp.*,
    137 F.3d 640 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Stichting Pensioenfonds Voor De Gezondheid v. United States*,
    129 F.3d 195 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Tri-County Hospice, Inc. v. Sebelius,*
    788 F.Supp.2d 1274 (E.D. Okla. 2010)..................................... 20, 21

*Trotter v. Tennessee,*
    290 U.S. 354 (1933)...................................................... 33

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)..................................................... 32, 41

*Tsosie v. Califano,*
    651 F.2d 719 (10th Cir. 1981)........................................... 18, 34

*United States ex rel. Totten v. Bombardier Corp.,*
    380 F.3d 488 (D.C. Cir. 2004)............................................. 40

*United States v. Husted,*
    545 F.3d 1240 (10th Cir. 2008)........................................... 28

*United States v. Stewart,*
    311 U.S. 60 (1940)..................................................... 18, 33

*United States v. Wells Fargo Bank,*
    485 U.S. 351 (1988)................................................... 18, 33

*Universal Const. Co., Inc. v. Occupational Safety & Health Review Comm'n,*
    182 F.3d 726 (10th Cir. 1999)........................................... 28, 35

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.,*
    348 U.S. 310 (1958).................................................... 34

*Williams v. Taylor,*
    529 U.S. 362 (2000)................................................... 32

*Wyoming v. United States,*
    279 F.3d 1214 (10th Cir. 2002)........................................... 26

*Yazoo & Miss. Valley R.R. Co. v. Thomas,*
    132 U.S. 174 (1889).................................................... 33

*Zivotovsky ex rel. Ariz. v. Sec'y of State,*
    444 F.3d 614 (D.C. Cir. 2006)........................................... 25, 26

# FEDERAL STATUTES

5 U.S.C. § 552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5 U.S.C. § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 804 (2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

15 U.S.C. § 1011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

25 U.S.C. § 45R. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

26 U.S.C. § 36B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 4980H. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 6056(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16, 23

26 U.S.C. § 6721. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 U.S.C. § 6722. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 U.S.C. § 6724(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23

42 U.S.C. § 1396a(gg). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 18024(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 18031. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 41, 44

42 U.S.C. § 18032(d)(3)(D)(i)(II). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

42 U.S.C. § 18041(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5

42 U.S.C. § 18071(f)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# STATE STATUTES

74 Okla. stat. tit. § 2241(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## FEDERAL COURT RULES

Rule 56 of the Federal Rules of Civil Procedure.......................................... 1

## FEDERAL REGULATIONS

26 C.F.R. § 1.36B-1(k)........................................................ 35

45 C.F.R. § 155.20. ..................................................... 2, 8, 9

58 Fed. Reg. 51,735 (Sept. 30, 1993)............................................. 39

*Health Insurance Premium Tax Credit*,
    76 Fed. Reg. 50,931 50,934 (Aug. 17, 2011)..................................... 8

*Health Insurance Premium Tax Credit*,
    77 Fed. Reg. 30,377, 30,378 (May 23, 2012)................................. 9, 38

78 Fed. Reg. 217 (Jan. 2, 2014)............................................... 22

79 Fed. Reg. 8544.......................................................... 22

Treas. Reg. § 1.36B-1 et seq................................................. 2, 9

## OTHER AUTHORITIES

*Nondelegation Canons*,
    67 U. Chi. L. Rev. 315 (2000). .......................................... 31

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's Local Rule 56.1, Plaintiff State of Oklahoma moves this Court to enter summary judgment in Plaintiff's favor. Specifically, Plaintiff moves for summary judgment on the claim that regulations promulgated by the Internal Revenue Service ("IRS"), extending eligibility for tax credits and premium assistance subsidies to individuals who purchase health insurance through Exchanges established by the federal government pursuant to Section 1321(c) of the Patient Protection and Affordable Care Act ("ACA"), (1) exceed the agency's statutory authority, (2) are arbitrary, capricious, and contrary to law, in violation of the Administrative Procedures Act, 5 U.S.C. § 706, or (3) alternatively, amount to unconstitutional commandeering.

## INTRODUCTION

The Patient Protection and Affordable Care Act ("ACA" or "the Act") authorizes the Internal Revenue Service ("IRS") to allow premium tax credits to individuals who purchase health insurance through health insurance exchanges established by a "State." The IRS issued regulations that effectively rewrite the statute and allow for payment of premium tax credits to individuals who purchase health insurance through an exchange established by a "State" *or* the federal government. This expansion of the availability of the tax credits will result in enormous new federal spending that Congress never authorized.

Not only does the plain text of the ACA not authorize the IRS's regulations, if permitted to take effect the regulations will disrupt Congress's goal in passing the premium tax credits, which was to induce the States to cooperate with the federal healthcare overhaul. By rewriting the law through regulation, Defendants have both illegally authorized enormous new federal spending and undercut the intent behind Congress's drafting choice. Defendants' regulations contradict the ACA and exceed their statutory authority, and should be enjoined.

On September 19, 2012, the State of Oklahoma ("the State" or "Oklahoma") filed its Amended Complaint, seeking a declaration that Treas. Reg. § 1.36B-1 *et seq*. and 45 C.F.R. § 155.20 (collectively, "the Challenged Regulations") are invalid to the extent that they authorize certain tax credits and subsidies beyond those authorized by the ACA, and an injunction prohibiting enforcement of the Challenged Regulations (Dkt. #35).[1] Defendants moved to dismiss the Amended Complaint, claiming that Oklahoma lacked standing, that its claims were not ripe, and that the Anti-Injunction Act deprived the Court of jurisdiction (Dkt.#41). This Court denied the motion as to Count II, Count III, and Count V, and granted it as to Counts I and IV (Dkt. #71). Count II alleges that the Challenged Regulations are *ultra vires*, and Count III alleges that the Challenged Regulations violate the Administrative Procedures Act. Count V alleges that, to the extent Defendants attempt to justify the Challenged Regulations by claiming that an Exchange established by the federal government is a form of "Exchange established by a state under Section 1311," the Challenged Regulations amount to unconstitutional commandeering.

## STATEMENT OF MATERIAL FACTS

**I.     The ACA contemplates two distinct types of Exchanges: those established by a State pursuant to Section 1311 and those established by the federal government pursuant to Section 1321.**

1.   The ACA provides for the creation of two distinct types of health insurance Exchanges, one established by a "State", ACA § 1311, 42 U.S.C. § 18031, and one established by the Secretary

---

[1] Three similar lawsuits have since been filed in other federal districts. *Halbig v. Sebelius*, No. 13-0623 (D.D.C. Jan. 15, 2014) (now on appeal to the D.C. Circuit, No. 14-5018); *King v. Sebelius*, No. 13-630 (E.D. Va., filed Sept. 16, 2013); *Indiana v. IRS*, No. 13-1612 (S.D. Ind., filed Oct. 8, 2013).

of the United States Department of Health and Human Services ("HHS"). ACA § 1321(c), 42 U.S.C. § 18041(c).

2. As Congress began drafting the ACA, it considered having the federal government establish and operate all of the Exchanges. But after the House initially took that approach, H.R. 3962, 111th Cong. §§ 301, 308 (2009), the Senate abandoned it in favor of an approach whereby the Exchanges would be established and operated by the States, in order to ensure state-level "buy-in" and some level of local control. Senator Ben Nelson of Nebraska, whose vote was critical to the Act's passage, summed up that prevailing Senate view, calling the "national exchange" approach a "dealbreaker," because it would "start us down the road of ... a single-payer plan." Carrie Budoff Brown, *Nelson: National Exchange a Dealbreaker*, POLITICO, Jan. 25, 2010, http://www.politico.com/livepulse/0110/Nelson_National_exchange_a_dealbreaker.html (a copy of which is attached hereto as Exhibit 1).

3. The Senate ultimately adopted the state-operated Exchange approach, making it part of the final legislation. In particular, the ACA provides: "Each State shall, not later than January 1, 2014, establish an American Health Benefit Exchange…for the State that facilitates the purchase of qualified health plans." ACA § 1311(b)(1), 42 U.S.C. § 18031(b)(1).

4. A different section of the ACA provides for circumstances in which a State declines or fails to establish an Exchange. *See* ACA § 1321(c), 42 U.S.C. § 18041(c) ("If a State does not establish an Exchange...the Secretary shall (directly or through agreement with a not-for-profit entity) establish and operate such Exchange within the State[.]"). This is so because the federal constitution forbids the federal government from commandeering the States to implement federal programs. *See Printz v. United States*, 521 U.S. 898, 925 (1997) ("[T]he Federal Government may not compel the states to implement, by legislation or executive action, federal regulatory

programs."); *See* Timothy S. Jost, *Health Insurance Exchanges: Legal Issues*, O'Neill Institute, Georgetown Univ. Legal Ctr., no. 23 at 7, Apr. 27, 2009, http://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=1022&context=ois_papers (a copy of which is attached hereto as Exhibit 2).[2]

5.    Because Congress could not force the States to establish Exchanges, it had to entice them to do so, and it did so through several means. First, and as explained above, Congress threatened to implement Exchanges directly in states that refused to participate. ACA § 1321(c), 42 U.S.C. § 18041(c). Second, Congress offered huge federal grants to states who agreed to set up Exchanges. ACA § 1311(a), 42 U.S.C. § 18031(a) (authorizing financial assistance to states for "activities (including planning activities) related to establishing an [Exchange]."). By contrast, Congress did not authorize any funding for HHS to create federal Exchanges. Third, Congress penalized States that declined to create their own Exchanges by prohibiting them from tightening their Medicaid eligibility standards. *See* ACA § 2001(b)(2), 42 U.S.C. § 1396a(gg) (requiring maintenance of eligibility standards until "the Secretary determines that an Exchange established by the State under

---

[2] Professor Jost, a scholar whose influence on the ACA was such that he was invited to the Oval Office for the signing ceremony, argued during the drafting of the ACA that:

> The Constitution has been interpreted to preclude Congress from passing laws that "commandeer" the authority of the states for federal regulatory purposes. That is, Congress cannot require the states to participate in a federal insurance exchange program by simple fiat. This limitation, however, would not necessarily block Congress from establishing insurance exchanges. Congress could invite state participation in a federal program, and provide a federal fallback program to administer exchanges in states that refused to establish complying exchanges. Alternatively it could exercise its Constitutional authority to spend money for the public welfare (the "spending power"), either **by offering tax subsidies for insurance only in states that complied with federal requirements** (as it has done with respect to tax subsidies for health savings accounts) or by offering explicit payments to states that establish exchanges conforming to federal requirements.

*Id*. (emphasis added.)

section [1311 of the ACA] is fully operational"). Fourth, and most importantly, Congress authorized tax credits to the residents of States who purchase health insurance through a state-established Exchange, while withholding those credits from residents of States who purchase health insurance through a federally-established Exchange. ACA § 1401, 26 U.S.C. § 36B.

## II. The majority of States, including Oklahoma, decline to establish an Exchange.

6. The State of Oklahoma elected to not establish an Exchange, and informed the federal government of this on November 19, 2012. *See* Affidavit of Oklahoma Secretary of State Chris Benge, (attached hereto as Exhibit 3). No entity, federal or otherwise, has taken action to establish a Section 1311 Exchange on behalf of the State. *Id.* Rather, the federal government is establishing in Oklahoma a federal Exchange pursuant to Section 1321 of the ACA. ACA § 1321(c), 42 U.S.C. § 18041(c).

7. In addition to Oklahoma, thirty-three other States decided not to establish their own exchanges. *See* Kaiser Family Foundation, *State Health Facts, State Decisions for Creating Health Insurance Exchanges*, (May 28, 2013), http://kff.org/health-reform/stateindicator/health-insurance-exchanges/(a copy of which is attached hereto as Exhibit 4). Two other States elected to establish Exchanges, but could not get them up and running in time, leaving a total of thirty-six States without state-established Exchanges for 2014. Jennifer Corbett Dooren, *Two States Seek Help With Health Exchanges*, WALL ST. J., May 22, 2013, http://online.wsj.com/news/articles/SB10001424127887323336104578499444065609364 (a copy of which is attached hereto as Exhibit 5). Because so many States declined to establish Exchanges, the federal government was faced with the enormous task of timely creating a functioning, near-national marketplace (colloquially known as "HealthCare.gov") for health insurance.

**III.    The ACA authorizes "Premium Assistance Credits" to assist in the purchase of health insurance "enrolled in through an Exchange established by the State under 1311."**

8.   In the case of an individual who meets certain criteria (a "Qualifying Individual"), Section 1401 of the ACA provides for subsidizing the Qualifying Individual's health insurance coverage through a payment from the United States Department of the Treasury (an "Advance Payment") to the issuer of the health insurance coverage. ACA § 1401, 26 U.S.C. § 36B.

9.   The amount of the Advance Payment made on behalf of the Qualifying Individual for a month is the amount that the Exchange determines the Qualifying Individual will be allowed to take as a credit (the "Premium Assistance Credit") against the Qualifying Individual's income tax for the year. *Id*. at § 36B(a) ("in the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed by this subtitle for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year").

10. 26 U.S.C. § 36B(b)(1) explains that the Premium Assistance Credit is "the sum of the premium assistance amounts determined under paragraph (2) with respect to all coverage months of the taxpayer occurring during the taxable year."

11. Paragraph (2)—Section 36B(b)(2)—in turn dictates that the  "premium assistance amounts" are:

> the lesser of—
> (A) the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer *and which were enrolled in through an Exchange established by the State under 1311 of the Patient Protection and Affordable Care Act*, or
>
> (B) the excess (if any) of--
> (i) the adjusted monthly premium for such month *for the applicable second lowest cost silver plan* with respect to the taxpayer, over

(ii) an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year.

26 U.S.C. § 36B(b)(2) (emphases added). The referenced "applicable second lowest cost silver plan" is in turn defined at Section 36B(b)(3)(b) as "the second lowest cost silver plan of the individual market in the rating area in which the taxpayer resides which…*is offered through the same Exchange through which the qualified health plans taken into account under paragraph (2)(A) were offered*[.]" *Id.* (emphasis added). In other words, the amount of any Premium Assistance Credit is tied to either (1) the monthly premiums paid by the taxpayer for insurance purchased through an Exchange established by the State under Section 1311, or (2) the premiums for the "applicable second lowest cost silver plan" offered through the Exchange established by the State under Section 1311.

12. The "coverage months" for which the Premium Assistance Credit are available are in turn defined in Section 36B(c)(2) as, "any month if…as of the first day of such month the taxpayer…*is covered by a qualified health plan described in subsection (b)(2)(A) that was enrolled in through an Exchange established by the State under section 1311 of the [ACA.]*.*Id.* (emphasis added). The Advance Payments provided under Section 1402 are similarly limited by linking them to the "coverage months" for which the Premium Assistance Credits are allowed. ACA § 1402, 42 U.S.C. § 18071(f)(2).

13. In other words, in at least three separate ways, Section 36B hinges eligibility for the Premium Assistance Credits and Advance Payments on the taxpayer receiving the credit having purchased his insurance through "an Exchange established by the State under section 1311." Section 36B never even mentions "Exchanges established by the Secretary under section 1321," much less authorizes credits to be given to those who purchase insurance through those federal Exchanges.

14. Additionally, in Section 1304, Congress defined the term "State" as "each of the 50 states and the District of Columbia." ACA § 1304, 42 U.S.C. § 18024(d); *accord* 45 C.F.R. § 155.20. Congress thus distinguished "an Exchange established by a *State* under Section 1311" from "an Exchange established by the *federal government* under Section 1321." *See also* 45 C.F.R. § 155.20 (where HHS defines a "federal facilitated Exchange" as "an Exchange established and operated *within* a State *by the Secretary* under *section 1321(c)(1)* of the Affordable Care Act.") (emphases added).

## IV. The IRS promulgates regulations that authorize Premium Assistance Credits in circumstances not authorized by the plain text of the underlying statute.

15. On May 18, 2012, Defendants published proposed regulations that described eligibility for the Premium Assistance Credit as follows:

> a taxpayer is eligible for the credit for a taxable year if . . . the taxpayer or a member of the taxpayer's family (1) is enrolled in one or more qualified health plans through an Exchange established under section 1311 *or 1321* of the Affordable Care Act . . . .

Health Insurance Premium Tax Credit, 76 Fed. Reg. 50,931, 50,934 (Aug. 17, 2011) (emphasis added). In other words, the proposed regulations authorized credits and subsidies for coverage purchased through federal exchanges, not just for coverage purchased through state-established Exchanges.

16. After the IRS published the proposed regulations, commenters (including dozens of members of Congress), and legal scholars objected, pointing out that the text of the ACA limited the credits and subsidies to plans "enrolled in through an Exchange established by the State under Section 1311 of the Patient Protection and Affordable Care Act," and that the addition of the six characters "or 1321" had without explanation vastly expanded the availability of the credits and subsidies. *See, e.g.*, Department of the Treasury, Internal Revenue Service, Health Insurance

Premium Tax Credit, Fed. Reg. 76 (August 17, 2011) (comment of Brian Clark, Sept. 9, 2011) (a copy of which is attached hereto as Exhibit 6);    Department of the Treasury, Internal Revenue Service, Health Insurance Premium Tax Credit, Fed. Reg. 76 (August 17, 2011) (comment of Christopher Whitcomb, Aug. 22, 2012) (a copy of which is attached hereto as Exhibit 7); Letter from Rep. David Phil Roe, U.S. House of Representatives, to Douglas Shulman, Comm'r of Internal Revenue (Nov. 4, 2011), available at http://roe.house.gov/UploadedFiles/Letter_to_IRS_Commissioner_regarding_tax_credits_under _PPACA_-_11.03.11.pdf(last visited Feb. 17, 2014) (a copy of which is attached hereto as Exhibit 8); Letter from Sen. Orrin G. Hatch, U.S. Senate, to Timothy Geithner, Sec'y, Dep't of the Treasury and Douglas Shulman, Comm'r of Internal Revenue (Dec. 1, 2011), available at http://www.finance.senate.gov/newsroom/ranking/release/?id=6c2ea7e8-2a57-451c-8e02-f066e8ff92f7(last visited Feb. 17, 2014) (a copy of which is attached hereto as Exhibit 9); Adler and Cannon, *Taxation Without Representation: The Illegal IRS Rule to Expand Tax Credits Under the PPACA*, Health Matrix: Journal of Law-Medicine, Volume 23, Issue 1, Spring 2013 (exhaustively researching and describing the questionable legality of the Challenged Regulations) (a copy of which is attached hereto as Exhibit 10).

17. Despite the objections, the IRS proceeded with the Challenged Regulations as proposed, and finalized them late in the day on Friday, May 18, 2012. Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377 (May 23, 2012) (a copy of which is attached hereto as Exhibit 11); 26 C.F.R. § 1.36B-1 *et seq*. and 45 C.F.R. § 155.20.

18. In its description of the Challenged Regulations, the IRS noted that commenters "disagreed" about whether the ACA's text "limits the availability of the premium tax credit only to taxpayers who enroll in qualified health plans on State Exchanges," 77 Fed. Reg. 30,377, 30,378,

but provided only the following, brief explanation as to why it was promulgating the Regulations as proposed:

> The statutory language of section 36B and other provisions of the Affordable Care Act support the interpretation that credits are available to taxpayers who obtain coverage through a State Exchange, regional Exchange, subsidiary Exchange, and the Federally-facilitated Exchange. Moreover, the relevant legislative history does not demonstrate that Congress intended to limit the premium tax credit to State Exchanges. Accordingly, the final regulations maintain the rule in the proposed regulations because it is consistent with the language, purpose, and structure of section 36B and the Affordable Care Act as a whole.

*Id.* The IRS did not cite any of the referenced "statutory language," "relevant legislative history," or "language, purpose, and structure of section 36B." Rather, the above-quoted explanation is the sum total of the justification given in the administrative record for the Challenged Regulations' expansion of the availability of credits and subsidies.

## V. The Challenged Regulations injure Oklahoma because the allowance of the Premium Assistance Credit in Oklahoma subjects the State to large penalties and burdensome reporting requirements.

19. 26 U.S.C. § 4980H was added to the Internal Revenue Code by Section 1501 of the ACA. Section 4980H is effective for months beginning on or after January 1, 2014, giving it an effective date coordinated with 26 U.S.C. § 36B.[3]

20. Section 4980H is applicable to an "Applicable Large Employer," defined to mean an employer that employed on average fifty or more full-time equivalent employees on business days during the prior year. ACA § 1501(c)(2)(a), 26 U.S.C. § 4980H(c)(2)(a).

21. Section 4980H is known as the "Employer Mandate" because it imposes on an Applicable Large Employer a penalty (called an "assessable payment") on employers if they fail to

---

[3] Defendants recently announced that despite Congress's clear mandate that it take effect on January 1, 2014, implementation of Section 4980H would be delayed entirely until January 1, 2015, with portions delayed until January 1, 2016.

offer health insurance that satisfies new federal requirements to their full-time employees. The penalties, however, are triggered only when the employer has failed to offer the coverage *and* "at least one full-time employee of the applicable large employer has…enrolled for such month in a qualified health plan ***with respect to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee[.]*" ACA § 1501(a) and (b), 26 U.S.C. § 4980H(a) and (b) (emphasis added).

22. In the above-described circumstances, if an employer fails to offer "minimum value" coverage, the ACA fines the employer $2,000 for every full-time employee who is eligible for a tax credit through an Exchange (after exempting the first thirty employees). ACA § 1501(a), 26 U.S.C. § 4980H(a). If an employer offers coverage that is "minimum value" but not "affordable," the ACA fines the employer either $3,000 for each employee who receives or is eligible for a tax credit through an Exchange, or the penalty for not offering "minimum value" coverage, whichever is less. ACA § 1501(b), 26 U.S.C. § 4980H(b).

23. Because there is in Oklahoma no Exchange established by the State (or anyone else) under Section 1311, it is impossible for an Oklahoman to have enrolled in qualifying health coverage "through an Exchange established by the State under 1311 of the Patient Protection and Affordable Care Act," as that phrase is used in Section 36B.

24. Thus, if Section 36B is read as meaning what it says, *i.e.*, that credits and subsidies are only available when a Qualifying Individual has enrolled in qualifying health coverage "through an Exchange established by the State under Section 1311 of the Patient Protection and Affordable Care Act," then credits and subsidies are <u>not</u> available in Oklahoma.

25. This matters to the State because it is an "Applicable Large Employer" as that term is defined in 26 U.S.C. § 4980H(c)(2). *See* Doerflinger Aff. ¶ 21 (attached hereto as Exhibit 12). As

explained above, as an Applicable Large Employer, if one of the State's full-time employees enrolls in a qualified health plan through an Exchange "to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee," the State can be assessed penalties pursuant to Section 4980H(a) or (b). Thus, it is the availability of credits and subsidies in Oklahoma that triggers the State's potential liability under Section 4980H.

**VI.   As a result of the Challenged Regulations making credits and subsidies available in Oklahoma, the State will be forced to provide insurance to employees to whom it does not currently provide insurance, or be subject to enormous penalties.**

26. While the health insurance Oklahoma offers to its employees pursuant to state law meets the ACA's standards for "minimum value" and "affordability," state law (and federal law prior to the ACA) does not require that the State offer that insurance to every "full-time employee," as that term is defined in the ACA. *See* Doerflinger Aff. ¶¶ 14-18. Thus, as a direct result of the Challenged Regulations, there are classes of State employees to whom the State must now offer insurance, or face enormous penalties under Section 4980H. *Id*.

27. Specifically, under state law, Oklahoma must offer health insurance only to those employees "whose employment is not seasonal or temporary and whose employment requires at least one thousand (1,000) hours of work per year..." *Id*. ¶ 17.[4] So under Oklahoma law, seasonal and temporary state employees must not be offered health insurance, regardless of how many hours they work, while employees working less than 1,000 hours per year ("999" employees) are not eligible, even if they routinely work more than thirty hours per week (e.g., thirty hours per week for thirty-three straight weeks). *Id.* Additionally, pursuant to Title 74, Section 2241(B), of the Oklahoma

---

[4] Under Oklahoma law, "temporary employment" is employment "that is limited in term, where the employee is expected to remain in the position for a certain period of time." Op. Okla. Att'y Gen. 2012 WL 1893253 (May 22, 2012).

Statutes, Tourism, Parks, and Recreation Department employees who work fewer than 1,600 hours/year are not eligible for "health, dental or life insurance." *See* Doerflinger Aff. ¶ 15.

28. Further, The State of Oklahoma currently employs no fewer than 243 Tourism, Parks, and Recreation Department employees who work less than 1,600 hours annually, and 2,465 "999" employees. *Id.* ¶¶ 37-38. The Human Capital Management division of the Oklahoma Office of Management and Enterprise Services ("OMES") is responsible for overseeing the State's benefits plan, and the Director of OMES, Preston Doerflinger, identifies in his affidavit several specific examples of such state employees who routinely work more than thirty hours per week and would be considered "full-time employees" for purposes of the ACA's requirement that the State make them an offer of coverage, but to whom the State is not obligated under state (or pre-ACA federal) law to make such an offer. *Id.* ¶¶ 47-49.

29. The State's monthly employer contribution for each employee to whom it provides health insurance is $295.84 bi-weekly, and $7,691.84 annually. *Id.* ¶¶ 39-40.

30. If the State fails to make these newly required offers of coverage, and incur the costs associated with doing so, the State will be subject to penalties of not less than $71,994,000 annually—an amount greater than the entire annual budgets of the State's Commerce, Agriculture, Conservation, and Labor departments *combined*. *Id.* ¶¶ 22 and 31. Because of the enormous potential penalties, the State cannot feasibly pass a budget that sets aside an amount to be used to pay those penalties. *Id.* ¶ 32. Rather, the State must change its employment laws and regulations as required by the ACA, make the required offers of coverage, and incur the costs of providing insurance to these Tourism, Parks, and Recreation Department and "999" employees in order to reduce the risk of being subject to such penalties. *Id.*

31. Additionally, in order to ensure compliance with the Employer Mandate, and to ensure that the State will not be subject to the enormous penalties described above, the State must incur the costs of shifting resources towards compliance efforts, including compliance educational programs, where state employees will learn, for example, about the enrollment-offering requirements of Section 4980H. *Id.* ¶¶ 34, 56-59. The State expects to continue to incur such costs in order to keep its personnel aware of final regulations and other official guidance related to assessments under Section 4980H, and expects to expend at least 1,000 person hours per year doing so. *Id.* By comparison, if the Challenged Regulations are overturned, expenditures for Compliance Educational Programs will not be necessary.

## VII. The State will be forced to take on the burden of compiling information for reports it must make to the federal government whenever the government requests it.

32. Additionally, 26 U.S.C. § 6056(a), which was added to the Internal Revenue Code by ACA § 1514, requires all Large Employers "required to meet the requirements of section 4980H with respect to its full-time employees," to compile and report to the federal government the following information: (1) the name, date, and employer identification number of the employer, (2) a certification as to whether the employer offers to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan, (3)  if the employer certifies that the employer did offer to its full-time employees (and their dependents) the opportunity to so enroll, (i) the length of any waiting period with respect to such coverage, (ii) the months during the calendar year for which coverage under the plan was available, (iii) the monthly premium for the lowest cost option in each of the enrollment categories under the plan, and (iv) the employer's share of the total allowed costs of benefits provided under the plan, (4) the number of full-time employees for each month during the calendar year, (5) the name, address,

and tax identification number of each full-time employee during the calendar year and the months (if any) during which such employee (and any dependents) were covered under any such health benefits plans, and (6) such other information as the Secretary may require. ACA § 1514(a), 26 U.S.C. § 6056(a).[5]

33. As explained above, Oklahoma is a Large Employer "required to meet the requirements of section 4980H" *only* because the Challenged Regulations have made the credits, advance payments, and subsidies available in Oklahoma. Thus, the Challenged Regulations triggered this reporting requirement.

34. In addition to the above-described report to the federal government, Section 6056(c) also requires the State to furnish to each of its full-time employees a written statement showing (1) the name, address, and phone number of the person required to make the report for the State and (2) the information required to be shown on the report with respect to the employee. ACA § 1514(c), 26 U.S.C. § 6056(c).

35. If the State fails to make the various reports required by Section 6056, the State will be subject to monetary penalties under 26 U.S.C. § 6724(d), which authorizes penalties for failure to file a correct information return, *see* 26 U.S.C. § 6721, and failure to furnish correct payee statements, *see* 26 U.S.C. § 6722. Under both statutes, the penalty imposed on the State will be $100 per return it fails to make, capped at $1.5 million. *Id.*

36. OMES will be responsible for compiling and making the reports required by Section 6056, and for retaining the relevant data after the reports are made. *Id.* Director of OMES, Preston Doerflinger, agrees with the federal government that these reporting requirements are burdensome,

---

[5] Defendants also announced that in addition to the delay of Section 4980H, implementation of these reporting requirements would be delayed until January 1, 2015.

Doerflinger Aff. ¶ 45, and estimates that these reporting requirements will cost the State at least $115,686 per year, and will divert state personnel from accomplishing other tasks and goals that are valuable to the State. *Id.*¶¶ 34 and 46. This amount will necessarily increase if the IRS requests more frequent reporting, which the statute allows it to do. 26 U.S.C. § 6056(a).

## SUMMARY OF THE ARGUMENT

**I.** The State has standing to challenge the legality of the Challenged Regulations because the Regulations authorize the payment of tax credits and subsidies in Oklahoma, which triggers application of the Employer Mandate to the State. The Employer Mandate in turn forces the State to (1) incur the expense of offering insurance to new classes of employees, (2) incur the expense of compliance measures to ensure that it is not subject to penalties for failing to offer insurance to all "full-time" employees, and (3) incur the expense of complying with burdensome new reporting requirements. And if the State declines to incur these new expenses and burdens, it will be assessed enormous monetary penalties by Defendants for its failure to do so. Either way, the State will have suffered injuries to its proprietary interests. In addition to those injuries to the State's proprietary interests, the Challenged Regulations have harmed the State by depriving it of a statutory right granted to it by Congress, specifically the right to determine whether certain burdens tied to the State's decision to establish an Exchange will be imposed on the State and its Large Employers.

**II.** The Challenged Regulations should be declared unlawful and their enforcement enjoined because they contradict the plain text of 26 U.S.C. § 36B, which unambiguously limits eligibility for Premium Assistance Credits to individuals who purchase insurance on an Exchange established by a State.[6] The phrase "Exchange established by a state under Section 1311" is wholly

---

[6] There is, in fact, virtually no disagreement on this point. The non-partisan Congressional Research Service, for example, concluded that Section 36B was unambiguous on the issue of eligibility for the Premium Assistance Credits. Cong. Res. Serv., *Legal Analysis of Availability of*

unambiguous—and there certainly is no valid method of statutory construction that would transform that phrase into "Exchange established by a state *or by the federal government*." But because Defendants' authority to promulgate the Challenged Regulations depends upon whether the statute contained ambiguity that must be resolved, Defendants manufacture ambiguity by claiming that scattered *other* provisions in the ACA create doubt about whether Congress actually meant what it said in Section 36B. But as explained more fully below, those other provisions do not contradict the plain language of Section 36B, and, in any event, the Court need not use other provisions of the ACA as a gloss on the meaning of Section 36B. When the statutory provision being interpreted contains no ambiguity, that as a matter of law "is the end of the matter." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Section 36B directly and unambiguously answers the question of whether the credits are available in States that elected to not establish an Exchange. Defendants thus lacked the authority to redefine those eligibility standards.

Even if Section 36B could be deemed ambiguous, Defendants' construction of the statute is not a "permissible" one. *Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). First, numerous bedrock canons of statutory construction foreclose Defendants' interpretation of the statute. Their interpretation (1) violates the canon against rendering statutory language superfluous, (2) disregards the canon that "differing language" in "two subsections" of a statute should not be treated by the courts as having "the same meaning in each,"

*Premium Tax Credits in State and Federally Created Exchanges Pursuant to the Affordable Care Act* (Jul. 23, 2012) ("a strictly textual analysis of the plain meaning of the provision would likely lead to the conclusion that the IRS's authority to issue the premium tax credits is limited only to situations in which the taxpayer is enrolled in a state-established exchange. Therefore, an IRS interpretation that extended tax credits to those enrolled in federally facilitated exchanges would be contrary to clear congressional intent, receive no *Chevron* deference, and likely be deemed invalid.")

*Russello v. United States*, 464 U.S. 16, 23 (1983), (3) ignores the canon that tax benefits cannot be implied, "they must be unambiguously proved," *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988), and "must rest … on more than a doubt or ambiguity," *United States v. Stewart*, 311 U.S. 60, 71 (1940), and (4) ignores the canon that federal incursions into regulation traditionally left to the States must be unambiguously stated.

Second, the statutory language that the Government claims creates the ambiguity (those scattered other provisions in the ACA) are not part of Internal Revenue Code at all, and while the IRS had the authority to promulgate rules to effectuate Section 36B ("The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of *this* section") (emphasis added), the authority to interpret those other provisions of the ACA lay with other agencies (primarily HHS). As such, the IRS's interpretation of those other provisions is entitled to no deference. *Tsosie v. Califano*, 651 F.2d 719, 722 (10th Cir. 1981) (holding that an agency's "construction [of a statute] is not entitled to special deference to the extent it rests on the interpretation of another agency's statutes and regulations").

Third, Defendants' interpretation of the statute is impermissible because it flatly contradicts Congress's very specific language and intent with the limitation it placed in Section 36B, which was to induce the States to cooperate with Congress's desire to have the States establish and operate Exchanges by conditioning the availability of credits and subsidies on the States establishing an Exchange. So, rather than further the congressional intent behind Section 36B, the Challenged Regulations undermine that intent, and all but guarantee that the States who have declined to establish an Exchange will *never* have a reason to change their minds.

Lastly, the Challenged Regulations are defective because they violate the Administrative Procedures Act's mandate that an agency (1) consider all important aspects of the issues raised by

the agency action, (2) offer an explanation for its decision that is consistent with the administrative record before it, and (3) make a plausible decision that is the product of agency expertise. *See Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999). Defendants received comments highlighting the clear existence of the limitation Congress placed on eligibility for the Premium Assistance Credits, but largely ignored those comments, offering only a three-sentence response containing nothing but vague allusions to the "language, purpose, and structure" of the ACA "as a whole," that showed *none* of the hallmarks of the reasoned analysis required by the Administrative Procedures Act. These cursory, vague responses both fail on their own terms and reveal a lack of serious agency consideration of the legal problems with impermissibly expanding eligibility for the credits.

**III.** Alternatively, if this Court accepts Defendants' claim that Congress intended that the Exchanges the federal government establishes pursuant to Section 1321 of the ACA are quite literally the "same Exchange" as the "Exchanges established by the State" described in Section 1311, this Court should declare Section 1321 unconstitutional commandeering for purporting to allow the Defendant Secretary of Health and Human Services to exercise authority as a State and for creating the kind of accountability-damaging confusion repeatedly emphasized in Supreme Court precedents. *See New York v. United States*, 505 U.S. 144, 167-69 (1992) (discussing political accountability in state-federal interactions).

## ARGUMENT AND AUTHORITIES

**I.    Oklahoma has standing to challenge the Challenged Regulations because the Regulations have injured the State.**

To establish standing to challenge the Challenged Regulations, the State must prove (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Tri-County Hospice, Inc. v. Sebelius*, 788 F.Supp.2d 1274, 1276 (E.D. Okla. 2010) (*citing New England Health Care Employees Pension v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008)). To date, Defendants have conceded that the traceability and redressability prongs are satisfied, and have only disputed whether the State has adequately established an injury in fact. This brief will thus focus on the injuries suffered by the State.[7]

On that front, *Tri-County Hospice, Inc. v. Sebelius* is a logical starting point for the analysis. There, this Court was called upon to decide whether a hospice provider was injured by a HHS regulation that calculated the Medicaid reimbursement rates that the hospice would receive in a way inconsistent with the underlying statute. 788 F.Supp.2d at 1275. Even though the hospice had not established that it would actually be underpaid as a result of the regulation, this Court noted that "[P]laintiffs are typically presumed to have constitutional standing when, as here, they are directly regulated by a rule," *id*. at 1277 (*quoting Am. Petroleum Inst. v. Johnson*, 541 F.Supp.2d 165, 176 (D.D.C. 2008)), and accordingly concluded that the hospice had been injured by "the fact that HHS is operating an invalid regulation, leading to accounting and payment inaccuracies," even in the absence of any "monetary injury." *Id*. (*quoting Los Angeles Haven Hospice, Inc. v. Leavitt*, 2009 WL 5868513 (C.D. Cal. 2009)).

---

[7] In any event, it is clear that the State's statutory right to be free from these expenses, decisions, and considerations stems from the plain language of the ACA, and that it is the IRS Rule that has deprived Oklahoma of that right. And the relief that the State seeks—a declaration that the IRS Rule is unlawful and an injunction preventing its enforcement—will foreclose the payment of tax credits to any of the State's employees, and will thus prevent the State from being injured by the necessity to comply with the requirements of Section 4980H and the imposition of penalties under the Employer Mandate.

Here, the State has shown that if it is correct on the merits, Defendants will be "operating an invalid regulation," leading to the unlawful payment of credits and subsidies and the unlawful threat of penalties on Large Employers like the State. Applying the reasoning in *Tri-County Hospice*, that alone is enough to establish injury in fact. But as explained more fully below, the State has also proven more than the *Tri-County Hospice* plaintiff, by also establishing that it has suffered, and will continue to suffer, significant monetary harm as a result of the Challenged Regulations.

## II. The Challenged Regulations force the State to either provide costly insurance to employees to whom it currently does not provide insurance or pay substantial penalties to the federal government.

Oklahoma is an Applicable Large Employer for purposes of the ACA's Employer Mandate. Unless they are invalid, the Challenged Regulations cause the State to be subject to the ACA's Employer Mandate, and under circumstances that are ruled out by the plain language of the Act. The Employer Mandate gives the State a choice between (a) offering every employee that the ACA defines as "full time" the opportunity to enroll in minimum essential coverage that meets the Act's minimum value standard; or (b) being exposed to penalties that can be triggered if even one of the State's full-time employees is determined by the federal Exchange to be eligible for a credit, advance payment, or subsidy. Either choice will harm the State's proprietary interest by requiring it to spend money it should not have to spend.

And while Defendants have repeatedly argued to this Court that there are no circumstances in which the State will be at risk of penalties as a result of the Employer Mandate, that is demonstrably untrue. As explained in paragraphs 26-28of the State's Statement of Facts, the State has classes of employees who are not eligible for benefits under state and pre-ACA federal law. Nevertheless, the State must offer health insurance to them or be subject to penalties as those employees would meet the ACA's definition of "full time employee." As paragraph 29  of the

State's Statement of Facts illustrate, this will result in the State having to spend approximately $7,691.84 per year, per such employee, in order to comply with the Employer Mandate, or face the hefty penalties authorized by Section 4980H.

In addition to that injury that will occur as soon as the Employer Mandate becomes effective, the Challenged Regulations have already done harm to the State's proprietary interests. As explained in paragraph 31 of the State's Statement of Facts, the Challenged Regulations have forced the State to incur the expense associated with figuring out how to implement the changes to its employment policies, how to establish and comply with the record-keeping practices imposed on it, how to respond to notices from the federal government that one or more of the State's employees has been deemed eligible for an advance payment, and other compliance-related concerns. The State expects these compliance efforts to consume not less than 1,000 person hours annually, at significant expense to the State, and even then, the State can of course be subject to the enormous Section 4980H(a) penalty through inadvertence. Indeed, the federal government has issued hundreds of pages worth of proposed rules that the State is wading through to try to best insulate itself from penalty through compliance with the regulations. *See* Prop. Treas. Reg. § 54.4980H, 78 Fed. Reg. 217 (Jan. 2, 2014), available at https://www.federalregister.gov/articles/2013/01/02/2012-31269/shared-responsibility-for-employers-regarding-health-coverage.[8] And as the State pointed out after Defendants announced a delay in the Employer Mandate's effective date (Dkt. #66), Defendants have effectively conceded that Large Employers have been burdened by the Employer Mandate and its associated requirements, which have so confounded Large Employers that implementation delay upon implementation delay has been necessary.

---

[8] As this Motion and Brief were being finalized, the Department of Treasury, through its component the Internal Revenue Service, issued what are labeled as "Final Regulations." 79 Fed. Reg. 8544, 8601.

**III.**   **The Challenged Regulations force the State to either incur the expense of complying with burdensome new reporting requirements or pay substantial penalties to the federal government**.

Additionally, as explained at paragraphs 32-36 of the State's Statement of Facts, because the Challenged Regulations render Oklahoma a Large Employer "required to meet the requirements of section 4980H with respect to its full-time employees," the State must compile and report to the federal government a laundry list of information, and must do so whenever the federal government requests that information. 26 U.S.C. § 6056(a)-(b). For the same reasons, the State must also furnish to each of its full-time employees a written statement showing (1) the name, address, and phone number of the person required to make the report to the federal government for the State and (2) the information required to be shown on the report with respect to the employee. 26 U.S.C. § 6056(c).

These reports and statements will not compile and mail themselves. Rather, the State must pay employees to undertake these new administrative burdens, at an estimated cost of at least $115,686 per year. And if the State fails to make the various reports required by 26 U.S.C. § 6056, the State will be subject to penalties under 26 U.S.C. § 6724(d). In either event, the Challenged Regulations will have yet again caused the State to spend money that it should not have to spend. This amounts to a quintessential economic injury that gives rise to standing. *See, e.g., Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 900 (1992) (where an abortion clinic and physicians had standing to challenge a statute imposing reporting requirements).

**A. The Challenged Regulations deprive the State of its statutory right to decide whether the Employer Mandate and accompanying reporting requirements will apply in Oklahoma.**

While Congress may not simply manufacture standing out of whole cloth by "confer[ring] jurisdiction on Art. III courts to render advisory opinions," it "may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973). Here, Congress conferred on the sovereign States—and no one else—the right to determine whether to establish an Exchange and whether to accept the corresponding benefits and burdens that accompany that choice.

The Challenged Regulations deprive Oklahoma of the statutory right to decide whether to have credits and subsidies available within its territorial boundaries, thereby avoiding the known burdens of the Employer Mandate. This is an injury to the State *as a* sovereign (as opposed to its capacity as a Large Employer), but it is not an injury to any sovereign interest derived from the Tenth Amendment. Rather, it is an injury that flows *solely* from the text of the ACA, in which Congress conveyed to the sovereign States the right to make these decisions.

Nor is this an attempt to assert *parens patriae* standing. Were that so, the State would be asserting claims based on injuries to its citizens. But here, it is impossible for anyone *but* the State to have suffered this injury because Congress granted *only* the sovereign States this statutory right that the Challenged Regulations deprive. So let there be no doubt, the State itself has been injured, and this injury is not one based on any Tenth Amendment notion of sovereignty. Rather, this injury is based on a statutory right that was granted to the State by Congress, and which Defendants took from the States when they enacted the Challenged Regulations.

As explained above, deprivation of rights granted by statute give rise to an injury for purposes of standing. In *Havens Realty Corp. v. Coleman*, for example, the Supreme Court found

such an interest in Section 804(d) of the Fair Housing Act, which prohibited rental companies from misrepresenting the availability of vacant units because of the inquirer's race, color, religion, sex, or national original. 455 U.S. 363, 372 (1982). That statute, the Court held, "establishes an enforceable right to truthful information concerning the availability of housing"; accordingly, an apartment rental company's violation of Section 804(d) injured the inquiring party, giving him standing to sue, even though he was a "tester" who "approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home[.]" *Id.* at 373-74. The tester was injured not because the rental company's actions caused him financial harm—they did not—but because the company violated a statutory right that Congress had established for him. *Id.* at 374.

Another "common example of such a statute," the United States Court of Appeals for the D.C. Circuit ("D.C. Circuit") has explained, "is the Freedom of Information Act [("FOIA")], 5 U.S.C. § 552." *Zivotovsky ex rel. Ariz. v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006). In FOIA cases, as in the present case, the plaintiff need not show that the Government's negation of his right to information results in present financial harm. "Anyone whose request for specific information has been denied has standing to bring an action; the requester's circumstances—why he wants the information, what he plans to do with it, what harm he suffered from the failure to disclose—are irrelevant to his standing . . . The requester is injured-in-fact for standing purposes because he did not get what the statute entitled him to receive." *Id.* at 617-18 (citing, *inter alia*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) ("Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records.")).

In *Zivotovsky*, the D.C. Circuit applied the FOIA analogy to hold that a plaintiff had standing to challenge the State Department's refusal to grant him a passport listing "Israel" as his place of birth, in violation of statute entitling him to such a passport. 444 F.3d at 619. The Court rejected precisely the same kind of arguments that Defendants make in this case—namely, that plaintiff would not have standing to challenge the Government's action until he suffered other harms as a result of the Government's refusal to issue the passport, harms that were "purely conjectural" and insufficiently "imminent." *Id.* at 617. The Court rejected the Government's argument, stressing that "[a]lthough it is natural to think of an injury in terms of some economic, physical, or psychological damage," an injury also "can consist of the violation of an individual right conferred on a person by statute." *See id.* at 619.

Prior to the promulgation of the Challenged Regulations, federal law (i.e., the ACA) gave the State the right to decide whether to establish an Exchange and accept the burdens that came with such a choice (i.e., subjecting the State's large employers to the Employer Mandate). By eliminating that right, the Challenged Regulations "invade" the State's "legally protected interest," giving it an injury sufficient for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury is caused by the Challenged Regulations, and the relief requested by the State would redress that injury. *Id.* at 560-61.

IV.    **The Challenged Regulations are *ultra vires* and violate the Administrative Procedures Act because they contradict the unambiguous language of the statute.**

"A court may regard a government officer's conduct as so 'illegal' as to permit a suit for specific relief against the officer…if (1) the conduct is not within the officer's statutory powers or, (2) those powers, or their exercise in the particular case, are unconstitutional." *Wyoming v. United*

*States*, 279 F.3d 1214, 1225 (10th Cir. 2002) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 702 (1949)).

Determining whether the Challenged Regulations exceed Defendants' statutory power requires an application of the "familiar standards of review" established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). In *Chevron*, the Supreme Court outlined the test for reviewing an agency's formal interpretation of a statute it administers. At step one, a reviewing court must determine "whether Congress has directly spoken to the precise question at issue." *Id*. at 842. If Congress has clearly addressed the issue, the court "must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. Importantly, reviewing courts "owe the agency no deference on the existence of ambiguity," and thus determine de novo whether the statute is ambiguous. *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C.Cir. 2005); *accord Marshall v. Chater*, 75 F.3d 1421, 1428 (10th Cir. 1996). In so doing, the court may "emplo[y] traditional tools of statutory construction," *Chevron,* 467 U.S. at 843, "includ[ing] examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Harbert v. Healthcare Serv. Group, Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004).

Even when the Court finds ambiguity, that alone does not get the agency to step two of *Chevron*, because "ambiguity is not enough *per se* to warrant deference to the agency. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity." *Am. Bar Ass'n*, 430 F.3d. at 469. In other words, the inquiry into ambiguity is intended to identify whether Congress expressed an "implicit delegation of authority to the agency." *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998).

If the court determines that the statutory language in question is ambiguous, however, the court proceeds to step two. At step two, a reviewing court determines whether the agency's

interpretation is a "permissible construction" of the pertinent statutory language. *Chevron,* 467 U.S. at 843. An interpretation is "permissible" only if it is (1) reasonable, (2) consistently applied, and (3) does not frustrate the policy sought to be implemented. *Universal Const. Co., Inc. v. Occupational Safety & Health Review Comm'n*, 182 F.3d 726, 729 (10th Cir. 1999)

### A. The Challenged Regulations flatly contradict the plain text of the Affordable Care Act.

In general, the starting point for courts in interpreting a statute is the language of the statute itself. The Supreme Court often recites the "plain meaning rule," that if the language of the statute is clear and unambiguous, it must be applied according to its terms:

> [I]n interpreting a statute a court should always turn first to one cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there .... When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (citations omitted); *United States v. Husted*, 545 F.3d 1240, 1247 (10th Cir. 2008) ("It is a longstanding principle that absent ambiguity we cannot rely on legislative history to interpret a statute.").

As explained in paragraphs 8-14 of Plaintiff's Statement of Material facts, Section 36B authorizes Premium Assistance Credits for each month in a given year in which a taxpayer has obtained qualifying health insurance through an Exchange established by a State pursuant to Section 1311 of the ACA. Confirming this limitation, Section 36B also unambiguously states that the amount of the tax credit is calculated with reference to either a qualifying health insurance plan "enrolled in through an Exchange established by the State under [Section] 1311 of the Patient Protection and Affordable Care Act" or the "second lowest cost silver plan . . . offered through the same Exchange." ACA § 1401, 26 U.S.C. §§ 36B(b)(2)(A), 36B(b)(3)(B). *Every* reference to an

Exchange in the tax-credit eligibility provisions of Section 36B is to an Exchange "established by the State under Section 1311"; Exchanges established by the federal government under Section 1321 are never mentioned.

Because the section of law that Defendants purport to effectuate with the Challenged Regulations is unambiguous on the relevant point (the eligibility for credits), that should be "the end of the matter." *Chevron,*, 467 U.S. at 842-43 (Where "Congress has directly spoken to the precise question at issue…the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Defendants were thus without the authority to promulgate any regulation that redefined eligibility for the credits. Nevertheless, it appears that Defendants simply rewrote Section 36B through rulemaking to fit their idea of what the statute *should* say. But in its January 27, 2014 opinion in *Burrage v. United States*, ___ U.S. ___, 134 S.Ct. 881 (2014), the Supreme Court reiterated its long-standing position that considerations of "good public policy" are irrelevent to a federal court's role in construing a clearly written statute.

> But in the last analysis, these always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written—even if we think some other approach might "'accor[d] with good policy.'" *Commissioner v. Lundy*, 516 U. S. 235, 252 (1996) (quoting *Badaracco v. Commissioner*, 464 U. S. 386, 398 (1984)).

*Id*. 134 S.Ct. at 892.

And at least one court of appeals—the United States Court of Appeals for the Eleventh Circuit—flatly rejected analogous agency-level redrafting of federal law. In *Brungart v. BellSouth Telecommunications, Inc*., the Eleventh Circuit reviewed the validity of a Department of Labor regulation implementing the Family Medical Leave Act ("FMLA"). 231 F.3d 791 (11th Cir. 2000). The FMLA unambiguously stated that an employee must have worked at least 1,250 hours in the

previous twelve months to be eligible for leave. The Department of Labor regulation, however,

stated that if an employer failed to notify an employee that they were ineligible for FMLA leave,

the employee was automatically deemed eligible, regardless of how many hours they had worked.

The Eleventh Circuit held:

> There is no ambiguity in the statute concerning eligibility for family medical leave,
> no gap to be filled. Instead, the Department of Labor in this regulation has attempted
> to pry apart the clear words of the act in order to create a gap into which it can wedge
> its policy preference. We understand the Department's motive, which is to further the
> goals of the act by forcing employers to respond to leave requests within a
> reasonable period of time. But when an administrative agency seeks to improve
> legislation by altering the basic coverage provisions that Congress has written into
> the law, it has gone too far. The rule of law in general, and separation of powers
> principles in particular, require that such administrative hubris be reigned in, and that
> the task of improving the basic provisions of statutes be left to the same body that
> wrote them in the first place.

*Id*. at 796-97.

While it could have been argued that the regulation furthered the general leave-granting

purposes of the FMLA, by expanding the class of employees eligible to take leave, the Eleventh

Circuit had little trouble invalidating the regulation. Quoting another court of appeals, the Eleventh

Circuit explained that

> [t]he statutory text is perfectly clear and covers the issue. The right of family leave
> is conferred only on employees who have worked at least 1,250 hours in the previous
> 12 months.' To put it in *Chevron* terms, 'Congress has directly spoken to the precise
> question at issue,' which is eligibility for the medical leave rights created in the
> statute, and because 'the intent of Congress is clear, that is the end of the matter; for
> the court, as well as the agency, must give effect to the unambiguously expressed
> intent of Congress.

*Id*. at 796 (quoting *Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 582 (7th Cir. 2000) (quoting

*Chevron ,*467 U.S. at 842-43)).

Here, because Section 36B unambiguously describes the eligibility conditions for the tax

credits and the formula for the amount, Defendants lacked the authority to redefine that eligibility

and amount. Consequently, that should be "the end of the matter." The Court should declare the

Challenged Regulations invalid and require Defendants to enforce Section 36B according to its

terms. *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of

a statute must, in the first instance, be sought in the language in which the act is framed, and if that

is plain, and if the law is within the constitutional authority of the law-making body which passed

it, the sole function of the courts is to enforce it according to its terms.").

### B. Established principles of statutory construction foreclose Defendants' construction of 26 U.S.C. § 36B.

Even if Defendants could get to step two of *Chevron*, the Challenged Regulations are not "a

permissible construction of the statute" because they violate multiple canons of statutory

construction. "It is well established that the canon of constitutional avoidance does constrain an

agency's discretion to interpret statutory ambiguities, even when *Chevron* deference would

otherwise be due." *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1249 (10th Cir. 2008). Indeed,

in *Ramah Navajo Chapter v. Lujan*, the United States Court of Appeals for the Tenth Circuit applied

the same principle to a different canon, concluding that "for purposes of th[at] case, … the canon

of construction favoring Native Americans controls over the more general rule of deference to

agency interpretations of ambiguous statutes." 112 F.3d 1455, 1462 (10th Cir. 1997). Finally, in

*Massachusetts v. U.S. Department of Transportation*, the D.C. Circuit noted that "time-honored

canons of construction may ... constrain the possible number of reasonable ways to read an

ambiguity in a statute." 93 F.3d 890, 893 (D.C. Cir. 1996). *See also* Cass Sunstein, *Nondelegation

Canons*, 67 U. CHI. L. REV. 315, 316 (2000) (explaining that canons of construction "forbid

administrative agencies from making decisions on their own" by depriving them of their "ordinary

discretion" to construe an "ambiguous statutory provision").

First, the surplusage canon recognizes that Congress is presumed to have added words for a purpose. *See Hill v. Kemp*, 478 F.3d 1236, 1247 (10th Cir. 2007) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). The Challenged Regulations, which allow taxpayers to qualify for the credit by purchasing insurance on *any* Exchange, turn the statutory phrase "established by a State under [Section] 1311 of the [ACA]" into mere surplusage. In other words, the Challenged Regulations take the pen to Section 36B and render everything after the word "Exchange" meaningless: "that was enrolled in through an Exchange ~~established by the State under section 1311 of the Patient Protection and Affordable Care Act~~." This, despite the "cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Market Co. v. Hoffman*, 101 U.S. 112 (1879).

Second, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Elwell v. Oklahoma ex rel. Bd. of Regents of University of Okla.*, 693 F.3d 1303, 1309-10 (10th Cir. 2012) (quoting *Russello*, 464 U.S. at 23. Here, the Challenged Regulations treat the phrase "an Exchange established *by the State*," as the equivalent of different and broader phrases found elsewhere in the ACA. For example, Section 1312 refers to "an Exchange established *under this Act*," while Section 1421 refers generically to "an exchange." ACA § 1312(d)(3)(D)(i)(II) (emphasis added), 42 U.S.C. § 18032(d)(3)(D)(i)(II); ACA § 1421, 25 U.S.C. § 45R (emphasis added). Both of these references encompass both Exchanges created by states under Section 1311 and Exchanges created by the federal government under Section 1321. The fact that Congress referred elsewhere in the ACA to these broader categories of Exchanges proves that Congress understood the differences between them, and when Congress

wanted to refer to *all* Exchanges (including federally established ones), it "knew how to do so." *Custis v. United States*, 511 U.S. 485, 492 (1994).

Third, the Challenged Regulations violate the canon requiring that tax credits "be expressed in clear and unambiguous terms." *Yazoo & Miss. Valley R.R. Co. v. Thomas*, 132 U.S. 174, 183 (1889). Such tax benefits "are not to be implied; they must be unambiguously proved," *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988); and "must rest ... on more than a doubt or ambiguity," *United States v. Stewart*, 311 U.S. 60, 71 (1940). As the D.C. Circuit has stated, a statute must "unquestionably and conclusively" establish entitlement to such a credit. *Stichting Pensioenfonds Voor De Gezondheid v. United States*, 129 F.3d 195, 198 (D.C. Cir. 1997); *see also Trotter v. Tennessee*, 290 U.S. 354, 356 (1933) (If "doubts are nicely balanced," the requested tax exemption is defeated). Here, Defendants' entire case is premised on their claim that Section 36B is ambiguous as to whether those who enroll for insurance through an Exchange established by the federal government are eligible for tax credits. But even were it true that such ambiguity was present, this canon would mandate that the ambiguity be resolved contrary to the Challenged Regulations.

Lastly, the Challenged Regulations violate the canon that "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). The States and the federal government long operated under the presumption—legislatively established by Congress in the McCarran-Ferguson Act of 1945, 15 U.S.C. § 1011—that health insurance regulation is a matter of state control. As the Supreme Court observed in the middle of the twentieth century, "[t]he control of all types of insurance companies and contracts has been primarily a state

33

function since the States came into being." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 316 (1958). The Challenged Regulations radically disrupt this longstanding state function by overriding the majority of the States' policy determinations as to what health insurance its large employers must offer. As a result, the IRS lacked the authority to promulgate the Challenged Regulations based on mere ambiguity in Section 36B. Rather, only an "unmistakably clear" statement by Congress in Section 36B could confer that authority.

## C. The IRS lacked the authority to interpret the provisions of the ACA that it relies on to support the Challenged Regulations.

The Challenged Regulations are likewise an impermissible construction of Section 36B because Defendants justify them based on their interpretation of provisions in the ACA that Defendants either lack or share the authority to interpret. *Tsosie v. Califano*, 651 F.2d 719, 722 (10th Cir. 1981) (holding that agency's "construction [of a statute] is not entitled to special deference to the extent it rests on the interpretation of another agency's statutes and regulations"); *Dep't of Treasury v. Fed. Labor Relations Auth.*, 837 F.2d 1163, 1167 (D.C. Cir. 1988) ("[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference."); *Cheney R.R. Co. v. R.R. Ret. Bd.*, 50 F.3d 1071, 1073-74 (D.C. Cir. 1995) (no deference where issue "turn[ed] on the interpretation" of laws that were "not the Board's governing statutes").

For example, one argument made by Defendants is that ACA Section 1321(c)'s reference to "such Exchange" creates ambiguity as to whether federal Exchanges established pursuant to Section 1321 can be deemed, through some "legal fiction," as having been established by states. But critically, Sections 1311 and 1321 (the sections that establish the state and federal Exchanges, respectively) were codified in Chapter 157 of Title 42 of the United States Code—the domain of

HHS, not the IRS. Section 1321 is, in fact, explicitly addressed to the "Secretary" (of HHS) and not to the "Commissioner" (of the IRS). The IRS apparently recognizes that it has no authority or competence to construe the "Exchange" or the "such Exchange" language, as evidenced by the fact that the Challenged Regulations simply adopt and defer to HHS's definition of "Exchange." 26 C.F.R. § 1.36B-1(k).

In sum, the key provisions under Defendants' theory of the case are Sections 1311 and 1321 of the ACA, but the IRS clearly does not administer those provisions. As a result, its interpretation of the phrase "such Exchange" and other language contained in those sections is entitled to no deference, and without that deference, its strained interpretation can serve as no basis for the Challenged Regulations' counter-textual interpretation of Section 36B.

### D. The Challenged Regulations ignore—and even undermine—Congress's intent behind 26 U.S.C. § 36B.

If the Court is inclined to seek confirmation of the text in the legislative history, the Challenged Regulations are an impermissible construction of Section 36B for yet a third reason: they frustrate congressional intent by removing a key incentive for States opting to establish exchanges pursuant to Section 1311. *See Universal Const. Co., Inc. v. Occupational Safety & Health Review Comm'n*, 182 F.3d 726, 729 (10th Cir. 1999) (noting that an agency interpretation of a statute is impermissible if it "frustrate[s] the policy sought to be implemented by Congress").

Directly commanding state governments to assist in the implementation of a federal regulatory scheme would be unconstitutional commandeering. *See Printz,* 521 U.S. at 935 ("[T]he Federal Government may not compel the states to implement, by legislation or executive action, federal regulatory programs."). As a result, if Congress believes state cooperation is necessary to

facilitate the implementation of a federal program, it has to incentivize the States to act, rather than command them to do so.

As explained in the Statement of Facts, the ACA offers the States several incentives to establish an Exchange. The most important of those is the authorization for Premium Assistance Credits to the residents of States who purchase health insurance through a State-established Exchange, while withholding those credits from residents of States who purchase health insurance through a federally-established exchange. These credits and subsidies amount to a congressional promise to pour billions of federal dollars into the States. As the leading scholars on this issue have explained:

> The language in Sections 1401 and 1402 restricting credits and subsidies to state-created Exchanges is more than just consistent with the rest of the Act. It is integral to Section 1311's directive that states "shall" create an Exchange. As it likely creates a larger financial incentive than the Medicaid "maintenance of effort" requirement, it is the primary sanction imposed on states that do not establish Exchanges. It thus animates Section 1311's "shall." To ignore it as the IRS has would sap that directive of most of its force.

Adler and Cannon, *Taxation Without Representation: The Illegal IRS Rule to Expand Tax Credits Under the PPACA* at 153 (Exhibit 10).

Because of the choice made by the majority of the States in the first year of the ACA, Defendants have seemingly concluded that the incentive created by the limitation can be abandoned. But if congressional intent is to be considered, surely it is congressional intent at the time the provision was adopted that matters. But it was clearly Congress's intent to have that incentive in place, and the Constitution necessitated that incentive. With the federal government's extremely visible failure in establishing federal Exchanges, the need to incentivize the States to establish their own Exchanges is heightened, not lessened.

Defendants argue that the overarching policy goal of the ACA is to provide health coverage to as many people as possible. Even if true, Defendants cannot further that goal at the expense of the specific goal Congress had in mind with the statutory provision in question. And in any event, Defendants' "miss-the-trees-for-the-forest" approach will actually have the effect of all but guaranteeing that none of the thirty-four States who initially declined to establish an Exchange will have any reason to change their minds.

### E. Defendants' cursory and inadequate response in the administrative record to comments questioning their authority to promulgate the Challenged Regulations proves that they violated the Administrative Procedures Act by failing to give reasoned consideration to those comments.

For many of the same reasons, the Challenged Regulations violate the Administrative Procedures Act because they were not "based on a consideration of the relevant factors" and constituted a "clear error of judgment." *Colo. Envtl. Coalition*, 185 F.3d at 1167 (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). In promulgating the Challenged Regulations, Defendants (1) failed to consider all important aspects of the issues raised by the agency action, (2) offered an explanation for its decision that was inconsistent with the administrative record before it, and (3) failed to make a plausible decision that is the product of its agency expertise. *Id.* (noting that an "agency decision [is] arbitrary and capricious if the agency…failed to consider an important aspect of the problem…offered an explanation for its decision that runs counter to the evidence…or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.") (internal quotations and citations omitted).

Indeed, when Defendants received comments highlighting the Challenged Regulations' inexplicable departure from the text of Section 36B, Defendants largely ignored those comments.

Instead, Defendants merely offered a most cursory explanation for rejecting comments that identified the illegality of expanding credits through the proposed rule:

> The statutory language of section 36B and other provisions of the Affordable Care Act support the interpretation that credits are available to taxpayers who obtain coverage through a State Exchange, regional Exchange, subsidiary Exchange, and the Federally-facilitated Exchange. Moreover, the relevant legislative history does not demonstrate that Congress intended to limit the premium tax credit to State Exchanges. Accordingly, the final regulations maintain the rule in the proposed regulations because it is consistent with the language, purpose, and structure of section 36B and the Affordable Care Act as a whole.

77 Fed. Reg. 30,377, 30,378. Vague allusions to the "purpose" and "other provisions" of the ACA do not provide a reasoned basis for interpreting Section 36B in a way that contradicts the clear text of the statute.

Second, the Challenged Regulations state that "[t]he statutory language of section 36B and other provisions of the [ACA] support the interpretation that credits are available to taxpayers who obtain coverage through a . . . Federally-facilitated exchange." *See id.* Not only is this flatly untrue, Defendants gave no indication that they had considered *any* of the canons of statutory construction discussed *infra*, which should have been the starting point of any statutory analysis. Defendants (1) offered no justification for rendering portions of Section 36B superfluous, (2) failed to explain why they ignored the fact that Congress had clearly shown elsewhere in the ACA that it knew how to refer to state- and federally-established Exchanges collectively, and (3) justified the expansion of the credits based on their conclusion that there was no evidence that "Congress intended to limit the premium tax credit," when the canon against reducing tax liabilities without explicit authorization compelled the opposite result. Defendants *completely* failed to consider these highly relevant factors.

Third, Defendants gave no consideration to the near trillion dollar impact of their change to the statutory language, as evidenced by their certification that the Challenged Regulations were "not

a significant regulatory action." *Id.* at 30,385 ("It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563. Therefore, a regulatory assessment is not required"); *but see* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) (defining a "significant regulatory action" as a regulation expected to have an annual effect on the economy of $100 million or more); 5 U.S.C. § 804 (2) (defining major rule as a regulation or any rule with an anticipated annual cost or economic effect of $100 million or more).

Fourth, while Defendants claimed that the "purpose" of the ACA as a whole supported the Challenged Regulations, Defendants utterly failed to consider the purpose Congress had in mind when it limited the availability of credits and subsidies, which was to induce the States to cooperate with implementation of the ACA. Failure to consider that specific purpose of Section 36B led to a "clear error of judgment" that undermined congressional intent and will perpetuate state resistance to implementation of the ACA.

**F. The decision in *Halbig v. Sebelius* was erroneous and should not be followed.**

On January 15, 2014, the district court in *Halbig v. Sebelius,* No. 13-0623 (D.D.C. Jan. 15, 2014)—a case involving claims similar to those brought by the State here—granted summary judgment in favor of the federal government. That decision is currently on appeal to the D.C. Circuit.[9] The district court's decision was in error and should not be followed.

As an initial matter, rather than finding that the Challenged Regulations were within the IRS's rulemaking discretion, the district court reached the remarkable conclusion that the statute unambiguously means something completely different from what it actually says and that the IRS

_____

[9] Briefing will be complete in that case on February 19, 2014. Argument has been scheduled for March 25, 2014.

actually lacked discretion to promulgate a rule that did anything *other than* make the credits available nationwide. *Halbig*, slip op. at 38 ("The Court therefore concludes that 'Congress has directly spoken to the precise question' of whether an 'Exchange' under 26 U.S.C. § 36B includes federally-facilitated Exchanges…[a]nd that must be "the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). That conclusion cannot withstand serious scrutiny and should not be followed here.

The district court agreed that, "[o]n its face, the plain language of 26 U.S.C. § 36B(b)-(c) . . . appears to support [Plaintiffs'] interpretation." But, nevertheless, the court asked: "Why would Congress have inserted the phrase 'established by the State under [Section 1311 of the ACA]' if it intended to refer to Exchanges created by a state or by HHS?" Sl. Op. at 26. The district court relied on perceived "anomalies" in the text to justify its departure from the plain language. But the only permissible basis for departing from plain text is if it creates an absurd result. *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) (Roberts, J.) (noting that "extraordinary power" to "ignore the plain language ... is limited to the situation in which adherence to the plain text leads to an 'absurd' result"). That is, mere "anomalies" are not enough. *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1041 (D.C. Cir. 2001) (per curiam) (noting that the absurdity doctrine cannot be invoked absent "an extraordinarily convincing justification.").

In reality, however, any perceived "anomalies" in the ACA that drove the district court's analysis arose not from textual conflicts between different sections of the statute, but from variances between the statute and the district court's perception of Congress's overall purpose in passing the ACA: "A state-run Exchange is not an end in and of itself, but rather a mechanism intended to facilitate the purchase of affordable health insurance." *Halbig*, slip op. at 34. Thus, the district court reasoned that "[i]t makes little sense to assume that Congress sacrificed nationwide availability of

the tax credit . . . in an attempt to promote state-run Exchanges." *Id.* at 34-35. According to the district court, "Congress believed that the Act would address the lack of access by many Americans to affordable health care and would lead to 'near-universal coverage.'" *Id.* at 33 (concluding that the "central purpose of the ACA" is "to provide affordable health care to virtually all Americans") (citations omitted); *id.* at 37 ("Congress assumed that tax credits would be available nationwide.") (citations omitted). Yet even assuming that the district court correctly identified Congress's goal with the eligibility provision (Section 36B), no canon of statutory interpretation authorizes a court to elevate legislative purpose over the plain meaning of the statutory text. Accordingly, even if the ACA's text is at cross-purposes with Congress's objective of universal coverage, as the district court and the IRS believe, that supposed conflict is irrelevant. "In such a contest, the text must prevail." *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 259 n.6 (2009).

Further, the district court's error turned largely on the court's conclusion that "Plaintiffs' theory is tenable only if one accepts that in enacting the ACA, Congress intended to compel states to run their own Exchanges—or at least to provide such compelling incentives that they would not decline to do so…[and] there is simply no evidence in the statute itself or in the legislative history of any intent by Congress to ensure that states established their own Exchanges." *Halbig*, slip op. at 34. This conclusion is plainly wrong. First, the mandatory language employed by Congress, "[e]ach State *shall*…establish an [Exchange]," indicates a congressional intent that the States establish Exchanges. 42 U.S.C. § 18031(b)(1). Second, Congress appropriated unlimited sums of money to HHS for grants to the States to aid them in establishing state Exchanges. 42 U.S.C. § 18031(a). On the other hand, Congress did not appropriate a single penny to HHS to aid it in establishing a fallback federal exchange. J. Lester Feder, *HHS May Have to Get 'Creative' on Exchange*, POLITICO, August 16, 2011, http://www.politico.com/news/stories/0811/61513.html

("A quirk in the Affordable Care Act is that while it gives HHS the authority to create a federal exchange for states that don't set up their own, it doesn't actually provide any funding to do so. By contrast, the law appropriates essentially unlimited sums for helping states create their own exchanges."). Nevertheless, HHS has been left to pilfer funds from appropriations intended for other purposes. Sarah Kliff, *The Incredible Shrinking Prevention Fund*, The Washington Post "Wonkblog", April 19, 2013 ("The Obama administration plans to use $454 million in Prevention [and Public Health] Fund dollars to help pay for the federal health insurance exchange.").

Moreover, the legislative record confirms that the statutory structure was no accident—Congress intended the States to establish Exchanges. As the Secretary of HHS herself recognized, "[i]t all starts with the assumption that the states take the lead." Kate Pickert, *Health Reform: Reluctant States Could Invite a Federal Takeover*, Time, Nov. 12, 2010. *See also* 156 Cong. Rec. S1835 (daily ed. Mar. 23, 2010) (statement of Sen. Conrad) ("This health care reform . . . creates State-based health exchanges for individuals and small businesses.").

In any event, the district court's conclusion—that Congress could not possibly have meant to limit eligibility for the credits in States that complied with the federal scheme—flatly ignores what Congress did in the ACA with regard to the Medicaid expansion. While the overall goal of the ACA's Medicaid expansion is to increase the availability of that form of government-sponsored healthcare coverage, Congress nonetheless threatened States with the loss of *all* Medicaid funding if they declined to expand Medicaid in their States. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2607 (2012). Congress therefore accepted the reality that if States declined to comply with Congress's wishes, Medicaid would actually become less available in those States, rather than more so.

Nor is this policy approach limited to the legislative branch of the federal government. Oklahoma was recently notified by the executive branch that the federal government would no longer provide a waiver for the State's Insure Oklahoma program (a state-tailored Medicaid program) unless the State expanded that program by relaxing eligibility standards. *See* Letter to Cindy Mann (June 25, 2013) available at: http://www.oag.ok.gov/oagweb.nsf/3e67f1cee13bc090862572b2005ad559/2d083c3524bac42d8 6257b950075eb57/$FILE/Insure%20Oklahoma-%20Signed%20letter.pdf. The rationale given by the executive branch for killing this program altogether was that it did not further the ACA's goal of expanding access to healthcare. *Id*. In other words, with the ACA, both Congress and the executive branch have shown a willingness to *reduce* availability of healthcare when States decline to implement portions of the ACA. Thus, even if the plain language of Section 36B seemingly runs counter to the ACA's overarching goal of expanding access to healthcare, that is hardly an "anomaly" in the context of the ACA, and the district court erred when it relied on this perceived inconsistency to ignore the plain language of the eligibility provision.

V.    **Section 1321(c) of the Affordable Care Act unconstitutionally commandeers state authority.**

In the alternative, this Court should grant summary judgment on Plaintiff's claim that any interpretation of Section 1321(c) that purports to allow the federal government to "step into the shoes" of a state to create an "Exchange established by the State" impermissibly commandeers state authority. To borrow from *Printz*, it would be as if, after a state refused to open its jails to federal prisoners, a United States Marshal opened up a jail, called it a "State Jail", and held it out as a jail "established by the state."

But claims made by Defendants in this and related litigation illustrate that they understand the ACA as authorizing something almost as audacious. In Defendants' Memorandum in Support of Their Cross-Motion for Summary Judgment and In Opposition to Plaintiffs' Summary Judgment Motion at page 30, *Halbig v. Sebelius*, No. 13-0623 (D.D.C. 2013), ECF No. 50, Defendants make the rather remarkable claim that:

> Congress's use of the phrase "such Exchange" *does not* mean that the federally-facilitated Exchange and the state-sponsored Exchange are "necessarily separate." The phrase means, instead, that the federally-facilitated Exchange is the *same entity* as the earlier-referenced Exchange, that is, the Exchange contemplated under 42 U.S.C. § 18031.

In other words, the federal government believes that when it establishes an Exchange pursuant to Section 1321(c), it is  actually establishing "the *same entity* as" the Exchange referred to in ACA Section 1311(b)—an Exchange that is, by law, established *by* the State *for* the State. ("Each State shall, not later than January 1, 2014, establish an...Exchange…for the State.").

But as repeatedly articulated by the Supreme Court, an important concern in American federalism has been the maintenance of boundaries between the federal and state governments. *See New York v. United States*, 505 U.S. 144, 167-69 (1992) (discussing political accountability and federalism); *Printz,* 521 U.S. at 919–21. The Supreme Court very recently placed an emphasis on accountability in the federal system when it struck down the ACA's coercive Medicaid expansion. *See Nat'l Fed'n of Indep. Bus.*, 132 S.Ct. at 2602–2603, 2660–61. Although these cases involved the federal government's inability to order or coerce states and their officials, the underlying principle of accountability would be undermined if Congress allowed federal programs to be operated as if by states. Allowing the federal government to purport to "step into the shoes" of a State and create an exchange that qualifies as an "Exchange established by the State" for purposes of provisions like Section 1401 clearly creates the confusion the Supreme Court has so often decried.

44

If Defendants' claim is true, the federal government would have necessarily established a state-created governmental agency or state-created non-profit entity to establish the exchange within the meaning of Section 1311. ACA § 1311(d)(1) (requiring the State to create the Exchange as a state agency or a tax exempt organization established by the State). Put another way, in order for the Exchange to which Defendants refer not be "establish[ed]" by HHS, it would be necessary that the federal government, acting as the State, adopt the Exchange standards promulgated by HHS under Section 1321(a) or to adopt a state law or regulation that HHS determines implements those standards within the State. ACA § 1321(b)(1)-(2).

But it goes without saying that the federal government cannot create a state agency, enact a state statute, or take any of the other actions Defendants seem to assume the federal government can to promote the fiction that an Exchange established by HHS under Section 1321(c) is "an exchange established by a State under section 1311" for purposes of Section 36B. To permit the federal government to do so would interfere with the State electorate's ability to distinguish the responsibility of state officials from federal officials for the success or failure of the Exchanges in violation of a principle of accountability to the electorate.

For these reasons, as an alternative to declaring the Challenged Regulations unlawful because they impermissibly interpret Section 36B, this Court should grant summary judgment on Plaintiffs' claim that Section 1321(c) of the ACA violates the federalism principles embodied in the United States Constitution and its Tenth Amendment. Declaring Section 1321(c) unconstitutional, this Court should then enjoin any government action authorized under Section 1321(c), including the operation of federally-facilitated exchanges.

## CONCLUSION

For these reasons, Plaintiff's Motion for Summary Judgment should be granted.

Respectfully submitted,

**s/ PATRICK R. WYRICK**
**Patrick R. Wyrick, OBA #21874**
**Solicitor General**
Oklahoma Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-0669 (facsimile)
Service email: fc.docket@oag.state.ok.us
                        patrick.wyrick@oag.ok.gov
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of February, 2014, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Joel McElvain
Susan S. Brandon

s/ PATRICK R. WYRICK