# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ex rel. Scott Pruitt, in his official capacity as Attorney General of Oklahoma, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-11-30-RAW |
| SYLVIA MATHEWS BURWELL[1], in her official capacity as Secretary of the United States Department of Health and Human Services; and JACOB J. LEW, in his official capacity as Secretary of the United States Department of the Treasury, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## **ORDER**

### I. Introduction

Before the court are the cross-motions of the parties for summary judgment. This lawsuit is a challenge to a federal regulation. The Patient Protection and Affordable Care Act ("ACA" or "the Act") regulates the individual health insurance market primarily through "Exchanges" set up along state lines. An Exchange is a means of organizing the insurance marketplace to help individuals shop for coverage and compare available plans based on price, benefits, and services.

Specifically, Section 1311(b)(1) of the ACA requires that "[e]ach State shall, not later than January 1, 2014, establish an American Health Benefit Exchange. . . for the State." *See*

---

[1] Pursuant to Rule 25(d) F.R.Cv.P., Sylvia Mathews Burwell is substituted in her official capacity for Kathleen Sebelius.

42 U.S.C. §18031(b)(1). This directive, however, runs afoul of the principle that Congress cannot compel sovereign states to implement federal regulatory programs. *See Printz v. United States,* 521 U.S. 898, 925 (1997). The Act also provides, therefore, that states may choose not to establish such Exchanges. Oklahoma has so chosen. Under section 1321 of the Act, each state may "elect[] . . . to apply the requirements" for the state exchanges, or if "a State is not an electing State . . . or the [Health and Human Services] Secretary determines" that the State will fail to set up an Exchange before the statutory deadline, "the Secretary shall (directly or through agreement with a not-for-profit entity) establish and operate *such Exchange* within the State." *See* 42 U.S.C. §18041(b) - (c). (emphasis added).

Additionally, Congress authorized federal subsidies (in the form of tax credits) paid directly by the Federal Treasury to the taxpayer's insurer as an offset against his or her premiums. *See* 26 U.S.C. §36B; 42 U.S.C. §18082(c). The Act provides that a tax credit "shall be allowed" in a particular "amount," 26 U.S.C. §36B(a), based on the number of "coverage months of the taxpayer occurring during the taxable year." 26 U.S.C. §36B(b)(1). A "coverage month" is a month during which "the taxpayer . . . is covered by a qualified heath plan . . . enrolled in through an Exchange *established by the State under section 1311* of the [ACA]." 26 U.S.C. §36B(c)(2)(A)(i) (emphasis added). The subsidy for any particular "coverage month" is based on premiums for coverage that was "enrolled in through an Exchange *established by the State under [section] 1311* of the ACA." 26 U.S.C. §36B(b)(2)(A) (emphasis added).

2

Further, the Act contains an "employer mandate." This provision may require an "assessable payment" by an "applicable large employer" if that employer fails to provide affordable health care coverage to its full-time employees and their dependents. *See* 26 U.S.C. §4980H(a) - (b). The availability of the subsidy also effectively triggers the assessable payments under the employer mandate, inasmuch as the payment is only triggered if at least one employee enrolls in a plan, offered through an Exchange, for which "an applicable premium tax credit . . . is allowed or paid." *Id.* Oklahoma contends it has standing in this case (among other reasons) because it constitutes an "applicable large employer" and the receipt of tax credits by any of its employees would trigger its liability for a penalty under that provision for failure to provide adequate coverage to those employees.

This contention arises because the Internal Revenue Service ("IRS") has promulgated a regulation (the "IRS Rule") that extends premium assistance tax credits to anyone "enrolled in one or more qualified health plans through an Exchange." 26 C.F.R. §1.36B-2(a)(1). It then adopts by cross-reference an HHS definition of "Exchange" to include any Exchange, "regardless of whether the exchange is established or operated by a State . . . or by HHS." 26 C.F.R. §1.36B-1(k); 45 C.F.R. §155.20. In other words, the IRS Rule requires the Treasury to grant subsidies for coverage purchases through *all* Exchanges – not only those established by states under §1311 of the Act, but also those established by HHS under §1321 of the Act. The IRS Rule is under challenge in this case, with plaintiff arguing that the regulation is contrary to the statutory language.

3

## II. Justiciability

As a threshold matter, the court must address defendants' assertion that plaintiff's challenge to the regulation is not justiciable.[2] It is the plaintiff's burden to establish the court's subject matter jurisdiction by a preponderance of the evidence. *Showalter v. Weinstein*, 233 Fed.Appx. 803, **4 (10th Cir. 2007). One branch of defendants' argument is that plaintiff lacks standing to sue.[3] "Article III standing is a prerequisite to every lawsuit in federal court." *Bishop v. Smith*, 760 F.3d 1070, 1088 (10th Cir. 2014). "To establish Article III standing, a plaintiff must show: (1) that it has suffered a concrete and particular injury in fact that is either actual or imminent; (2) the injury is fairly traceable to the alleged actions of the defendant; and (3) the injury will likely be redressed by a favorable decision." *Kerr v. Hickenlooper,* 744 F.3d 1156, 1163 (10th Cir.2014).[4] Defendants move for judgment on the grounds that (1) Oklahoma does not suffer an injury in fact from the regulation and (2) even if Oklahoma suffered an injury in fact, that injury would not be redressable here.

---

[2] Subject-matter jurisdiction is a condition precedent to reaching the merits of a legal dispute. *Haywood v. Drown,* 556 U.S. 729, 755 (2009).

[3] The court denied defendants' motion to dismiss on standing grounds, and defendants have renewed their assertion in the present motion. "Each element of standing must be supported with the manner and degree of evidence required at the pertinent, successive stages of the litigation." *Tandy v. City of Wichita,* 380 F.3d 1277, 1284 (10th Cir.2004). At the summary judgment stage, the plaintiff cannot rest solely on the complaint's allegations, but must show injury in fact through affidavits or other evidence that tends to establish specific facts. *See Carolina Cas. Ins. Co. v. Pinnacol Assurance,* 425 F.3d 921, 927 (10th Cir.2005). In this regard, plaintiff places principal reliance upon an affidavit by Preston L. Doerflinger, both Secretary of Finance and Revenue of the State of Oklahoma and Director of the Oklahoma Office of Management and Enterprise Services. (#87-12).

[4] *See also Susan B. Anthony List v. Driehaus,* 134 S.Ct. 2334, 2341 (2014).

The Act's "assessable payments" under the employer mandate are only triggered if at least one full-time employee obtains a subsidy by purchasing insurance on an Exchange. 26 U.S.C. §4980H(a)(2). Oklahoma has not established its own Exchange, and therefore state employees would not be eligible for subsidies if not for the IRS Rule. Accordingly, the State of Oklahoma would, if not for the IRS Rule, face no risk of incurring penalties under the employer mandate.

As a result of the IRS Rule, however, the State of Oklahoma's employees now *are* eligible for the subsidies. Plaintiff contends that, as an employer,[5] it could face penalties if just one employee receives a federal subsidy. *See* 26 U.S.C. §4980H(a), (c)(1). Plaintiff also contends that the Act imposes compliance costs. "At the summary judgment stage, the injury-in-fact element requires that the plaintiff set forth by affidavit or other evidence specific facts which for purposes of the summary judgment will be taken to be true." *Clajon Prod. Corp. v. Petera,* 70 F.3d 1566, 1572 (10th Cir.1995).[6]

---

[5]The court previously ruled that Oklahoma did not have "State *qua* State" standing. (#71). Plaintiff continues to press its theory that the IRS Rule harms the State of Oklahoma "by depriving it of a statutory right granted it by Congress, specifically the right to determine whether certain burdens tied to the State's decision to establish an Exchange will be imposed on the State and its Large Employers." (#87 at 16). This court does not see sufficient support in the case law for such a theory, but a higher court may differ.

[6] Such jurisdictional facts are not "taken to be true" at the final judgment stage. "'[W]hen a case has proceeded to final judgment after a trial . . . those facts (if controverted) must be adequately supported by the evidence adduced at trial to avoid dismissal on standing grounds.'" *Utah Ass'n of Counties v. Bush,* 455 F.3d 1094, 1100 (10th Cir.2006)(quoting *United States v. Hays,* 515 U.S. 737, 743 (1995)). Although the court in its discretion could hold an evidentiary hearing on the issue of standing, the court finds it unnecessary as matters of witness credibility are not at issue. The court finds the case may be resolved at the summary judgment stage without a trial. Therefore, this court reviews plaintiff's adduced evidence for sufficiency under the preponderance of the evidence standard.

First, Oklahoma asserts that, as a result of the challenged regulations making credits and subsidies available in Oklahoma, the State will be forced to provide insurance to employees to whom it does not currently provide insurance, or be subject to enormous penalties. Defendants contend, and Oklahoma concedes, that Oklahoma already offers coverage to its state employees (and their dependents) pursuant to state law that meets the ACA's standards for "minimum value" and "affordability," thus facing no Section 4980H liability for those employees. Oklahoma contends, however, that state law (and federal law prior to the ACA) does not require that the State offer that insurance to every "full-time employee," as that term is defined in the ACA. Thus, according to Oklahoma's argument, it still faces a penalty for its failure to offer coverage to some employees whom it treats as part-time, but who (it contends) would be treated as full-time under Section 4980H. *See* 26 U.S.C. §4980H(c)(4) (employee is full-time if he or she is employed on average at least 30 hours per week).

Oklahoma describes two categories of employees with respect to whom (it contends) it faces potential liability for the Section 4980H large employer penalty. First, it asserts it may be penalized for a failure to offer coverage to variable-hour Tourism, Parks and Recreation Department (TPR) employees who work fewer than 1600 hours over a twelve-month period. Second, Oklahoma alleges that it may face a penalty for a failure to offer coverage to "999 employees," that is, employees for whom it does not know, at the time that

6

they are hired, whether they will work for more than 1,000 hours over the first year of their service.

Defendants respond that Oklahoma is mistaken, principally because the regulations permit an employer to use a "look back" method of up to twelve months after the date of hire for newly-hired, variable hour employees, to determine whether those employees have averaged more than 30 hours a week over that period; only after that period (as well as an additional, optional 90-day administrative period) expires could those employees be treated as full-time for purposes of Section 4980H. Defendants cite 26 C.F.R. §54.4980H-3(d)(1) & (d)(3) for this point. Oklahoma responds (in indisputable fashion): "Complexities permeate the final Section 4980H regulations describing the look-back method." (#94 at 12). Oklahoma then provides a lengthy defense of its calculations.

The court would, of course, step into this quagmire if it were necessary to resolve the standing question. The intricacies are such that it would likely require an evidentiary hearing during which the court could ask questions of the witnesses and counsel. In the court's view, such an inquiry is not necessary in this case, because standing has been established on another basis. For one thing, the look-back method is not self-executing. That is, compliance with the Act in general requires employee training and diversion of resources from other areas for implementation. *See* #87 at 14, ¶31; #87-12 at ¶¶34, 56-59.[7]

---

[7]Specifically regarding plaintiff's ¶31, defendants state: "This paragraph is disputed for the same reason that paragraph 30 is disputed." (#91-1 at 14). The basis on which paragraph 30 is disputed, however, is that Oklahoma is incorrect about facing liability under §4980H, not the assertions regarding compliance costs.

7

The Fourth Circuit held that Liberty University had standing to contest the employer mandate because "[e]ven if the coverage Liberty currently provides ultimately proves sufficient, it may well incur additional costs because of the administrative burden of assuring compliance with the employer mandate[.]" *Liberty Univ., Inc. v. Lew,* 733 F.3d 72, 89-90 (4th Cir.2013).[8] Compliance costs constitute an injury for purposes of standing. *See Virginia v. Am. Booksellers Ass'n. Inc.,* 484 U.S. 383, 392 (1988)(recognizing standing by business forced by threat of liability "to take significant and costly compliance measures."); *Ass'n of Private Sector Colleges v. Duncan,* 681 F.3d 427, 458 (D.C. Cir.2012)(finding standing based on compliance costs).[9]

In addition to challenging plaintiff's Article III standing, defendants contend plaintiff has not demonstrated prudential standing either.[10] Defendants argue that plaintiff cannot challenge the IRS Rule's expansion of subsidies because of "the well-established position

---

[8]"Liberty need not show that it will be subject to an assessable payment to establish standing if it otherwise [proves] facts that establish standing." *Id.* at 89.

[9]The defendants argue that one particular compliance cost cited by the plaintiff – namely, reporting under 26 U.S.C. §6056 – would apply to the State of Oklahoma even if it prevails in this action. This appears to be correct, and the court does not rely this provision to find standing.

[10]Generally, to meet prudential standing requirements, a plaintiff must (1) assert its own rights, not a third party's; (2) not bring a "generalized grievance" shared by a large class of citizens, and (3) protect an interest arguably within the zone of interests to be protected by the statute or constitutional guarantee. *See Sac & Fox Nation of Mo. v. Pierce,* 213 F.3d 566, 573 (10th Cir.2000). The court is satisfied these requirements are met in this case.
  To the extent plaintiff proceeds under the Administrative Procedure Act ("APA"), plaintiff must also satisfy those standing requirements, specifically (1) there has been some "final agency action" and (2) plaintiff's claims "fall within the zone of interests protected by the statute forming the basis of its claims" *Catron County Board of Commissioners, New Mexico v. United States Fish & Wildlife Service,* 75 F.3d 1429, 1434 (10th Cir.1996). The court finds Oklahoma has standing under the APA.

that, ordinarily, one may not litigate the tax liability of another." *Women's Equity Action League v. Cavazos,* 879 F.2d 880, 885 n.3 (D.C.Cir.1989)(citing *Allen v. Wright,* 468 U.S. 737, 748-49 (1984)). Because invalidating the Rule would deprive third parties of tax credits, the government argues, the plaintiff cannot bring this suit.

The issue before this court is whether plaintiff has Article III standing and has invoked an appropriate cause of action. As stated by a district court facing similar litigation: "Plaintiffs' claim is not a tax liability suit." *King v. Sebelius,* 997 F.Supp.2d 415, 424 (E.D.Va.), *aff'd, King v. Burwell,* 759 F.3d 358 (4th Cir.2014). "[H]ere Plaintiffs are challenging the IRS Rule and not the IRS's ability to collect taxes." *Id. (*footnote omitted).[11] Plaintiff prevailing in such a lawsuit might have an *incidental* effect on the granting of tax credits, but such a circumstance does not deprive the plaintiff of standing in the plaintiff's own right. Such incidental effects are the product of a reticulated statutory framework such as the ACA.[12]

Finally, defendants contend plaintiff must seek relief in a tax refund suit. Recently, two circuit courts rejected this position. *See Halbig v. Burwell,* 758 F.3d 390, 398 (D.C. Cir. 2014) ("We must therefore conclude that a tax refund suit is inadequate as an alternative

---

[11] In a supporting passage, *id.*, the district court in *King* cited *Hobby Lobby Stores, Inc. v. Sebelius,* in which the Tenth Circuit made a similar distinction.. *See* 723 F.3d 1114, 1127 (10th Cir.2013).

[12] Defendants also contend that Oklahoma lacks an injury that could be redressed in this action because this court could not extinguish any absent employees' claim to a Section 36B tax credit. This court has found standing based on administrative burden and compliance costs. Such injury is redressable.

9

remedy[.]"); *King v. Burwell,* 759 F.3d 358, 366 (4th Cir. 2014) ("The defendants' arguments are not persuasive."). This court agrees and does not find lack of standing on this basis.

### III. The Merits

Finding this claim to be justiciable, the court turns to the merits. As just noted, the court has the benefit of two recent opinions by courts of appeals, which reach opposite conclusions. In *Halbig v. Burwell,* 758 F.3d 390 (D.C.Cir.2014), the majority struck down the IRS Rule. In *King v. Burwell,* 759 F.3d 358 (4th Cir.2014), the IRS Rule was upheld.[13] For the reasons described below, this court finds the *Halbig* decision more persuasive.[14] This court also independently relies on Tenth Circuit and Supreme Court authority.

"When faced with a challenge to the validity of a regulation, we apply the analytical framework provided by the United States Supreme Court in [*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)]." *Sundance Assocs., Inc., v. Reno,* 139 F.3d 804, 807 (10th Cir.1998).

*Chevron* entails two steps. If the court determines "at the first stage of the inquiry that 'Congress has directly spoken to the precise question at issue,' the court 'must give effect to the unambiguously expressed intent of Congress.'" *See Ron Peterson Firearms, LLC v.*

---

[13] Both opinions were issued on the same day. Neither addresses the other.

[14] The panel decision in *Halbig* has been vacated pending *en banc* rehearing. *See* 2014 WL 4627181. Such status does not preclude this court from considering the decision's rationale, logic and analysis. *See, e.g., Iwata v. Intel Corp.,* 349 F.Supp.2d 135, 148 (D.Mass.2004); *Bruneau v. South Kortright Cent. School,* 962 F.Supp. 301, 305 n.3 (N.D.N.Y.1997).

10

*Jones,* 760 F.3d 1147, 1155 (10th Cir.2014)(citation omitted).[15] If, however, "'the statute is silent or ambiguous with respect to the specific issue,'" the court "'will uphold the agency's interpretation if it is based on a permissible construction of the statute.'" *Id.*[16] "The first question, whether there is such an ambiguity, is for the court, and we owe the agency no deference on the existence of ambiguity." *Am. Bar Ass'n v. FTC,* 430 F.3d 457, 468 (D.C.Cir.2005).

In *Sundance Associates*, the Tenth Circuit reviewed regulations seeking to implement a federal statute requiring producers of sexually explicit matter to maintain certain records. The statute defined those persons who would qualify as producers. The regulation defined "producer" to apply to both primary and secondary producers. The Tenth Circuit found that the regulation clashed impermissibly with the statutory definition, which expressly excluded

---

[15]Courts may use statutory language and legislative history at the first step of the *Chevron* analysis. *Id.* at 1157 n.10. When, however, the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent. *Id.* Neither the *Halbig* majority nor the *King* court found the legislative history terribly helpful, in any event. *See Halbig,* 758 F.3d at 407 ("Here, the scant legislative history sheds little light on the precise question of the availability of subsidies on federal Exchanges."); *King,* 759 F.3d at 372 ("We are thus of the opinion that nothing in the legislative history of the Act provides compelling support for either side's position.").

[16]Moreover, legislative history may not be used to create ambiguity in the statutory language. *See St. Charles Inv. Co. v. C.I.R.,* 232 F.3d 773, 776 (10th Cir.2000). "Our role in construing statutes was summarized by Justice Holmes: 'We do not inquire what the legislature meant; we ask only what the statute means.'" *Id.* (citations omitted).

Judge Easterbrook has expressed the outer limits of this skepticism: "Legislative intent is a fiction, a back-formation from other and often undisclosed sources. Every legislat*or* has an intent, which usually cannot be discovered, since most say nothing before voting on most bills; and the legislat*ure* is a collective body that does not have a mind; it 'intends' only that the text be adopted, and statutory texts usually are compromises that match no one's first preference." Frank H. Easterbrook, foreword to *Reading Law: The Interpretation of Legal Texts,* by Antonin Scalia & Bryan A. Garner, xxii (1st ed.2012)(emphasis in original).

"mere distribution" and other activities such as might be engaged in by what the regulation called a "secondary producer."[17] The Tenth Circuit found the regulation invalid at stage one of *Chevron*. *See* 139 F.3d at 808. The court went on to note that, assuming *arguendo* that the statutory language was unclear, the regulation was an impermissible construction of the statute. *Id.* at 810.

The court found that the government's interpretation (that the evident exception in the statute was actually intended to broaden the statute's scope) "leads us down a path toward Alice's Wonderland, where up is down and down is up, and words mean anything." *Id.* at 808.[18] In words pertinent to the present case, the Tenth Circuit stated "neither the court nor the Attorney General has the authority to rewrite a poor piece of legislation (if, indeed, that is what it is). That responsibility lies solely with Congress." *Id.* at 810

Similarly, the majority in *Halbig* resolved the issue at the first stage of *Chevron*, finding that inasmuch as "the ACA unambiguously restricts the section 36B subsidy to insurance purchased on Exchanges 'established by the State,' we reverse the district court and vacate the IRS's regulation." *Halbig,* 758 F.3d at 394. *See also id.* at 412 ("Accordingly, applying the statute's plain meaning, we find that section 36B unambiguously

---

[17]In the case at bar, a statutory definition also exists. In section 1304(d) of the Act, "State" is defined to mean "each of the 50 States and the District of Columbia." 42 U.S.C. §18024(d).

[18]Cf. *King,* 759 F.3d at 377 (Davis, J., concurring) ("'[E]stablished by the State' indeed means established by the state – except when it does not[.]").

forecloses the interpretation embodied in the IRS Rule and instead limits the availability of premium tax credits to state-established Exchanges.").

The majority in *Halbig* acknowledged that sections 1311 and 1321 do establish "some degree of equivalence between state and federal exchanges[.]" *Id.* at 402. This equivalence is such, the court went on, that "if section 36B had authorized credits for insurance purchased on an 'Exchange established under 1311,' the IRS Rule would stand." *Id.* That is not, however, the language chosen by Congress. Instead, credits are authorized only for coverage purchased on an "Exchange established by the State under section 1311." Faced with that statutory language, "the government offers no textual basis – in sections 1311 and 1321 or elsewhere – for concluding that a federally-established Exchange is, in fact or legal fiction, established by a state." *Id.*

In contrast, the court in *King* adopted the "legal fiction" interpretation. It resolved the case at step two of *Chevron*, finding the statutory language ambiguous, giving deference to the IRS's determination, and upholding the IRS Rule as a permissible exercise of the agency's discretion. *King,* 759 F.3d at 363.

The court in *King* acknowledged that "[t]here can be no question that there is a certain sense to the plaintiffs' position." *Id.* at 368. Ultimately, however, "the court is of the opinion that the defendants have the stronger position, although only slightly." *Id.* at 369. On one hand, "the court cannot ignore the common-sense appeal of the plaintiffs' argument; a literal reading of the statute undoubtedly accords more closely with their position." *Id.*

13

On the other hand, "it makes sense to read §1321(c)'s directive that HHS establish "such Exchange" to mean that the federal government acts on behalf of the state when it establishes its own Exchange." *Id.* Thus, the court concluded the statute was ambiguous and moved to stage two of the *Chevron* analysis. The court then upheld the regulation, being "primarily persuaded by the IRS Rule's advancement of the broad policy goals of the Act." *Id.* at 373.

This court concludes that what even the *King* court called the "common-sense appeal" of the plaintiff's position should prevail. Dissenting in *Halbig*, Judge Edwards describes his reading of the Act, wherein "'established by the State' is [a] term of art that includes any Exchange within a State." *Halbig,* 758 F.3d at 417 (Edwards, J., dissenting). If this view is correct, it is an unusual term of art, in that one word is statutorily defined in a way that precludes the alternative reading. Under 42 U.S.C. §18024(d), "State" cannot mean the federal government. This definition is dispositive when combined with the interpretive hurdle presented by the phrase "established by."

In other words, the "legal fiction" reading does not appear to comport with normal English usage, as Professor Richard Epstein describes:

> These long and learned opinions should not obscure the fact that at the root of the case is a simple question: Do the words an "exchange established by a State" cover an exchange that is established by the federal government "on behalf of a state"? To the unpracticed eye, the two propositions are not synonyms, but opposites. When I do something on behalf of myself, it is quite a different thing from someone else doing it on my behalf. The first case involves self-control. The second involves a change of actors. It is not, moreover, that the federal government establishes the exchange on behalf of a state that

14

> has *authorized* the action, under which case normal principles of agency law would apply. Quite the opposite: the federal government decides to act because the state has refused to put the program into place. It is hard to see, as a textual matter, why the two situations should be regarded as identical when the political forces at work in them are so different.
>
> http://ricochet.com/understanding-obamacare-subsidy-rulings/
> (July 22, 2014)(emphasis in original)

Professor Nicholas Bagley takes the opposing view, asserting that "the best way to understand the phrase [i.e., 'established by the State'] is that it was a shorthand for exchange, whoever happened to establish it." http://theincidentaleconomist.com/wordpress/what-did-congress-mean-by-established-by-the-state/(July 25, 2014). He points to various perceived anomalies which would result from the "literal" reading. Neither court of appeals adopted the "anomalies" argument. The court in *King* said it was "unpersuaded" on this point. 759 F.3d 358, 371 (4th Cir.2014). The majority in *Halbig (*viewing the argument under the absurdity doctrine)[19] found that the purported anomalies did not cross the "'high threshold' of unreasonableness before we conclude that a statute does not mean what it says." 758 F.3d at 402. Thus, "[n]othing about the imperative to read section 36B in harmony with the rest of the ACA requires interpreting 'established by the State' to mean anything other than what it plainly says." *Id.* at 406. In any event, the Supreme Court "does not revise

---

[19]"The absurdity doctrine is an exception to the rule that the plain and ordinary meaning of a statute controls. . . . [W]here a plain language interpretation of a statute would lead to an absurd outcome which Congress clearly could not have intended, the court employs the absurdity exception to avoid the absurd result." *In re McGough,* 737 F.3d 1268, 1276 (10th Cir.2013).

15

legislation . . . just because the text as written creates an apparent anomaly as to some subject it does not address." *Michigan v. Bay Mills Indian Cmty.,* 134 S. Ct. 2024, 2033 (2014).

At the first step of the *Chevron* analysis, the court asks "whether Congress has directly spoken to the precise question at issue." *In re FCC 11-161,* 753 F.3d 1015, 1040 (10th Cir.2014)(citation omitted). On this particular "precise question," however, case law does not provide "wiggle room" for finding ambiguity. This is because tax credits must be expressed in "clear and unambiguous language." *Yazoo & Miss. Valley R.R. Co. v. Thomas,* 132 U.S. 174, 186 (1889).[20] *See also Shami v. C.I.R.,* 741 F.3d 560, 567 (5th Cir.2014)(Tax credits are a matter of legislative grace, are only allowed as clearly provided for by statute, and are narrowly construed).[21]

---

[20]Both the court in *King* and the dissent in *Halbig* brushed this contention aside by citing *Mayo Foundation for Medical Education and Research v. United States,* 131 S.Ct. 704 (2011) and its statement that "[t]he principles underlying [the] decision in *Chevron* apply with full force in the tax context." *Id.* at 713. The quoted statement in *Mayo Foundation*, however, appears in a discussion of stage two of *Chevron.* Rather, in this court's view, the *Yazoo* requirement of "clear and unambiguous language" goes to stage one and the preliminary issue of ambiguity. "When the statute is unambiguous, there has been no delegation to the agency to interpret the statute and therefore the agency's interpretation deserves no consideration at all, much less deference." *Terrell v. United States,* 564 F.3d 442, 450 (6th Cir.2009). "Under *Chevron*, the statute's plain meaning controls, whatever the Board might have to say." *Scialabba v. Cuellar de Osorio,* 134 S.Ct. 2191, 2203 (2014). Again, the only "clear and unambiguous language" on this "precise question" is that only those covered "through an Exchange established by the State under section 1311 of the [ACA]" may receive "premium assistance amounts." There is no "clear and unambiguous language" that one who purchases on a federal Exchange is so entitled, as required by the *Yazoo* decision.

[21]"We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regulatory Group v. EPA,* 134 S.Ct. 2424, 2444 (citation omitted). Tax credits of the scope involved here would appear to fit within this category.
 The court in *King* noted the importance of the tax credits, but reached the opposite conclusion, i.e., "given the importance of the tax credits to the overall statutory scheme, it is reasonable to assume that Congress created the ambiguity in this case with at least some degree of intentionality." 759 F.3d at 373 n.4. This court disagrees, for the reasons stated.

## IV. Conclusion

The court is aware that the stakes are higher in the case at bar than they might be in another case. The issue of consequences has been touched upon in the previous decisions discussed. Speaking of its decision to vacate the IRS Rule, the majority in *Halbig* stated "[w]e reach this conclusion, frankly, with reluctance." 758 F.3d at 412.

Other judges in similar litigation have cast the plaintiffs' argument in apocalyptic language. The first sentence of Judge Edwards' dissent in *Halbig* is as follows: "This case is about Appellants' not-so-veiled attempt to gut the Patient Protection and Affordable Care Act ('ACA')." 758 F.3d at 412-13. Concurring in *King,* Judge Davis states that "[a]ppellants' approach would effectively destroy the statute . . . ." 759 F.3d 358, 379 (Davis, J., concurring). Further, "[w]hat [appellants] may not do is rely on our help to deny to millions of Americans desperately-needed health insurance. . . .." *Id.*

Of course, a proper legal decision is not a matter of the court "helping" one side or the other. A lawsuit challenging a federal regulation is a commonplace occurrence in this country, not an affront to judicial dignity. A higher-profile case results in greater scrutiny of the decision, which is understandable and appropriate. "[H]igh as those stakes are, the principle of legislative supremacy that guides us is higher still. . . This limited role serves democratic interests by ensuring that policy is made by elected, politically accountable representatives, not by appointed life-tenured judges." *Halbig*, 758 F.3d at 412.

This is a case of statutory interpretation. "The text is what it is, no matter which side benefits." *Bormes v. United States,* 759 F.3d 793, 798 (7th Cir.2014). Such a case (even if affirmed on the inevitable appeal) does not "gut" or "destroy" anything. On the contrary, the court is <u>upholding</u> the Act as written. Congress is free to amend the ACA to provide for tax credits in both state and federal exchanges, if that is the legislative will.[22] As the Act presently stands, "vague notions of a statute's 'basic purpose' are nonetheless inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 261 (1993) (emphasis in original). It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Group v. EPA*, 134 S.Ct. 2427, 2446 (2014). "But in the last analysis, these always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written – even if we think some other approach might 'accor[d] with good policy.'" *Burrage v. United States,* 134 S.Ct. 881, 892 (2014)(quoting *Commissioner v. Lundy,* 516 U.S. 235, 252 (1996)(other citation omitted)). *See also Michigan v. Bay Mills Indian Community,* 134 S.Ct. 2024, 2034 (2014)("This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that . . . Congress 'must have intended' something broader."); *Util. Air Regulatory Group v. EPA,* 134 S.Ct. 2427, 2446 (2014)("The power of executing the laws necessarily includes both authority and responsibility to resolve

---

[22]"If Congress enacted into law something different from what it intended, then it should amend the statute to conform to its intent." *Lamie v. U.S. Trustee,* 540 U.S. 526, 542 (2004).

18

some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice.").[23]

The animating principles of this court's decision have been articulated by the Tenth Circuit: "[C]ourts, out of respect for their limited role in tripartite government, should not try to rewrite legislative compromises to create a more coherent, more rational statute. A statute is not 'absurd' if it could reflect the sort of compromise that attends legislative endeavor." *Robbins v. Chronister,* 435 F.3d 1238, 1243 (10th Cir.2006).[24] "An agency's rule-making power is not 'the power to make law,' it is only the 'power to adopt regulations to

---

[23] In his dissent in *Halbig*, Judge Edwards states "§36B(b) interpreted as Appellants urge would function as a poison pill to the insurance markets in the States that did not elect to create their own Exchanges. This surely is not what Congress intended." 758 F.3d at 415-16 (Edwards, J., dissenting). This comes close to simply postulating a congressional intent that the statute "work," which effectively negates *Chevron* analysis. "The question . . . is not what Congress 'would have wanted' but what Congress enacted[.]" *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618 (1992).

[24] The court permitted plaintiff to supplement the record with statements made by Professor Jonathan Gruber, who was involved in the ACA's drafting. (#115). It is evidently undisputed that in January, 2012, Prof. Gruber made the statement "if you're a state and you don't set up an Exchange, that means your citizens don't get their tax credits." What is disputed is whether Prof. Gruber's statement was "off the cuff." The statement evidently has now been disavowed on his part. In any event, the court does not consider this statement as reflecting "legislative intent" (a concept in which the court has little faith anyway) because Prof. Gruber is not a member of Congress and his statement was made after the Act had passed. The court takes the statement for the limited relevance of words of <u>interpretation</u>, not intent. That is to say, the statement cuts against any argument that the plaintiff's interpretation is absurd on its face, or that plaintiff's argument that the statutory language might support a reading of "incentivizing" states to set up exchanges is "nonsense, made up out of whole cloth." *Halbig,* 758 F.3d at 414 (Edwards, J., dissenting).
  Also in his *Halbig* dissent, Judge Edwards states "Appellants have not explained why Congress would want to encourage States to operate Exchanges rather than the federal government doing so, nor is there any indication that Congress had this goal." *Id*. at 426 (Edwards, J., dissenting). This court finds such an indication in Section 1311 of the Act itself, which purports to <u>direct</u> States to establish Exchanges. Professor James Blumstein argues that, after drafting this provision, the drafters recognized the "anti-commandeering principle" and added Section 1321 as what he calls an "'oops' provision." http://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/03/19/professor-james-blumstein-on-halbig-v-sebelius/(March 19, 2014). This likewise is not an absurd interpretation.

carry into effect the will of Congress as expressed by the statute.'" *Sundance Associates*, 139 F3d at 808 (citation omitted) "In reviewing statutes, courts do not assume the language is imprecise ... Rather, we assume that in drafting legislation, Congress says what it means." Id at 809.

The court holds that the IRS Rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, pursuant to 5 U.S.C. §706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, pursuant to 5 U.S.C. §706(2)(C), or otherwise is an invalid implementation of the ACA, and is hereby vacated. The court's order of vacatur is stayed, however, pending resolution of any appeal from this order.

It is the order of the court that the motion of the defendants for summary judgment (#91) is hereby denied. The motion of the plaintiff for summary judgment (#87) is hereby granted.

**ORDERED THIS 30th DAY OF SEPTEMBER, 2014.**

_____
**HONORABLE RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**
**EASTERN DISTRICT OF OKLAHOMA**